# EXHIBIT 27

```
 1   STATE OF ILLINOIS    )
                          )  SS:
 2   COUNTY OF C O O K    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT - CRIMINAL DIVISION
 4

 5   THE PEOPLE OF THE STATE  )
     OF ILLINOIS,             )
 6                            )
                 Plaintiff,   )
 7                            )
       vs.                    ) No. 18 CR 09222
 8                            )
     TABATHA WASHINGTON and   )
 9   DANTE HOWARD,            )
                              )
10                Defendants. )

11            REPORT OF PROCEEDINGS had in the
     above-entitled cause before the HONORABLE DIANA L.
12   KENWORTHY, Judge of said court, on the 19th day of
     November, 2019.

13            PRESENT:

14
     HONORABLE KIMBERLY M. FOXX,
15        State's Attorney of Cook County, by:
     MS. EMILY LEUIN, ASA, and
16   MS. JENNIFER MCCARTY, ASA,
          Assistant State's Attorneys,
17        appeared on behalf of the People;

18   MRS. AMY P. CAMPANELLI,
          Public Defender of Cook County, by:
19   MS. BRETT BALMER, APD, and
     MS. MIRANDA NILES, APD,
20        Assistant Public Defenders,
          appeared on behalf of Defendant Washington; and
21   MS. SHELLEY BLAIR, APD, and
     MS. ELIZABETH KUCABA, APD,
22        Assistant Public Defenders,
          appeared on behalf of Defendant Howard.

23
     ADRIENNE ANDERSON, CSR
24   Official Court Reporter
     CSR No. 084-004320
```

EXHIBIT

8

BS001137

1

1                    KIRSTIN HOWELL,

2     appearing as a witness, having been first duly sworn,

3     was examined and testified as follows:

4                    DIRECT EXAMINATION

5                    By Ms. Leuin:

6     Q.   Dr. Howell, you said your name is Kirstin

7     Howell; correct?

8     A.   Yes.

9     Q.   And, Doctor, where are you currently employed?

10    A.   I work for the Cook County Medical Examiner's

11    Office.

12    Q.   What is your position with the Cook County

13    Medical Examiner's Office?

14    A.   I am an assistant medical examiner.

15    Q.   How long have you done that for Cook County?

16    A.   I have worked at Cook County for almost

17    two-and-a-half years.  I have been an assistant medical

18    examiner for almost one-and-a-half years.

19    Q.   So let me go back to your education and then

20    we'll get to where you are now.

21         In terms of your education to become a medical

22    examiner, what is your educational history?

23    A.   I got a Bachelor of Science from Tufts

24    University outside of Boston, Massachusetts in 2001.

BS001194

1 I received my medical degree from Temple University in

2 Philadelphia, Pennsylvania in 2008.  I did several years

3 of a surgery residency here in Chicago at the Mount

4 Sinai Hospital, and then did a pathology residency at

5 Northwestern University here in Chicago, and then did a

6 fellowship at the Cook County Medical Examiner's Office,

7 graduating in 2018.

8  **Q.** And so in terms of the fellowship, what were

9 you involved with there?

10  **A.** As a fellow, I did all of the things that I do

11 as a medical examiner.  I examine bodies.  I perform

12 autopsies.  I work with the investigators to find out

13 the circumstances surrounding the death.  I work with

14 our photographers and radiographers to find out what is

15 going on with all of my patients.

16  **Q.** And you said you are currently an assistant

17 medical examiner with Cook County; is that correct?

18  **A.** Correct.

19  **Q.** Now, as part of your job with the Cook County

20 Medical Examiner's Office, have you had occasion to

21 perform postmortem examinations?

22  **A.** Yes.

23  **Q.** And what is the purpose of performing a

24 postmortem examination?

BS001195

1      **A.**    The postmortem examination is done to examine

2      the body.  We do an external examination and an internal

3      examination to look for evidence of medical

4      intervention, illness, and injury.

5      **Q.**    Now, as part of your employment within your

6      training with the Cook County Medical Examiner's Office,

7      approximately how many postmortem examinations have you

8      been involved in?

9      **A.**    Over 550 forensic autopsies.

10     **Q.**    Now, in doing that, have you been qualified as

11     an expert before in the field of forensic pathology?

12     **A.**    Yes.

13     **Q.**    How many times have you been called to testify?

14     **A.**    I have been qualified nine times.

15     **Q.**    Were those all the times you were --

16     **A.**    Yes.

17     **Q.**    -- called to testify?

18            Okay.  And you are currently licensed to

19     practice in Illinois?

20     **A.**    Yes.

21     **Q.**    Do you also engage in any kind of continuous

22     training as part of your job with the Cook County

23     Medical Examiner's Office?

24     **A.**    Yes, continuous medical education and patient

1    safety education as part of my certification with the

2    Board of Pathologists.

3        **Q.**    And are you current with that?

4        **A.**    Yes.

5        **Q.**    And are you part of any organizations?

6        **A.**    I belong to the National Association of Medical

7    Examiners, the American Association of Forensic

8    Scientists, and the College of American Pathologists,

9    and American Society of Clinical Pathologists.

10    MS. LEUIN:  Your Honor, at this time, subject to any

11    cross-examination, I would ask that she be qualified as

12    an expert in the field of forensic pathology.

13    THE COURT:  Any objection on behalf of

14    Ms. Washington?

15    MS. BALMER:  No, Judge.

16    THE COURT:  Any objection on behalf of Mr. Howard?

17    MS. BLAIR:  No objection.

18    THE COURT:  All right.

19    BY MS. LEUIN:

20        **Q.**    Doctor, as part of your employment with the

21    Cook County Medical Examiner's Office, did you have an

22    opportunity to examine -- I'm sorry.

23        Did you -- yes.  Did you have an opportunity to

24    examine a patient by the name of Kim Edmondson back on

1    May 30th -- May 31st, 2018?

2    **A.**   Yes.

3    **Q.**   Now, is there anything here today that would

4    assist you in your testimony?

5    **A.**   A copy of the protocol.

6    **Q.**   Do you have one or no?

7    **A.**   I probably do.

8    **Q.**   I can provide you with it.

9    **A.**   I appreciate it.

10    MS. LEUIN:  Your Honor, may I approach?

11    THE COURT:  Yes.

12    BY MS. LEUIN:

13    **Q.**   I have what I've referred to as People's

14    Exhibit No. 3.  If you can take a look at that and tell

15    me if you recognize what that is.

16    **A.**   Yes.  This is a certified copy of the protocol

17    performed on Kim Edmondson.

18    **Q.**   Would that assist you in your testimony today?

19    **A.**   Yes.

20    **Q.**   Doctor --

21    THE COURT:  And the defense has no objection to her

22    referring to her report while on the stand on behalf of

23    Ms. Washington?

24    MS. BALMER:  No, Judge.

BS001198

1      THE COURT:  Mr. Howard?

2      MS. BLAIR:  No objection.

3      THE COURT:  Thank you.

4  BY MS. LEUIN:

5      Q.   Doctor, in terms of this particular case, did

6  this case get a particular assignment number?

7      A.   Yes.

8      Q.   What was that assignment number?

9      A.   It was Case No. ME2018-02535.

10     Q.   Is that a number that is specific to that

11 particular individual?

12     A.   Yes.  This is the unique identifier that was

13 assigned by the Medical Examiner's Office to this

14 particular case and individual.

15     Q.   Now, the person that you're referring to

16 assigned to that number is Mr. Kim Edmondson; is that

17 correct?

18     A.   Correct.

19     Q.   When was the date of your examination?

20     A.   The date of the examination was May 31, 2018.

21     Q.   Now, who was present for that examination or

22 who did you work along with?

23     A.   I worked with another assistant medical

24 examiner in the office, Dr. Benjamin Soriano.

1       Q.   And what was the purpose of that?

2       A.   I was still a fellow at the time of the

3    examination, so he was my supervisor.

4       Q.   Now, when you did the assignment with this

5    case, what if anything did you do in terms of a

6    postmortem examination?

7       A.   So we started with an external examination.  We

8    examined the body front to back, head to toe, looking

9    for evidence of disease, injury, or medical

10   intervention.  And then we did an internal examination,

11   so we did a Y-shaped incision, removed the organs,

12   examined those for evidence of disease, injury, illness,

13   or medical intervention, and the same with the head.

14      Q.   I want to go back to the external examination.

15           When you initially observed Mr. Edmondson, how

16   did he appear?

17      A.   He came clothed in pants and had an injury --

18   several injuries to his body.

19      Q.   Could you describe for the Court exactly what

20   you observed from your external examination with regard

21   to any recent injuries on his body.

22      A.   From the top of his head there was a

23   one-and-a-quarter by three-quarter inch X-shaped

24   laceration on the back of his head.  There was a

1    three-eighth inch laceration at the corner of his lip

2    on the left side, a one-half inch laceration or tear at

3    the left nasolabial fold, so by the nose and lip;

4    one-eighth inch laceration on the left side of the lower

5    lip; and then multiple contusions on his lower lip.

6          There were -- there was a three-quarter inch

7    laceration on the central chest with a one-quarter inch

8    skin flap along the interior margin.  And then there

9    were some contusions on his extremities.

10    **Q.**   And those are -- fair to say those are injuries

11    that you observed to be relatively fresh?

12    **A.**   Yes.

13    **Q.**   Now, let's start with the first one that you're

14    referring to on the back of his head.  Approximately

15    where is that injury located on the back of

16    Mr. Edmondson's head?

17    **A.**   It was on the right side of his head, near the

18    top of his head.

19    **Q.**   And when you say top, if you could point

20    exactly where you're referring to on your head for the

21    Court.

22    **A.**   So right about here.

23    MS. LEUIN:  And, Your Honor, I would -- I believe

24    the witness is pointing to -- higher than her ear,

BS001201

1      toward the back right side of her head.

2          THE COURT:  All right.

3      BY MS. LEUIN:

4          Q.    Doctor, and you said it was an X.  Can you

5      describe what you mean by that.

6          A.    It was like a cruciform or X shape kind of

7      lesion or cross shape on the back of his head.

8          Q.    Would you be able to tell the Court whether or

9      not any skin was missing at that point or did all the

10     skin appear to be intact, just cut?

11         A.    All -- all of the skin appeared to be intact,

12     just torn.

13         Q.    And the tearing would give that X shape then?

14         A.    Yes.

15         Q.    At that point could you tell whether or not

16     that injury had any blood on it?

17         A.    There was blood, but we rinse it off for our

18     exam.

19         Q.    Now, you mentioned a tearing near his nostril

20     area.  Could you describe that for the Court.

21         A.    I did not document how deep it was, but there

22     was like a one-quarter inch tear by the nostril.

23         Q.    You also mentioned something with his lip.

24     Could you describe that.

1      **A.**    Yes.   There were also tears near the corner of

2    his lip.

3      **Q.**    What about the chest injury, could you mention

4    that as well?

5      **A.**    Yes.   There was a three-quarter inch tear or a

6    laceration of the skin on his chest, and it was torn in

7    such a manner that there was like a little skin flap

8    with it.

9      **Q.**    Where, approximately, on his chest was this

10   located?

11     **A.**    In the central chest area.

12     **Q.**    Doctor, after making these initial

13   observations, what, if anything, was done?

14     **A.**    An internal examination was performed.

15     **Q.**    And if you can describe for the Court how you

16   do the internal examination.

17     **A.**    So with the internal examination, a Y-shaped

18   incision is made on the chest and abdomen.   The skin is

19   reflected.   The chest plate is removed.   And then the

20   organs are removed and examined.

21     **Q.**    Did you note anything with regard to

22   Mr. Edmondson's organs?

23     **A.**    There was no evidence of injury on the organs

24   of the torso or abdomen.

BS001203

1     **Q.**   With regard to the head, can we discuss now the

2     area that you referred to as the X incision.  Could you

3     describe what, if anything, your internal examination

4     revealed.

5     **A.**   So when we examine the head, we make an

6     intrachoroidal or intermastoid choroidal incision, which

7     is basically kind of like a headband kind of incision.

8     And then the skin is reflected down to the front and to

9     the back.

10          And when we did that, underneath where the

11     cross-shape laceration or tear on the skin, there was a

12     circular hole in the skull.

13     **Q.**   And you're referring to a circular hole in the

14     skull.  Are you referring to the actual bone, the skull

15     portion?

16     **A.**   Yes, the bone itself was punched out.

17     **Q.**   When you say punched out, were you able to

18     observe any pieces or a whole bone that would fit there?

19     **A.**   There were bony fragments within the hole.

20     **Q.**   So in describing this hole, is it fair to say

21     that some of the pieces went internal versus the whole

22     portion coming externally?

23     **A.**   Yes.

24     **Q.**   Now, the size of this hole, could you tell the

BS001204

1     Court what that was.

2     **A.**   It was measured to be one inch by

3     fifteen-sixteenths of an inch.

4     **Q.**   Could you tell how deep this hole area was?

5     **A.**   It appeared that the defect penetrated into the

6     head and brain for about three-quarters of an inch.

7     **Q.**   This -- if you could describe for the Court

8     what the layers are of this injury in terms of skin,

9     skull, what this -- what -- if something were to

10    penetrate this hole, what would it be going through?

11    **A.**   To go through the skin, and that's where the

12    skin was torn on the curved part of the head.  Then

13    there was circular defects, so it punched through the

14    layers of the skull and then into the brain, at least

15    the bony portions were protruding into the brain.

16    **Q.**   Now, Doctor, what type of force, if any, would

17    be required to be able to have an injury like this

18    occur?

19    **A.**   So with a simple fall onto a flat surface or

20    with a wide -- something hitting the head, you would

21    expect kind of a linear fracture because it distributes

22    the force around the head.

23    If it were a -- I would expect something that

24    created this kind of hole would be a round sort of

BS001205

1    instrument.  If it had hit with an angle, then you would

2    expect to see kind of a dent because that's the first

3    kind of injury that you would get.

4          But it's a nicely punched-out lesion.  And then

5    the inner part of the bone has kind of a funnel-shaped

6    defect, which is called internal beveling.  And that's

7    kind how when bone from the external, flat surface

8    pushes on the spongy inner bone and then pushes onto the

9    inner surface, and it like pushes in that way.

10   **Q.**   Now, Doctor, are you able to say what caused

11   this injury?

12   **A.**   I do not know what caused this injury.

13   MS. LEUIN:  Your Honor, may I approach?

14   THE COURT:  Of course.

15   MS. LEUIN:  If I could have one moment.

16   BY MS. LEUIN:

17   **Q.**   I'm showing you what I've previously marked as

18   People's Exhibit Nos. 2 and then 4 through 7.  If you

19   could take a look at those, please.

20         Do you recognize what these are?

21   **A.**   Yes.

22   **Q.**   What are these?

23   **A.**   These are photos taken at the time of autopsy.

24   **Q.**   And would this be regarding this particular

1    individual by the name of Kim Edmondson?

2        A.    Yes.  They are all identified with the unique

3    identifier that was assigned to the case upon acceptance

4    at the Medical Examiner's Office.

5        Q.    Specifically, People's Exhibit No. 2, could you

6    tell the Court what that is.

7        A.    This is an identification photo, so it is a

8    photo of the decedent's face with the identification

9    tag.

10       Q.    People's Exhibit No. 4, please.

11       A.    This is a photo of the lacerations on the left

12   side of the lip and at the commissure of the lip or the

13   corner of the lip.

14       Q.    People's Exhibit No. 5.

15       A.    This is a laceration on the central chest.

16       Q.    Now, these lacerations you referred to in

17   People's 3 -- sorry, 4 and 5, were these ones you

18   referred to earlier that were fresh in time?

19       A.    Yes.

20       Q.    Now, specifically, People's No. 6, could you

21   tell the Court what that one is.

22       A.    This is a photo of the defect in the skullcap.

23       Q.    And is this photo after removal?

24       A.    Yes.

BS001207

1    **Q.**   People's Exhibit No. 7?

2    **A.**   People's Exhibit No. 7 is a photo of the defect

3  in situ after the scalp -- or the scalp has been

4  reflected.

5    **Q.**   And with regard to the hole, as you see it here

6  in People's Exhibit No. 7, did you do anything in your

7  examination to alter the shape or -- well, the shape of

8  that hole?

9    **A.**   No.

10    **Q.**   Do these photos I just showed you truly and

11  accurately depict the injuries you described from the

12  examination you did?

13    **A.**   Yes.

14    **Q.**   Doctor, do you also, as part of your

15  examinations on individuals, sometimes do toxicology?

16    **A.**   Yes.

17    **Q.**   In this particular case, was a toxicology

18  screen done?

19    **A.**   Yes.

20    **Q.**   What, if anything, was observed in the

21  toxicology screen for Mr. Edmondson at the time of his

22  postmortem examination?

23    **A.**   In his toxicology we found ethanol or drinking

24  alcohol; cocaine; cocaethylene, which is a product that

BS001208

1    is combined or it's made in the body when you take

2    cocaine and drink alcohol at the same time;

3    benzoylecgonine, which is a breakdown product of

4    cocaine; and then phencyclidine, also known as PCP.

5         Q.   These particular things that you mentioned, are

6    you able to tell whether or not they were recently

7    ingested by Mr. Edmondson?

8         A.   The fact that he still has ethanol in his

9    blood; has cocaethylene, so the combination of the

10   cocaine and the ethanol; and then the phencyclidine, the

11   fact that they are all still in his system means that

12   they were present and functional at time of death.  With

13   the presence of the benzoylecgonine, that means that

14   there has been cocaine in his system that's been kind of

15   breaking down over some time period.

16        Q.   Doctor, based upon your examination in this

17   case, do you have an opinion based on your experience

18   and training as to the manner of death in this case?

19        A.   Manner of death in this case was decided as

20   homicide.

21        Q.   And the cause being?

22        A.   Blunt trauma of the head due to assault.

23        Q.   And you're basing your opinion today on?

24        A.   On the evidence seen at the time of autopsy

73

1    and that was obtained by our investigators at the

2    office.

3    **Q.**    Now, Doctor, I had a chance earlier to show you

4    what I will mark as People's Exhibit No. 8, which

5    essentially is a cannister that contained some items.

6    Do you recall looking at that?

7    **A.**    Yes.

8    **Q.**    Are you able today to say whether or not any of

9    those items could have caused the injury in this case?

10    **A.**    They could be consistent with the cause of

11    death.

12    **Q.**    Can you say with any certainty?

13    **A.**    No.

14    **Q.**    Additionally, you mentioned that he had what is

15    known as PCP in his system?

16    **A.**    Yes.

17    **Q.**    Could a person who is under the influence of

18    the substances you mentioned possibly walk for a period

19    of time with his injury?

20    **A.**    Yes.

21    **Q.**    Why is that?

22    **A.**    The area of injury is -- people vary in what

23    their brains -- and without specific brain mapping, I

24    don't know exactly what was affected, but this area of

1    the brain is more concerned with either speech or voice

2    recognition and maybe some visual recognition and/or

3    combining all of that together for awareness of the

4    outside world, but it doesn't involve vital parts of the

5    brain that are responsible for running the heart or

6    lungs.

7        Q.    Could someone who suffered from that head

8    injury -- and just so it's clear, are you saying today

9    that the head injury is the cause of death?

10       A.    Yes.

11       Q.    And that being the hole with the X on it?

12       A.    Yes.

13       Q.    Could someone with that injury be able to

14   speak?

15       A.    Yes.

16       Q.    And what about the type of bleeding involved in

17   that injury?

18       A.    Usually head wounds bleed significantly.

19       Q.    Would it be -- in this particular case, were

20   you able to tell if there was also internal bleeding?

21       A.    There was no -- there was bleeding around --

22   let me find my documentation.

23             So there was subdural hemorrhage, which is

24   bleeding between the dura, which is a membrane that

1 covers the brain and the brain itself.  There was also

2 subarachnoid hemorrhage, which is a very thin membrane

3 that covers the brain.

4   MS. LEUIN:  One moment, Your Honor.

5   THE COURT:  All right.

6   MS. LEUIN:  I have nothing further, Your Honor.

7   THE COURT:  All right.  Ms. Washington's counsel.

8   MS. BALMER:  Thank you, Judge.

9       CROSS-EXAMINATION

10      By Ms. Balmer:

11  **Q.** Good morning, Doctor.

12  **A.** Good morning.

13  **Q.** Now, you said you have been with the Cook

14 County Medical Examiner's for two-and-a-half years?

15  **A.** Yes, approximately.

16  **Q.** So did you start there -- it would have been

17 what, May of 2017?

18  **A.** July of 2017.

19  **Q.** July of 2017.

20   And you have been a -- so when you started, you

21 were a fellow for a year?

22  **A.** Yes.

23  **Q.** And so then you have been an actual assistant

24 medical examiner since July of '18?

BS001212

1      **A.**    Yes.

2      **Q.**    So at the time of this autopsy on May 31st of

3      2018, you had been a fellow for less than a year?

4      **A.**    Correct.

5      **Q.**    And you are under the supervision of an

6      assistant medical examiner?

7      **A.**    Yes.

8      **Q.**    And on that day it was Dr. Benjamin Soriano?

9      **A.**    Correct.

10     **Q.**    And he was in the room with you because he had

11     to supervise the autopsy?

12     **A.**    Yes.

13     **Q.**    Did you consult with him throughout?

14     **A.**    Yes.

15     **Q.**    And he actually had to sign off on your report?

16     **A.**    Correct.

17     **Q.**    You could not prepare autopsy reports on your

18     own?

19     **A.**    No.

20     **Q.**    The 550 autopsies you said you performed,

21     that's since you have been a medical examiner for the

22     past year and a half?

23     **A.**    That includes my fellowship.

24     **Q.**    So in two-and-a-half years?

BS001213

1       **A.**   Yes.

2       **Q.**   Okay.  Now, in doing the autopsy, you mentioned

3    doing an external and an internal exam; right?

4       **A.**   Correct.

5       **Q.**   During the external exam, you noted that there

6    were possible chronic needle tracks on his arm; correct?

7       **A.**   Yes.

8       **Q.**   That would indicate that he was likely a

9    chronic drug user; correct?

10      **A.**   Yes, if they were actual needle track marks.

11      **Q.**   And that's what they appeared to you?

12      **A.**   That's what they appeared to be.

13      **Q.**   Okay.  The laceration on his lips, you

14   mentioned several lacerations.  Those were superficial?

15      **A.**   They went through most of the lip.

16      **Q.**   Okay.  That didn't cause his death?

17      **A.**   No.

18      **Q.**   And the laceration in the center of his chest

19   was also superficial?

20      **A.**   Yes, it did not go through.

21      **Q.**   Okay.  Just for clarification, a laceration is

22   a cut?

23      **A.**   A laceration is a tear.

24      **Q.**   A tear.

1            An abrasion is more like a --

2    **A.**   Like a scratch.

3    **Q.**   And a contusion?

4    **A.**   Is a bruise.

5    **Q.**   Okay.  None of those generally cause death;

6 correct?

7    **A.**   Generally not.

8    **Q.**   Okay.  Now, you mentioned the laceration on the

9 back of Mr. Edmondson's head was a round defect?

10    **A.**   The laceration was like an X shape or a T shape

11 on the back of his head.

12    **Q.**   The laceration was?

13    **A.**   Yes.

14    **Q.**   But then the hole in his skull was a round

15 defect?

16    **A.**   Yes.

17    **Q.**   And you said that would have been caused by a

18 round instrument?

19    **A.**   Consistent with a round instrument, yes.

20    **Q.**   Okay.  Going to the toxicology that you had

21 ordered, he had a blood-alcohol level of .071; correct?

22    **A.**   Correct.

23    **Q.**   You said he had cocaine in his system?

24    **A.**   Yes.

BS001215

1    **Q.**   Cocaethylene?

2    **A.**   Correct.

3    **Q.**   And you mentioned that cocaethylene is a

4  chemical breakdown of cocaine, and it's when cocaine and

5  alcohol are mixed in the bloodstream?

6    **A.**   Yes.  And it was also active --

7    **Q.**   Okay.

8    **A.**   -- as an alterant.

9    **Q.**   Right.

10     It's an active metabolite with activity equal

11  to or greater than cocaine; right?

12    **A.**   I -- yes.

13    **Q.**   And you know from your experience and training

14  that cocaethylene toxicity may be associated with sudden

15  death and cardiovascular events; correct?

16    **A.**   Correct.

17    **Q.**   And that occurs in regular cocaine users?

18    **A.**   Yes.

19    **Q.**   Can occur?

20    **A.**   Uh-huh.

21    **Q.**   It increases the heart rate and the blood

22  pressure even more than cocaine; correct?

23    **A.**   Yes.

24    **Q.**   You mentioned the benzo --

BS001216

1      **A.**    Benzoylecgonine.

2      **Q.**    Benzoylecgonine.  You said that was a breakdown

3    of cocaine over time?

4      **A.**    Correct.

5      **Q.**    Another indication that he was a chronic drug

6    user; correct?

7      **A.**    Or at least had used it earlier in the day.

8      **Q.**    Okay.  You mentioned PCP, also known as angel

9    dust?

10      **A.**    Yes, phencyclidine, also known as PCP or angel

11    dust.

12      **Q.**    That's a hallucinogenic drug; right?

13      **A.**    Yes.

14      **Q.**    That can cause agitation?

15      **A.**    Yes.

16      **Q.**    Combativeness?

17      **A.**    Yes.

18      **Q.**    Aggressiveness?

19      **A.**    Yes.

20      **Q.**    Ataxia, which is impaired coordination?

21      **A.**    Uh-huh.

22      **Q.**    Is that a yes?

23      **A.**    Yes.

24      **Q.**    Respiratory depression?

BS001217

1      **A.**    I believe so.

2      **Q.**    And even hallucinations; correct?

3      **A.**    Yes.

4      **Q.**    Right.

5             So at the time of the autopsy on May 31st,

6    2018, you had not received the toxicology report; right?

7      **A.**    Correct.

8      **Q.**    You got it -- you received it or at least it

9    was issued on June 13th of 2018?

10     **A.**    Yes.

11     **Q.**    Two weeks after the autopsy?

12     **A.**    Yes.

13     **Q.**    So it's attached to your protocol, but you did

14   not -- other than mentioning that the toxicology was

15   attached to your report --

16     **A.**    Uh-huh.

17     **Q.**    -- you did not -- I'm sorry.

18            You did not include the effect of the drugs in

19   his system and how they may have played a role in his

20   death; correct?

21     **A.**    No, I did not.

22     **Q.**    Now, at the time you did the autopsy, you had

23   reviewed the medical examiner investigations case

24   report?

1      **A.**    Correct.

2      **Q.**    Did you review any of the scene photos?

3      **A.**    Yes.

4      **Q.**    The scene photos -- well, you know there's

5      photographs taken by the Chicago police officers on the

6      scene; right?

7      **A.**    Yes.

8      **Q.**    But then there's also photographs taken by the

9      medical examiner investigator?

10     **A.**    Yes.

11     **Q.**    And those are the ones that are indicated with

12     a date stamp?

13     **A.**    I believe so.  It depends on the camera that

14     they're using at the time.

15     MS. BALMER:  Okay.  Judge, may I approach?

16     THE COURT:  Yes.

17     BY MS. BALMER:

18     **Q.**    Doctor, showing you what's been previously

19     marked as Defense Exhibit No. 2, can you tell me that

20     is.

21     **A.**    It is a scene photo of the deceased, yeah,

22     being turned so that we can see the back of his head.

23     **Q.**    Okay.  And that is where he was recovered?

24     **A.**    Yes.

BS001219

1     Q.   You know from reviewing all the reports that he

2   was dead on scene when the paramedics arrived?

3     A.   Yes.

4     Q.   And you indicated that he's being turned, so

5   that indicates to you that he had been found lying on

6   his back; correct?

7     A.   Or that he had been turned onto his back by

8   EMS.

9     Q.   Okay.  Well, and you notice in that photograph

10   that there is a large amount of blood under where his

11   head would have been; correct?

12     A.   Yes.

13     Q.   Thank you.

14     And you said that head injuries bleed a lot?

15     A.   Yes.

16     Q.   That report that you reviewed, well, the case

17   report that the medical examiner investigator prepares,

18   that you said you reviewed before the autopsy, that

19   includes a narrative; correct?

20     A.   Correct.

21     Q.   And that narrative comes from the medical

22   examiner investigator speaking with Chicago police

23   officers on the scene?

24     A.   Yes.

BS001220

 1      Q.    And possibly any witnesses that may have been

 2   there as well?

 3      A.    Yes.

 4      Q.    So that narrative is essentially the police

 5   officer's version or their educated guess of what

 6   happened to this victim; right?

 7      A.    Yes, and whatever other information our

 8   investigator may have gotten from other people at the

 9   scene.

10      Q.    Okay.  So this report indicated that he --

11      MS. LEUIN:  Your Honor, I would object at this point

12   to the police report -- well, essentially what the

13   police are reporting in terms of interviewing witnesses

14   at the scene.

15      MS. BALMER:  Judge, she indicated that she reviewed

16   this case report prior to her autopsy.

17      THE COURT:  The objection is overruled.

18   BY MS. BALMER:

19      Q.    You know from the narrative of this case report

20   that the medical examiner investigator spoke with

21   Officer Rios and Officer Ryan who were on the scene;

22   right?  It's the second paragraph of the narrative,

23   page 3 of 5.

24      A.    Yes.

1      **Q.**   And you are aware that he had been found

2  unresponsive behind the garbage can in the parking lot

3  of 5147 West Lake?

4      **A.**   Yes.

5      **Q.**   Or a dumpster; right?

6      **A.**   Uh-huh.

7      **Q.**   I'm sorry.  Is that a yes?

8      **A.**   Yes.

9      **Q.**   Doctor, this is a -- tell me what that is.

10     **A.**   It is a photo of a dumpster.

11     **Q.**   And --

12  THE COURT:  Are you marking that as Defense Exhibit

13  No. 3?

14    MS. BALMER:  3.  I'm sorry, Judge, yes.

15  BY MS. BALMER:

16     **Q.**   And does that appear to be the same location

17  where Mr. Edmondson was found?

18     **A.**   I don't know.

19     **Q.**   Showing again Defense Exhibit No. 2.

20     **A.**   It could be.  There's a fence in the background

21  that could be consistent with the photo with the

22  dumpster.

23     **Q.**   And there's a lot of trash on the ground in

24  that area?

BS001222

1      **A.**    Yes.

2      **Q.**    Both in the photograph showing -- depicting the

3      dumpster and the photograph that depicts where

4      Mr. Edmondson was found?

5      **A.**    Yes.

6      **Q.**    He's laying in basically a lot of trash?

7      **A.**    Yes.

8      **Q.**    You don't know what was on the ground?

9      **A.**    I don't know.

10     **Q.**    You don't know if there was broken glass,

11     bottles; right?

12     **A.**    I don't know.

13     **Q.**    So at the time of your autopsy, you knew

14     everything that the police said happened to

15     Mr. Edmondson; right?

16     **A.**    I -- whatever our investigator got.

17     **Q.**    Well, this narrative included the statement

18     that the weapon used was a pipe; right?

19     **A.**    Yes.

20     **Q.**    So that's what you were going on when you

21     performed this autopsy?

22     **A.**    That is, yes.

23     **Q.**    You said that earlier you -- with the State's

24     attorney, you looked at these poles that were recovered,

1    inventoried in this case?

2    **A.**   Yes.

3         (Whereupon a discussion was held

4         outside the record, after which the

5         following proceedings were had

6         herein:)

7    MS. BALMER:  Judge, may I approach?

8    THE COURT:  Yes.

9  BY MS. BALMER:

10    **Q.**   Showing what's been previously marked as

11  People's Exhibit, Group Exhibit 8, was this one of the

12  poles that you viewed earlier?

13    **A.**   Yes.

14    **Q.**   This was the only one that had a rubber tip on

15  it?

16    **A.**   I believe so.

17    **Q.**   And if -- do you want some gloves?

18    **A.**   Yes.

19    THE COURT:  Lynette, is getting some, the deputy,

20  yeah.

21         (Tendering.)

22    THE COURT:  Thank you very much.

23  BY MS. BALMER:

24    **Q.**   If you could hold that.  How would you

BS001224

1    characterize the weight of that pole?

2        **A.**    I don't know.  It's -- it's a pipe.

3        **Q.**    Would you say it's light?

4        **A.**    I don't know.  I don't know how I would

5    characterize it.

6        **Q.**    Well, it's not heavy?

7        **A.**    It's not heavy.

8        **Q.**    And you indicated that the round defect in the

9    skull of Mr. Edmondson was one inch by 15 by 16 inches?

10       **A.**    Correct.

11       **Q.**    The one end of the pole that you're holding

12   without the rubber tip, that is not a one by almost-one

13   inch circumference; correct?

14       **A.**    No, it does not appear to be.

15       **Q.**    And is it your opinion as you sit there today

16   that this light pole was the weapon used that caused the

17   injury that caused Kim Edmondson's death?

18       MS. LEUIN:  Objection.  That was not the testimony.

19       MS. BALMER:  Well, she indicated that it was

20   possibly the cause of death.  She couldn't say with

21   certainty, but I'm asking if that's consistent with the

22   evidence that she's holding in her hand.

23       THE COURT:  She did say that she had examined

24   People's Exhibit 8, which contained various items.  The

1    items could be the cause of death, but she couldn't say

2    with certainty.  I don't know.  There were many items in

3    there.  I'm not sure which one she is saying.  I have no

4    idea how many, if there's ten things in there, two

5    things, which one she said might have been the cause of

6    death.

7         MS. BALMER:  Can I ask?

8         THE COURT:  Sure.

9         MS. BALMER:  Judge, can I show her the other ones?

10       THE COURT:  Okay.

11  BY MS. BALMER:

12    **Q.**   Doctor, I'm going to ask that you take out the

13    other three poles that are in People's Group Exhibit

14    No. 8.

15         Do any of the other three have a rubber tip on

16    the end?

17    **A.**   No.

18    **Q.**   And if you could hold one of those up, one at a

19    time.  Is that pole lighter than the one with the rubber

20    tip or heavier or lighter?

21    **A.**   It may be heavier than this one.

22    **Q.**   Okay.  Are any of those four poles consistent

23    with your opinion that those could have been used to

24    cause the injury that caused the death of Kim Edmondson?

1    A.   It's possible that any of them were used.

2    Q.   Even the lighter one with the rubber tip?

3    A.   Even the lighter one with the rubber tip.

4    Q.   To cause the kind of circular -- round circular

5    defect that went through his -- his -- the skin and his

6    skull into the brain, it's fair to say that someone

7    would have to use one of those poles and strike him

8    head-on with a pole in the back of the head to cause

9    that injury; correct?

10    A.   It would be a perpendicular strike to the back

11    of the head, yes.

12    Q.   Okay.  So knowing what you knew that the police

13    believed happened and the fact that they indicated or

14    that your investigator indicated in this narrative that

15    the weapon used was a pipe, you don't know for sure, as

16    you sit there, that that is the -- the weapon that

17    caused his death or the injury that caused his death?

18    A.   The injury to the back of the head is the

19    injury that caused his death.

20    Q.   Right.

21    A.   And it is consistent with a strike from a round

22    object like a pipe.

23    Q.   Okay.  Again, all four of those pipes have a

24    smaller circumference than the hole that was in his

BS001227

1    head; right?

2         A.    I don't know what the exact measurements of all

3    of these are.  It is possible to create a larger hole

4    with a smaller pole.

5         Q.    If it was struck head-on, perpendicular to the

6    back of his head?

7         A.    Yes.

8         Q.    But you can't say -- you don't even know with

9    certainty that a weapon was used at all; right?

10        A.    Given the other injuries on his body, it is

11   consistent with an assault.

12        Q.    Okay.  Showing you again what's been marked as

13   Defense Exhibit No. 3, is that a -- that's the

14   photograph of the dumpster --

15        A.    Yes.

16        Q.    -- that you indicated appeared to be next to

17   where Mr. Edmondson was found; right?

18        A.    Correct.

19        Q.    The handles of that dumpster are circular --

20        A.    Yes.

21        Q.    -- correct?

22              You know from your life experience that those

23   dumpsters are made with heavy metal; correct?

24        A.    Correct.

1     **Q.**   Which means the handles sticking out of that

2   dumpster is a heavy metal round object?

3     **A.**   Correct.

4   MS. BALMER:  I'm sorry, Judge.  One moment.

5   THE COURT:  Not a problem.

6        (Whereupon a discussion was held

7        outside the record, after which the

8        following proceedings were had

9        herein:)

10  BY MS. BALMER:

11    **Q.**   Doctor, showing you what's been previously

12  marked as Defense Exhibit No. 4, can you tell me what

13  that is.

14    **A.**   This is a close-up of the post on a dumpster

15  with measuring tape.

16    **Q.**   And if you could -- well, there is a ruler next

17  to the -- next to that circumference of the handle of

18  that dumpster; right?

19    **A.**   There is a ruler next to the handle, yes.

20    **Q.**   And can you tell from that photograph the

21  approximate measurements of -- I don't think it's

22  exactly in the center of the circle, but at the point

23  where the ruler is placed, can you say what those

24  measurements appear to be?

1      **A.**   Yeah.  At the point where the ruler is placed,

2    it appears to be one and one-quarter inch.

3      **Q.**   Okay.  Now, you said his injury that caused his

4    death on the back of his head was consistent with being

5    struck with a round object; right?

6      **A.**   Correct.

7      **Q.**   That injury is also consistent with a scenario

8    where someone high on PCP, cocaine, and alcohol falls

9    and hits his head on the round handle of a dumpster;

10   right?

11     **A.**   It would be unlikely given the location of the

12   injury that he would have fallen on that and also given

13   the size of that post on the dumpster and the side of

14   the defect in his skull.  The skull doesn't stretch, so

15   it would be unlikely that something larger than the hole

16   would be able to create a nearly circular hole in the

17   skull.

18     **Q.**   But it's possible?

19     **A.**   It would not -- it would not create a smaller

20   hole.

21     **Q.**   Is it possible that he could have fallen and

22   hit his head on a metal dumpster with a round circular

23   handle, and that could have caused the hole in his head

24   that caused his death?

1     **A.**   It is unlikely that a fall with only minimal

2    distance would have created a circular punched-out

3    defect in the skull with protrusion into the brain.

4     **Q.**   That's not my question.

5          My question is, is it possible?

6     **A.**   I don't believe it is.

7     **Q.**   And you can say that with scientific certainty

8    that it is not possible that falling on a dumpster

9    causes injury?

10     **A.**   Not with like a three-feet or two-foot fall.

11     **Q.**   Well, you don't know what happened to him out

12    in that area where he was found dead; right?

13     **A.**   Correct.

14     **Q.**   You have no idea if he stumbled back there to

15    go to the bathroom, bent over, and came up and hit his

16    head, the back of his head on a handle that was above

17    him; right?

18     **A.**   No.

19     **Q.**   And that could have caused an injury to his

20    head?

21     **A.**   It could have caused an injury to his head.

22     **Q.**   Well, he died instantly on the scene; right?

23     **A.**   I don't know.

24     **Q.**   You know that when the paramedics arrived, he

BS001231

1    was already deceased?

2         **A.**    Yes.

3         **Q.**    That amount of blood, would the blood loss have

4    caused his death?

5         **A.**    It is possible that blood loss contributed to

6    his death.

7         **Q.**    What would have caused him to die so quickly,

8    let's say, that he -- it happened within minutes of an

9    injury to his head?  How long do you think it would take

10   for someone to die from that kind of injury?

11        **A.**    I don't know.

12        **Q.**    You have no idea?

13        **A.**    I don't know.  Injuries to the head are tricky

14   because people are able to survive certain injuries to

15   the head.

16        **Q.**    Are people able to walk and jog a half mile

17   with an injury like that to his head where he died

18   instantly on the scene?

19        **A.**    They could because he could have been dying on

20   the entire route to the scene.

21        **Q.**    Okay.  Well, as you indicated, there is a lot

22   of blood loss; right?

23        **A.**    Yes.

24        **Q.**    And so if he was walking down the street for a

1    half mile, there certainly would have been a trail of

2    blood along behind him; right?

3    **A.**   I would expect him to have been bleeding along

4    the route.

5    **Q.**   Okay.  How tall was Mr. Edmondson?

6    **A.**   We measured him as 64 inches long I believe,

7    yes, 64 inches.

8    **Q.**   Which is how many --

9    **A.**   Five feet, four inches.

10    **Q.**   Okay.  Now, it's fair to say that you could

11    have come to a completely different conclusion about

12    what caused his death if the case report, the medical

13    examiner case report, for example, said that Kim

14    Edmondson was found face up on his back next to a

15    dumpster with a hole in the back of his head?

16    **A.**   It is possible, but given the other injuries on

17    his body, some sort of altercation would be a

18    possibility.

19    **Q.**   All the other injuries to his body, you're

20    indicating the injury to his lip and his chest?

21    **A.**   Yes.

22    **Q.**   Showing you what's previously been marked as

23    People's Exhibit No. 4 and No. 5, are those the injuries

24    you're referring to?

1      **A.**   Yes.

2      **Q.**   One to his lip and one to his chest?

3      **A.**   Yes.

4      **Q.**   So when you say the other injuries to his body,

5      that indicated to you that there had been an assault?

6      **A.**   That there was some -- yes.

7      **Q.**   Okay.  So it's possible that he could have

8      gotten some sort of struggle prior to the head injury

9      that could have caused the cut to his lip and the cut to

10     his chest and that had nothing to do with the hole in

11     his head; right?

12     **A.**   It's possible.  They would have been close to

13     the time of death, however.

14     **Q.**   Like half hour?

15     **A.**   Yes.

16     **Q.**   And I'll take those back.

17            Are you saying that without this narrative in

18     the case report prepared by your medical examiner, if

19     you had -- without the narrative, you had this autopsy,

20     you performed your internal exam that found two

21     superficial injuries, lip and chest, you performed an

22     external exam that showed those two injuries, the

23     internal exam that showed this round circular defect

24     that punctured a hole in the back of his head, if you

1    had not had that narrative, you're saying that you would

2    have said it wasn't the dumpster that he was found next

3    to, but it was probably a pipe?

4    **A.**   A pipe would have been consistent with that.

5    **Q.**   Would you have hypothesized that that was the

6    weapon that was used if a weapon was used at all?

7    **A.**   A pipe or a hammer, perhaps, some round

8    instrument.

9    **Q.**   Okay.  So if you're looking at scene photos as

10    you're doing an autopsy, is it your normal practice to

11    speculate about possible weapons if no one tells you

12    that a weapon was used in the case?

13    **A.**   If somebody has multiple injuries because of --

14    then yes.  Then we'd possibly speculate as a possible

15    weapon that may have caused the injuries.

16    **Q.**   Even after you reviewed the toxicology report

17    that said this man was high on cocaine, PCP, and

18    alcohol?

19    **A.**   Yes, because --

20    **Q.**   And he was a chronic drug user?

21    **A.**   Yes.

22    **Q.**   You automatically assume there's a weapon used

23    in every autopsy you look at?

24    MS. LEUIN:  Objection.

BS001235

1        THE COURT:  Overruled.  She can answer.

2    BY THE WITNESS:

3        A.    Homicide is always a possibility with

4    autopsies.

5    BY MS. BALMER:

6        Q.    Okay.  But again, my question is, without that

7    narrative, are you sitting there, telling this Court,

8    that you would have seen that hole in his head next to a

9    dumpster with a hole -- a handle with a similar size and

10   you would have said not that, probably someone hit him

11   in the back of the head?

12       A.    Yes.

13       Q.    You knew from that same narrative that there

14   was -- Mr. Edmondson had been involved in a previous or

15   earlier scuffle; right?

16       A.    Yes.

17       Q.    You know from that same narrative that it

18   indicated that this victim walked and collapsed?

19       A.    Yes.

20       Q.    And, again, that statement is from what a

21   police officer on the scene told to your investigator

22   who put that in this case report; right?

23       A.    Yes, wherever the investigator got his

24   information from the police.  I don't know if he

1    interviewed a witness.

2        Q.   And that's where you -- that's the report that

3    you reviewed prior to your autopsy?

4        A.   Yes.

5        Q.   If that same narrative had said that

6    Mr. Edmondson was talking to friends, he walked over

7    behind a dumpster, someone said he fell, and that when

8    they went to check on him he was laying there, his eyes

9    were open, and he was dead before the paramedics

10    arrived, would you have assumed that there had been a

11    fight earlier had you not been told that?

12        A.   The injuries on the body would make some sort

13    of altercation suspect, both injuries to his face, his

14    chest, and to his head.

15        Q.   Okay.  Well, you know he was found without a

16    shirt on?

17        A.   Yes.

18        Q.   And you know he was laying in a pile of trash;

19    right?

20        A.   Yes.

21        Q.   Which included bottles; right?

22        A.   Yes.

23        Q.   Including the half -- or I'm sorry, including

24    the pint of empty pipe -- empty pint of Seagram's vodka

1 that was found next to him; right?

2  **A.** If that was where he was found, I don't --

3  **Q.** In the narrative.

4  **A.** Uh-huh.

5  **Q.** Paragraph 3.

6  **A.** Okay.

7  **Q.** Did -- upon reviewing this narrative, did you

8 learn that next to Edmondson was a clear, empty bottle

9 of vodka?

10  **A.** Yes.

11 MS. BALMER:  Sorry, Judge, one second.

12   (Whereupon a discussion was held

13   outside the record, after which the

14   following proceedings were had

15   herein:)

16 BY MS. BALMER:

17  **Q.** Well, it's fair to say that whatever caused

18 this cut to his lip and to his chest is likely not the

19 same instrument that caused this circular defect in the

20 back of his head?

21  **A.** They could be the same instrument.

22  **Q.** They could be, but it's not -- it's possible

23 that they were caused by something else?

24  **A.** It's possible.

BS001238

1     **Q.**   It's possible that that pole that you looked at

2   earlier, the one with the rubber tip on the end, the

3   other side of that pole was jagged metal; right?

4     **A.**   Yes.

5     **Q.**   It's possible that that jagged metal pole could

6   have caused the injury to his lip and to his chest?

7     **A.**   It's possible.

8     **Q.**   Well, lacerations are tears; right?

9     **A.**   Yes.

10     **Q.**   And a ragged metal -- a ragged piece of metal

11   could certainly cause a tear?

12     **A.**   Yes.

13     **Q.**   You can't say with certainty if it wasn't a

14   combination of the many drugs in his system, you can't

15   say if that possibly caused a respiratory and/or

16   cardiovascular event that could have contributed to his

17   death; right?

18     **A.**   Given -- the trauma would trump the drugs in

19   his system.

20     **Q.**   Okay.  But you said you didn't even include the

21   toxicology report other than noting that it was attached

22   to your report, otherwise you made no reference to the

23   toxicology in your autopsy report; correct?

24     **A.**   Correct.

BS001239

1       **Q.**   You cannot say, as you sit there, that Kim

2   Edmondson -- you can't say to a reasonable degree of

3   scientific certainty that he died as a result of

4   homicide; correct?

5       **A.**   The injury to the back of his head killed him.

6       **Q.**   Right, right.

7       We know the injury to the back of his head

8   killed him, you don't know what caused the injury;

9   correct?

10      **A.**   I do not know what instrument caused the

11   injury.

12      **Q.**   Right.

13      So you can't say with a reasonable degree of

14   scientific certainty that it was homicide that caused

15   his death?

16      **A.**   It is my opinion based on the information that

17   I received that it was homicide.

18      **Q.**   And that's to a reasonable degree of scientific

19   certainty?

20      **A.**   It's based on my education and my training.

21      **Q.**   Which at that time was less than a year?

22      **A.**   Yes.

23      **Q.**   You can say with certainty he had a hole in the

24   back of his head; right?

BS001240

1    **A.**   Yes.

2    **Q.**   That's what killed him; right?

3    **A.**   Yes.

4    **Q.**   And you can say to a reasonable degree of

5   scientific certainty that he had a lot of narcotics in

6   his system?

7    **A.**   He had substances in his system, yes.

8    **Q.**   Very heavy, dangerous narcotics?

9    **A.**   I don't -- I don't qualify.

10    **Q.**   Well, there were multiple ones; right?

11    **A.**   Yes.

12   MS. BALMER:  Judge, may I have a moment?

13   THE COURT:  Yes.

14      (Whereupon a discussion was held

15      outside the record, after which the

16      following proceedings were had

17      herein:)

18   MS. BALMER:  Judge, I have no further questions.

19   THE COURT:  All right.  Ms. Blair.

20              CROSS-EXAMINATION

21              By Ms. Blair:

22    **Q.**   Doctor, just to be clear to the point, your

23   testimony and your opinion is that the cause of death in

24   this case for Mr. Edmondson was blunt force trauma to

BS001241

1    the back of his head; is that correct?

2        **A.**    Yes.

3        **Q.**    The cause of death was not any of the facial or

4    lip injuries you described; is that correct?

5        **A.**    Correct.

6        **Q.**    And the cause of death was not any of the

7    contusions or any other lacerations on his body; is that

8    correct?

9        **A.**    Correct.

10       **Q.**    Now, you testified that there was a toxicology

11    report done on Mr. Edmondson; correct?

12       **A.**    Yes.

13       **Q.**    However, those findings were not included in

14    your initial report; correct?

15       **A.**    Correct.

16       **Q.**    And, therefore, did not play into your opinion

17    in the initial report as to what the cause of death was;

18    is that correct?

19       **A.**    Correct.

20       **Q.**    However, in Mr. Edmondson's blood, you

21    testified there was ethanol, cocaine, cocaethylene?

22       **A.**    Uh-huh.

23       **Q.**    I don't know how to pronounce the other one, so

24    I'll spell it.  B-E-N-Z-O-Y-L-E-C-G-O-N-I-N-E?

BS001242

1        **A.**    Yes.

2        **Q.**    Phencyclidine; correct?

3        **A.**    Yes.

4        **Q.**    And all of those certainly have an effect on a

5    human's judgment; is that correct?

6        **A.**    Yes.

7        **Q.**    And on a human's -- actually, we shouldn't say

8    human's.

9             You can conclude that those compounds would

10   have affected his judgment?

11       **A.**    Probably.

12       **Q.**    And his -- possibly could have caused

13   aggressiveness in him?

14       **A.**    Yes, possibly.

15       **Q.**    Could have caused agitation; correct?

16       **A.**    Possible, uh-huh.

17       **Q.**    Hallucinations; correct?

18       **A.**    Possible.

19       **Q.**    Increased pulse rate; is that correct?

20       **A.**    Yes.

21       **Q.**    Possible seizures; is that correct?

22       **A.**    Possible.

23       **Q.**    Even possible coma or respiratory depression;

24   is that correct?

BS001243

1     **A.**   It's possible.

2     **Q.**   So those compounds, all of those either

3  individually or combined, certainly could have also had

4  an effect on his -- perhaps, on the speed of his death,

5  is that correct, on the impact of the trauma to his

6  head?

7     **A.**   I don't believe they would have altered the

8  speed of his death.

9     **Q.**   Okay.  Could they alone have actually caused

10  his death?

11     **A.**   In the absence of trauma, it is possible that

12  someone with the substances in their system could have

13  died from, yes.

14     MS. BLAIR:  If I could have one moment?

15     THE COURT:  All right.

16     MS. BLAIR:  Nothing further, actually.  Thank you.

17     THE COURT:  All right.  Any redirect of the medical

18  examiner?

19     MS. LEUIN:  No, Your Honor.

20     THE COURT:  All right.  Doctor, thank you very much.

21     MS. LEUIN:  Is she excused, Your Honor?

22     THE COURT:  Yes.  Does either side need her or may

23  we excuse her?

24     MS. KUCABA:  Yes.

BS001244

```
 1          THE COURT:  You are excused.  Thank you very much.
 2                      (Witness excused.)
 3          THE COURT:  I just need ten seconds.
 4                 (Whereupon a recess was taken, after
 5                 which the following proceedings were
 6                 had herein:)
 7          THE COURT:  Thank you very much.
 8             Did the State go to get its next witness?
 9          MS. NILES:  I believe so.
10          THE COURT:  Sure.  No problem.
11                 (Whereupon a discussion was held
12                 outside the record, after which the
13                 following proceedings were had
14                 herein:)
15          THE COURT:  If the State would like to call its next
16     witness.
17          MS. MCCARTY:  Thank you, Your Honor.  Anthony Beard.
18          THE COURT:  All right.
19                      (Witness approaching.)
20          THE COURT:  Hello.  Would you raise your right hand
21     before you sit.  That's okay.  Would you state and spell
22     your first and last name.
23          MR. BEARD:  First name Anthony, A-N-T-H-O-N-Y.  Last
24     name Beard, B-E-A-R-D.
```

```
 1                     (The oath was thereupon duly

 2                      administered to the witness by the

 3                      Court.)

 4          THE COURT:  Thank you very much.  Have a seat,

 5     please.

 6                          ANTHONY BEARD,

 7     appearing as a witness, having been first duly sworn,

 8     was examined and testified as follows:

 9                      DIRECT EXAMINATION

10                      By Ms. McCarty:

11     Q.    Good afternoon, Mr. Beard.

12           Will you please state your name for the record.

13     A.    Anthony Beard.

14     Q.    And how do you spell your last name, sir?

15     A.    B-E-A-R-D.

16     Q.    Mr. Beard, how old are you?

17     A.    31.

18     Q.    And do you live in the City of Chicago?

19     A.    Yes.

20     Q.    On the north, south, east, west side?

21     A.    South.

22     Q.    The south side, okay.

23           Mr. Beard, I want to direct your attention back

24     to May 30th of 2018.  Do you recall that date?
```