IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TABATHA WASHINGTON and DONTE HOWARD, | |
| Plaintiffs, | |
| v. | Case No.: 1:20-cv-00442 |
| CITY OF CHICAGO, VINCENT ALONZO (Star No. 21623), ADRIAN GARCIA (Star No. 20517) and DEMOSTHENES BALODIMAS (Star No. 21204), | Hon. Manish S. Shah Mag. Judge Jeffrey Cummings |
| Defendants. | |

**PLAINTIFFS' LOCAL RULE 56.1 RESPONSE TO DEFENDANTS'
LOCAL RULE 56.1(2) STATEMENT OF MATERIAL FACTS**

Plaintiffs Tabatha Washington ("Tabatha") and Donte Howard ("Donte") now submit their (1) Local Rule 56.1(b)(3) Response to Defendants' City of Chicago, Vincent Alonzo ("Alonzo"), Adrian Garcia ("Garcia") and Demosthenes Balodimas ("Balodimas") Statement of Facts, (2) Local 56.1(b)(3)(C) Statement of Additional Facts.

**I.      PLAINTIFFS' LOCAL RULE 56.1(b)(3) RESPONSE**

1.      Plaintiffs Tabatha Washington and Donte Howard (hereinafter, individually "Plaintiff Washington" and/or "Plaintiff Howard," and collectively, "Plaintiffs") filed their Complaint on January 21, 2020. (Ex. 1). Plaintiffs brought this action pursuant to 28 U.S.C. §§ 1331 and 1367 for alleged acts and commissions that occurred in the City of Chicago; thus, venue and jurisdiction of this Court are proper. (Ex. 1 at ¶ ¶ 6-7).

**Response:**

Admitted.

2.     At present, Plaintiffs allege Detectives Alonzo, Balodimas, and Garcia, (hereinafter, "Defendant Officers") falsely arrested and deprived them of their constitutional rights in violation of the Fourth Amendment (Count I) and maliciously prosecuted them (Count II). (Ex. 1, at p. 16-17, Counts I and II; Ex. 2 at p. 1). Plaintiffs seek liability against the City of Chicago under the doctrine of *respondeat superior* and seek to have the City of Chicago indemnify Defendant Officers. (Ex. 1, at p. 18-19, Counts IV and V).

**<u>Response:</u>**

Admitted.

3.     On May 30, 2018, Kim Edmondson (hereinafter, "Mr. Edmondson") walked up to his friends near Lake and Laramie in Chicago, Illinois and told them he had been attacked with a pole by a number of men and women or a woman outside of his apartment building. (Ex. 3, 19:1-7; Ex. 4, 28:17-29:5, 41:14-21; Ex. 5, 5:1-21). Mr. Edmondson then walked to urinate behind a dumpster at an adjacent parking lot. (Ex. 3, 20:24-21:3; Ex. 4, 30:24-31:16; 41:8-13; Ex. 5, 5:22-24).

**<u>Response:</u>**

Admitted in part and denied in part.  The cited testimony does not support the notion that "a number of men and women or a woman outside of his apartment building" attacked Edmondson, and the cited testimony in Defs' Ex. 3 (Anthony Beard) in inconsistent with the testimony in Ex. 4 (Khadijah Hill) and Ex. 5 (Larry Nelson).  Answering further, it is denied that the cited testimony is accurate, as it is inconsistent with previous statements that the witnesses gave to the Defendant Detectives.  The Defendants' Clear Closed Report ("CCR") says nothing about Nelson or Beard stating that Edmondson was attacked with "a pole."  (Exhibit A, CCR at pg. 14).  In Detective Alonzo's first interview with Beard, the latter says nothing about Edmondson being struck with "a pole.  (Exhibit B, Alonzo Dep at 16:10-17:1).  Detective Garcia testified about his first interview with Nelson:

> Q:     Did Larry Nelson tell you that he thought Kim Edmondson was beaten with a poles and pipes?
> A:     I'd have to look at my GPR ("General Progress Report") to give you a correct

- 2 -

statement on that, sir.

Q:     *Well if he told you that, you would probably put that in the GPR, right?*

            \*     \*     \*     \*

A:     *That's correct.*

            \*     \*     \*     \*

Q:     *Okay.  And does your GPR say anything about Larry Nelson seeing Kim Edmondson bleeding?*

A.     *Not, it does not.*

Q:     *Does it say anything about him being struck with any objects, like poles or pipes?*

A:     *No, it does not.*

(Exhibit C, Garcia Dep at 36:22-37:7, 39:20-40:1; emphasis added); (Exhibit D, Larry Nelson GPR).  Further, Edmondson's altercations with the Plaintiffs did not occur outside of "his" apartment, as he no longer lived there due to his mother previously kicking him out of the apartment at 5318 W. Washington. (Ex. E, Trial Transcript at 20:16-19).  Alonzo and Garcia were told that Edmonson had been "put out of the building."  (Exhibit F, White Interview Video at 0:01:24:10-0:01:30).

      4.     Someone notified Mr. Edmondson's friends that he collapsed. (Ex. 3, 21:4-8; Ex. 4, 31:17-32:6; Ex. 5, 6:8-11). Mr. Edmondson was lying behind a dumpster on his back, his eyes open, not breathing, and with a pool of blood around his head. (Ex. 3, 21:20-22:1, 21:18-23; Ex. 4, 32:18-33:1; Ex. 5, 6:17-24). One of Mr. Edmondson's friends called 911 while others flagged down nearby police. (Ex. 4, 38:2-9). Paramedics could not resuscitate him and pronounced him deceased on scene. (Ex. 6, at p. 5)

**Response:**

    Admitted.

      5.     Defendant Officers arrived at the parking lot to investigate Mr. Edmondson's death. (Ex. 7, 31:10-19; Ex. 8, 14:1-4; Ex. 9, 7:13-20). While surveilling the scene, Detective Alonzo noted there was blood in the parking lot that appeared to be along the path Mr. Edmondson took to the dumpster. (Ex. 8, 86:17-87:12).

**Response:**

Admitted that the Defendant Officers arrived at the parking lot to investigate Mr. Edmondson's death, otherwise denied. Alonzo's testimony was *not* that "there was blood in the parking lot that appeared to be *along the path Mr. Edmondson took to the dumpster*," but that:

Q:   *Is it your testimony today that there was blood found on Laramie on the walk?*
A:   *It's my testimony that there was blood found just off of Laramie as he entered the parking lot, before he went back to the back of the lot.*
Q:   Okay. But okay, so my question is a little different, sir. We've looked at 123 North Laramie, and we've looked at 168 North Laramie. *Did you at any point go to those locations and see if there was blood on the trial?*
A:   Yes.
Q:   Did you find any?
A:   *At times we were unable to locate any on that specific route that we're seeing o this video, other than the stuff that was….other than the blood that was located at the opening of the parking lot just off of Laramie.*

(Exhibit B, Alonzo Dep at 86:17-87:12). As CPD evidence technician Officer Krupa testified, the only other "apparent red blood stain" that was observed was "approximately 100 feet" away from Edmonson's body (Exhibit E, Krupa Trial Testimony at 149:24-150:8), and Defendants' Clear Closed report specifically noted that blood was recovered from "the ground at the *northwest corner of the lot*." (Exhibit A, CCR at pg. 9; emphasis added).

Edmondson entered through the *southwest* side of the parking lot then proceeded east - never walking in the northwest corner of the lot; several seconds of that portion of Edmondson's walk are captured on video. (See Exhibit G, B& B Beauty Supply Security Video); (Exhibit B, Alonzo Dep at 89:7-9: video "it appears to be a view of the parking lot, looking north and slightly east in the parking lot."); (See also Exhibit H, May 31, 2018, GPR: "shows victim walk f/ S. Laramie and go N/E through the parking lot out of camera view.").

Each of Edmondson's friends that he encountered that night – Beard, Hill and Nelson – were located outside of the Metro PCS on Lake and Laramie when Edmondson approached them from the south:

Q:   So when you first saw him walk up, where was he coming from?
A:   *He was coming from the south*, way down there.
Q;   Okay. *So he was walking northbound on Laramie—*
A:   *Yes.*

(Exhibit E, Beard Trial Testimony at 113:16-21); (Exhibit B, Alonzo Dep at 76:5-6: "Kim Edmondson walked eastbound on Washington and headed north on Laramie."). (Exhibit A, CCR at pgs. 14,18).

The Metro PCS is on the southwest corner of the lot, and the dumpsters where Edmondson was found are directly east. (Exhibit I, 5/30/18 GPR of parking lot); (Exhibit J, Scene

Photographs).

There was never any blood found on the one half mile trail Edmondson took after he left 5316 W. Washington:

> Q: ***And you didn't introduce any evidence that there was any blood found on Kim Edmondson's trail from 5316 West Washington and into where was found behind the dumpster, correct?***
> A: ***Right.***
> Q: ***Well you didn't have any evidence that there was any of his blood on that trail, correct?***
> A: ***Correct.***

(Exhibit K, ASA Leuin Dep 135:15-24; emphasis added). Defendants Balodimas and Alonzo admitted that there was no evidence of Edmondson's blood in the parking lot, either:

> Q: But my question is, though, ***is there any evidence that suggests that it was his blood?***
>
>           *     *     *     *
>
> A: ***None that I know of.***

(Exhibit L, Balodimas Dep at 11:19-23; emphasis added); (Exhibit B, Alonzo Dep at 93:7-10).

6.     One of Mr. Edmondson's friends, Anthony Beard, recounted to police that Mr. Edmondson told him shortly before his death that he was attacked by men and women with a pole near where he lived. (Ex. 8, 16:8-11, 16:15-17:1; Ex. 9, 9:19-22; Ex. 17, p. 15). Another friend, Larry Nelson, advised police that Mr. Edmondson said he was beaten up by his neighbors and he saw the victim bleeding before he walked toward the dumpsters. (Ex. 5, 7:5-13; Ex. 7, 33:14-21, 34:19-35:14, 36:15-21; Ex. 8, 16:8-11; Ex. 9, 9:19-22; Ex. 17, p. 15).

**Response:**

The first sentence is denied: in none of the cited testimony does Beard tell any detective that Edmondson told him that he was "attacked with a pole." Balodimas' testimony is merely that he was "standing next to Vince Alonzo. I heard –overheard the conversation that he was having with Anthony Beard." (Defs' Ex. 9:19-22). The Defendants' Clear Closed Report (Defs'. Ex. 17) likewise says nothing about Beard relaying a story about Edmondson being attacked with a pole:

Beard stated that he was sitting on a crate by the Metro PCS store when the victim walked

up with a cut to his lip and holding a white t-shirt on his head. He stated that the victim told him that he got jumped on at Washington and Lorel. The victim then walked to the dumpster to urinate. He then heard people saying that the victim collapsed.

(*Id.;* also attached hereto as Plaintiffs' Exhibit A).

The second sentence is admitted only insofar as it is supported by Garcia's testimony in Defendants Ex. 7 34:19-35:14, 36:15-21, and Defendants' Clear Closed Report (Defs'. Ex. 17) which specifically says that Nelson observed Edmondson "***bleeding from the mouth***." (See also Ex. A at pg. 14). The veracity of the statement is belied by the fact that Garcia's contemporaneous GPR of his interview with Nelson says nothing about seeing Edmondson bleeding. (Exhibit C, Garcia Dep at 36:22-37:7, 39:20-40); (Exhibit D, Nelson GPR).

7.    Mr. Nelson voluntarily brought officers to Mr. Edmondson's apartment at 5316 W. Plaintiff Washington Boulevard. (Ex. 7, 44:8-45:1; Ex. 9, 12:23-13:6) Detectives Balodimas and Garcia relocated and canvassed the building in an attempt to ascertain whether anyone knew anything about the altercation Mr. Edmondson reported before his death. (Ex. 7, 45:15-18; Ex. 9, 13:15-20, 14:21- 15:12). Detective Balodimas heard a conversation coming from Plaintiff Tabatha Plaintiff Washington's ground level apartment while standing outside her living room windows. (Ex. 9, 15:15-23; Ex. 10, 69:9-19).

**Response:**

Admitted that Nelson voluntarily brought officers to 5316 W. Washington Boulevard, not "5316 W. Plaintiff Washington Boulevard" [Dkt. #109 at ¶ 7], denied that Edmondson lived in that apartment, having been kicked out by his mother. Ex. E, Trial Transcript at 20:16-19. Admitted as to the second sentence. Admitted that Defendant Balodimas claims to have heard a conversation coming from Tabatha's apartment, otherwise denied.

Balodimas' claim is false. Balodimas testified that Tabatha lived in a "basement apartment," not a "ground level apartment." (Exhibit L, Balodimas Dep at 15:21-23: "I heard people talking in the basement –*in the basement apartment* at 5316 West Washington Boulevard"; emphasis added). The Defendants' Closed Report claims that:

> ***While standing in front of 5316 W. Washington***, ***Det. Balodimas overheard a conversation coming from the basement apartment. He stated that a female voice stated, "Fuck that bitch. He got what he deserved." He stated that a male voice then said, "when you protect, you have to fight." The female then stated, "He ain't going to get***

- 6 -

*my gun." The male voice then said, "He walked away. He fine."*

(Exhibit A, CCR at pg. 14; emphasis added). Plaintiffs deny these statements were ever made. (Exhibit M, 10/12/21 Tabatha Dep at 272:25-273:1, 280:23-181:17); (Exhibit N, Donte Dep at 160:2-13). Balodimas now claims that he was not "in front of 5316 W. Washington," but in the gangway next to the building, "10, 12 feet" from the front, and gave the garbled explanation for the discrepancy. (Exhibit L, Balodimas Dep at 31:24-32:22, 33:14-34:7, 34:13-23; emphasis added); (Exhibit O, 5316 W. Washington (PX22)).

Tabatha confirmed, though, that: (1) the windows in the back room where Plaintiffs (and Cynthia Cage, and Carlton White) were sitting were shut, (2) conversations could not be heard through them, and (3) the back room they were in was *30* feet from the front of the apartment, not the "10, 12" that Balodimas claims. (Exhibit M, 10/12/21 Tabatha Dep at 412:3-21). Defendants Alonso and Garcia confirmed that the hallway of the 5316 W. Washington building stretched 15 or 20 feet long before you even get to the front door of Tabatha's unit. (Exhibit B, Alonzo Dep at 95:8-16); (Exhibit C, Garcia Dep at 47:7-12). Balodimas also testified that he entered the apartment two-three minutes after allegedly hearing the Plaintiffs' conversation outside. (Exhibit L, Balodimas Dep at 18:8-15). Those minutes – and Plaintiffs and White – are captured on CPD Officer Jeffery Allen's bodycam, and none of the alleged statements can be heard. (Exhibit P, Jeffrey Allen May 30, 2018, Bodycam).

8.      An officer went to the rear door of Plaintiff Washington's apartment and

Plaintiff Washington, her cousin, Carlton White, and Plaintiff Howard answered the door. (Ex.

11, 0:01:00- 0:01:21)[1] Plaintiff Washington allowed officers to enter and explained she and Mr.

White were in an altercation with Mr. Edmondson earlier. (Ex. 11, 0:01:49-0:02:29; Ex. 12,

275:7-16; 335:16-20).

**Response:**

Admitted as to the first sentence. Admitted that Tabatha allowed the officer at the door – Jeffrey Allen - to enter her apartment but denied as to Defendants' description of the conversation. When asked by Officer Allen if everything was "ok in there," White states there was an altercation earlier with some guy who had been evicted from the building," and Tabatha states that "he [Edmondson] was trying to fight me." (Defs' Ex. 11, 0:01:49-0:02:29); (Defs' Ex. 11 is reattached as Plaintiff's Exhibit P)

---

[1] Time stamp citations refer to the time stamp on the video player, not to any time stamp on the video itself.

9.     When the officers told the group that everyone needed to come to the police station for further questioning about the incident, Plaintiff Washington and Mr. White told officers that Plaintiff Howard had just arrived and their other friend present, Cynthia Cage, was not involved in the altercation. (Ex. 11, 0:02:26-0:02:32, 0:04:09-0:04:19, 0:04:46-0:04:47; Ex. 12, 277:14-25)

**Response:**

Admitted except for the what the officers told the group; Defendant Garcia specifically told the group that "We're going to straighten this matter out because he (Edmondson) has a complaint."  (Defs' Ex. 11, 0:04:08-0:04:19).

10.     Plaintiff Howard told the detectives his name was Jeremiah Johnson and reiterated he just arrived at the apartment. (Ex. 11, at 04:40-0:04:44; Ex. 13, 7:7-17; 185:22-186:13; Ex. 14, "Left at house – Cage, Cynthia…Johnson, Jeremiah"). Based on Plaintiffs' representations, the detectives only took Plaintiff Washington and Plaintiff Howard into custody for further investigation. (Ex. 11, 0:08:40-0:08:50; Ex. 12, 276:19-20; Ex. 14, Cage and Johnson).

**Response:**

Admitted as to the first sentence.  Denied as to the second sentence.  The detectives took Tabatha and White into custody, not "Plaintiff Washington and Plaintiff Howard."  Further, there is nothing in Defendants' cited exhibits to support the notion that the officers' actions were "Based on Plaintiffs' representations."

### A.     Plaintiff Washington's First Interview with Police

11.     Plaintiff Washington told them her cousin, Mr. White, got into an argument with Mr. Edmondson outside the apartment building. (Ex. 12, 291:15-25; Ex. 15, 0:33:18-0:33:34) To break up the fight, she picked up a pole and swung at Mr. Edmondson. (Ex. 15, 0:34:08-0:34:27, 0:35:32-0:36:09) She told the detectives no one hit Mr. Edmondson with anything. (Ex.

12, 290:25-291:4; Ex. 15, 40:01-40:27).

**Response:**

Admitted that Tabatha told Defendants that White and Edmondson "got into it," and that Edmondson tried to "hit" her. Denied as to the second sentence. In the cited testimony, Tabatha does not say that she was trying to break up a fight, but that she picked up a small pole (gesturing with her hands) and swung it at Edmondson when he tried to hit her.

Denied as to the third sentence. That alleged statement is not contained in the cited deposition testimony. In the cited video, Tabatha is asked: "Your cousin, what did he use to hit him," and she answers: "He didn't hit him with nothing, nobody hit him with nothing," but Tabatha had already admitted to hitting Edmondson.

12.     Plaintiff Washington said a third male also fought Mr. Edmondson but repeatedly denied knowing that male or his name. (Ex. 12, 285:10-21, 287:1-7, 292:15-293:9; Ex. 15, 0:34:52-0:35:20, 40:17-40:58, 42:30-42:54). Plaintiff Washington described him as "big, tall, light-skinned" with a wide stomach. (Ex. 12, 299:13-20; Ex. 15, 40:39-40:47, 2:42:43-2:42:51, 2:43:40-2:43:55). Plaintiff Washington denied having any prior negative history with Mr. Edmondson. (Ex. 10, 62:22-63:13; Ex. 15, 0:39:00-0:39:18, 0:39:38-0:39:56, 23:44:40-23:44:46).

**Response:**

The first sentence is denied, and an inaccurate description of the cited evidence. Tabatha did not "repeatedly" deny knowing the third male; in the cited deposition testimony, she is asked about "the first time" she talked to the police at the station. It is admitted that she did not at first provide Donte's name to the police, but in the cited testimony she explains that did so because: (1) she was scared, (2) she thought since she was already "incarcerated," that identifying Donte was "irrelevant; and (3) "there really wasn't a fight." It is admitted that in the cited, cherry-picked clips from the same 12:40 a.m. interview, Tabatha does not reveal Donte's name to the police. The second and third sentences are admitted.

### B.     Mr. White's First Interview with Police

13.     In his first interview, Mr. White explained he had an altercation with Mr. Edmondson one week before. (Ex. 16, 1:19:51-1:21:01). On May 30, 2018, the day of the

incident, Mr. Edmondson approached Mr. White with an attitude and tried to punch Mr. White. (Ex. 16, 1:21:28-1:22:04). Mr. White swerved away and punched Mr. Edmondson in response. *Id*. Mr. Edmondson walked away. *Id*.

**Response:**

Admitted that in the cited video White told Alonzo and Garcia that: (1) a week earlier Edmondson attacked him and left a scare on his face; (2) Edmondson "had a whole attitude today"; (3) Edmondson was "snapping," and called Cynthia Cage a "bitch like four times"; and (4) when he tried to calm Edmondson down ("Joe, stop doing that") Edmondson swung at him.

14.     Mr. White said Plaintiff Washington came out with a stick from a tree and swung it Mr. Edmondson, striking him in the chest. (Ex. 16, 1:22:04-1:22:14). Mr. Edmondson then walked away again. (Ex. 16, 1:22:14-1:22:17). Mr. White said that was the last time they saw him. *Id*.

**Response:**

Admitted that in the cited video, White told Alonzo and Garcia that "Tabatha, my cousin, she had a little stick and hit his ass in the chest, or something right here (indicating)" and said: "stop playing with my cousin," otherwise the first sentence is denied as it is not contained in the video. The second sentence is admitted, though in the cited interview video, White also told Detectives that Edmonson then walked away again, claiming: "I'll be right back." The third sentence is admitted.

15.     The detectives asked Mr. White who was outside during the altercation. (Ex. 16, 1:23:32-1:23:41). Mr. White said it was only him, Mr. Edmondson, Plaintiff Washington, and Ms. Cage. *Id*.

**Response:**

Admitted.

16.     The detectives told Mr. White that Plaintiff Washington said a third male was involved. (Ex. 16, 1:25:48-1:26:46) Mr. White said the third male was "D" or "DT" and while

he engaged with Mr. Edmondson, "D" did not land any punches. *Id*. Mr. White said the third male left. (Ex. 16, 1:25:48-1:26:48).

**Response:**

The first sentence is denied. In the cited video, Garcia (falsely) told White that Tabatha told them that: "You (White) were out there fighting with some other boy out there, too….that you were out there fighting with him, with another guy." White tells the Defendants that: "they (Donte and Edmondson) got to fighting, tussling, but they weren't even really tussling[.]" The second sentence is denied - White says nothing about whether "D" landed any punches in the cited video. The third sentence is admitted.

17.    Mr. White explained the incident again. He again said while he fought Mr. Edmondson, Plaintiff Washington came out of her apartment with a stick from a tree and struck Mr. Edmondson in the chest. (Ex. 16, 1:31:27-1:31:55, 1:31:55-1:32:20, 1:32:20-1:32:31). Mr. Edmondson backed up and that's when "D" started air punching with Mr. Edmondson in the street for ten minutes. (Ex. 16, 1:32:31-1:32:43, 1:33:08-1:33:43).

**Response:**

The first sentence is admitted. The second sentence is denied, as it not an accurate description of the cited interview, and it is denied that Tabatha came out of her apartment with a stick from a tree." The folding chair leg that Tabatha had was picked up from the ground, as she was using it to help prop up the snow cone stand. (Exhibit Q, 9/28/21 Tabatha Dep at 120:9-16, 121:24-122:8); (See also Exhibit N, Donte Dep at 69:8-16)

In the cited video, White tells Alonzo and Garcia in the seconds before Defs' Ex. 16, 1:31:27-1:31:55 that Edmondson was "wilding out," and that "he was trying to leave [Edmondson] alone." White then tells the Defendants that Edmondson approached him, said: "fuck you, you a pussy" and that Edmondson then took a swing at him. (Defs' Ex 16, 131:55-132:20). He then tells the Defendants that Tabatha told Edmondson to stop messing with her cousin and that he had "better move." According to White, Edmonson then told Tabatha "I ain't going to do nothing to you T (Tabatha)" but then "he approached her" and she hit him in the chest." (*Id.* at 131:55-1:32:31)

The third sentence is an incomplete recitation of the cited video excerpts, but admitted as far as the fact that White told the Alonzo and Garcia that Edmondson backed up, and then "the other dude" got to fighting with him; White also agreed that they were "just air punching," and referred to Donte and Edmondson's altercation as "dancing." White also tells Defendants that he

- 11 -

and Tabatha "had nothing to do with that," meaning Donte's encounter with Edmondson. (*Id.* at 1:32:34). Admitted that White said "ten minutes," but denied that it was referring to Donte's interaction with Edmondson. Cynthia Case stated that Donte's interaction with Edmondson lasted "***A minute, probably less than that.***" (Exhibit E, Cage Trial Testimony at 41:1-2; emphasis added).

18.     During that altercation, Mr. Edmondson backed up into a car and left, saying he would be back. (Ex. 16, 1:32:43-1:33:08). Mr. White said Mr. Edmondson walked away with only a scrape on his chest and he was bleeding on his mouth from his fall into the car. (Ex. 16, 1:24:56-1:25:14, 1:29:05- 1:29:08, 1:38:16-1:38:26).

**Response:**

Admitted that in the cited video, White told Alonzo and Garcia that Donte and Edmondson were just "air punching," then Edmondson backed up into a car, said "that's what you're on, I'll be back," and "walked his ass off." The second sentence is admitted, except that in the cited video White tells Alonzo and Garcia: "I think he fell and hit his whole damn mouth on that damn car."

19.     The detectives asked for more information about "D," and Mr. White told them that Plaintiff Washington knew "D." (Ex. 16, 1:34:06-1:34:25). Mr. White explained he and "D" were at Plaintiff Washington's apartment because Mr. Edmondson was harassing and taunting her by banging on her front and back doors, trying to come in. (Ex. 16, 1:35:19-1:35:54).

**Response:**

The first sentence is admitted. White tells a similar story to Alonzo and Garcia to the one in sentence two, otherwise denied. There is no other support for this alleged story; Donte and Tabatha both stated that he was at her apartment that day to help her sell snow cones. (Exhibit N, Donte Dep at 36:15-19); (Exhibit R, 9/20/21 Tabatha Dep at 34:16-19); (See also Exhibit E, Cage Trial Testimony at 24:21-22).

### C.     Plaintiff Washington's Second and Third Interview with Police

20.     Detective Alonzo went back to question Plaintiff Washington and asked where he could find the third guy, "D." (Ex. 15, 2:41:25-2:41:34). Plaintiff Washington said she did

not know "D" and she was trying to figure out who he could be. (Ex. 15, 2:41:34-2:41:57). When Detective Alonzo told her Mr. White said she knew him, Plaintiff Washington said "D" was Donte. *Id*. Detective Alonzo asked for more identifying information and Plaintiff Washington provided it, including that he was light-skinned, had a wide stomach and tall, he goes to school, and he was recently released from jail. (Ex. 15, 2:41:57-2:43:46).

**Response:**

The first sentence is admitted. The second and third sentences are denied. In the cited video, Tabatha is awoken at 2:39 a.m., and asked who "D" is – she tells Alonzo that "both those guys' names starts with "D." (Referring to Donte and her, cousin, Carlton – who also goes by the name of "Derrick"; Exhibit E, Cage Trial Testimony at 28:16-9). When Alonzo asks her, "'D' is your cousin, right?" Tabatha immediately responds: "'D' is Donte."

Admitted that Tabatha provided the information in the fourth sentence to Alonzo as well as other identifying information; Tabatha then tells Alonzo: "I wish he (Edmondson) would just tell the truth, like he started all this stupid stuff, high on drugs." (Defs' Ex 15, 2:43:46-2:43:56).

21.     Detective Garcia came in after Detective Alonzo and asked Plaintiff Washington about the second male in her apartment. (Ex. 15, 2:43:56-2:44:02, 2:45:18-2:45:27). Plaintiff Washington said the other male in the apartment was Donte, later confirming Donte Howard. (Ex. 15, 2:45:27-2:45:49, 2:56:12-2:56:29; 2:56:10-2:56:28). Plaintiff Washington did not initially tell the detectives that Plaintiff Howard was the other male who fought Mr. Edmondson because she felt it was not relevant and not that big of a deal. (Ex. 12, 300:19-301:12).

**Response:**

The first sentence is admitted. The second sentence is admitted, though incomplete; in the cited video, Tabatha specifically tells Garcia that Donte was involved in an altercation with Edmondson. The third sentence is admitted, though incomplete as to what she told Detectives and why. In the cited video she tells the Defendants that it "wasn't a fight" between Donte and Edmondson; her explanation was that since she didn't think he did anything wrong and wasn't in custody, she didn't want to get him involved. (Exhibit M, 10/12/21 Tabatha Dep at 286:12-17, 287:1-228:1)

- 13 -

### D. Plaintiff Washington's Fourth Interview with Police

22. Detectives Garcia and Balodimas interviewed Plaintiff Washington again. (Ex. 15, 3:05:31-3:05:44). Plaintiff Washington described the fight, saying it started with Mr. White and Mr. Edmondson. (Ex. 15, 3:10:20-3:10:44) Plaintiff Washington stepped between them to try to break them up. (Ex. 15, 3:10:32-3:10:39). Plaintiff Howard and Mr. Edmondson then started "tussling," and Mr. Edmondson backed up into a car and then walked off. (Ex. 15, 3:10:50-3:11:24). Plaintiff Washington said that was the end of the fight. (Ex. 15, 3:11:16-3:11:22).

**Response:**

The first sentence is admitted. The remainder of Defendants' Paragraph 22 is comprised of cherry-picked snippets from a lengthy interview that omits context and key statements from Tabatha. After concealing Edmondson's death since roughly 9:45 p.m. the night before, Defendants awaken Tabatha just after 3 a.m. and reveal that Edmondson is dead,, then proceed to berate her, blow smoke at her and call her a liar. During that interview Balodimas confronts Tabatha with the fake statements he allegedly heard from her apartment, which she denies. (Defs' Ex. 15, 3:05:44-3:10-20). The second sentence is admitted. The third sentence is admitted, though Defendants omit Tabatha's response in which she tells Defendants: "No one beat him (Edmondson) up, that's what I'm trying to tell you. It wasn't a beat up story."

23. On further questioning, Plaintiff Washington admitted Mr. Edmondson with the "pole." (Ex. 15, 3:11:22-3:11:38). Detective Balodimas asked, "You hit him with a what?" *Id*. Plaintiff Washington said, "A stick." (Ex. 15, 3:11:22-3:11:38).

**Response:**

The first sentence is denied. Immediately after telling Balodimas and Garcia that Edmondson "walked off, it was nothing else," she freely states that: "***he (Edmondson) tried to hit me, I hit him with…I picked up a pole and hit him with it***." The second sentence is admitted. The third sentence is denied and incomplete. Tabatha tells Garcia and Balodimas that she used "a stick…" then is in interrupted by Balodimas who tells her: "Let me tell you something, the damage that was done to his head, you couldn't have done that." (Defs. Ex. 15 at 3:11:22-3:11:41).

24. Detective Balodimas asked Plaintiff Washington who hit Mr. Edmondson in the head. (Ex. 15, 3:11:38-3:11:48). Plaintiff Washington said Plaintiff Howard struck Mr.

- 14 -

Edmondson in the head with the pole, describing him as the "light skin, (motioning tall and wide), the fat one." (Ex. 12, 307:23-308:18; Ex. 15, 3:11:48-3:11:57).

**Response:**

      The first sentence is denied as incomplete. In Defs' Ex. 15, 3:11:38-3:11:48, Balodimas tells Tabatha: "Let me tell you something, the damage that was done to his head, you couldn't have done that." She then tells them again "I only hit him…(gesturing to the chest)." Balodimas then asks: "who did it?" Admitted that Tabatha told Garcia and Alonzo that Donte hit Edmonson in the head, denied that it was true, or that any information ever corroborated that.

      Tabatha confirmed that the only reason she implicated Donte was because she was scared and felt the detectives were trying to put words in her mouth. (Exhibit M, 10/12/2021 Tabatha Dep at 307:9-308:2). Tabatha quickly rescinded that story:

| | |
|---|---|
| Q: | Did anybody ever tell you that Donte struck Kim Edmondson with a pole? |
| A: | Yes. |
| Q: | Who? |
| A: | Tabatha. |
| Q: | ***And, isn't it true that shortly thereafter she said that she was confused, and that wasn't the truth?*** |
| |              *     *     *     * |
| A: | ***That is correct.*** |
| Q: | Okay. So other than that statement, did any other person state that Donte Howard possessed, or struck Kim Edmonson with a pole? |
| A: | Not to the best of my recollection. |
| Q: | ***Well, you reviewed your documents before today, did you not, sir?*** |
| A: | ***Yes.*** |
| Q: | ***Did you seen anything in those records where another person stated that Donte Howard struck Kim Edmonson with a pole?*** |
| A: | ***No, I did not.*** |

(Exhibit C, Garcia Dep at 14:10-20; emphasis added); (See also Exhibit A, CCR at pg. 16: "she only said that because she was scared."). Aside from Tabatha's quickly recanted, 3:09 a.m. statement about Donte, Defendants knew that he was not responsible for Edmonson's death:

| | |
|---|---|
| Q: | ***Did either White, Washington or Cage state that Howard struck Edmondson in the back of the head?*** |
| A: | ***No.*** |

(Exhibit L, Balodimas Dep at 60:4-7; emphasis added); (Exhibit K, ASA Leuin Dep at 106:7-10);

(Exhibit E, Cage Trial Testimony at 40:7-9: ***Q: "At any point did you see [Donte] with any objects***

- 15 -

*in his hands*?" A: "**Oh, no, no**."; emphasis added)

25.    The detectives told Plaintiff Washington to calm down and brought her water while she explained the altercation again. (Ex. 15, 3:13:47-3:14:35). Plaintiff Washington said everyone was outside drinking and Mr. White and Mr. Edmondson started arguing about something stupid. (Ex. 15, 3:14:10-3:14:22). Mr. White and Mr. Edmondson started "tussling." (Ex. 15, 3:14:22-3:14:31).

**Response:**

Admitted.

26.    Plaintiff Washington tried to break up Mr. White and Mr. Edmondson and Mr. Edmondson swung at Plaintiff Washington. (Ex. 15, 3:14:31-3:14:35). Plaintiff Washington picked up the pole. (Ex. 15, 3:14:50-3:15:00) She said after she picked up the stick, they all then walked to the liquor store when Mr. Edmondson walked away. (Ex. 15, 3:15:00-3:15:09).

**Response:**

The first sentence is admitted.  The second sentence is denied.  In the cited video, Tabatha tells Garcia and Balodimas that she picked up a "light stick."  The third sentence is consistent with what Tabatha tells Garcia and Balodimas, though denied to the implication that they walked to the liquor store immediately after she picked up the stick.

27.    Detective Garcia asked Plaintiff Washington who struck Mr. Edmondson in the head and Plaintiff Washington responded, "Donte." (Ex. 12, 309:22-310:3, 312:25-313:4, 316:6-12; Ex. 15, 3:15:20-3:15:45). When the detectives asked how many times, Plaintiff Washington knew they were asking how many times Plaintiff Howard hit Mr. Edmondson in the head and she responded one time. (Ex. 12, 319:13-320:3; Ex. 15, 3:15:47-3:15:58, 3:16:15-3:16:18).

**Response:**

Admitted that Tabatha provided to Garcia and Balodimas the information in Paragraph 27;

- 16 -

denied that it was accurate, corroborated, or that Defendants had any reason to believe it after she recanted it. Tabatha confirmed that the only reason she implicated Donte was because she was scared and felt the detectives were trying to put words in her mouth. (Exhibit M, 10/12/2021 Tabatha Dep at 307:9-308:2). Tabatha quickly rescinded that story:

> Q:  Did anybody ever tell you that Donte struck Kim Edmondson with a pole?
> A:  Yes.
> Q:  Who?
> A:  Tabatha.
> Q:  ***And, isn't it true that shortly thereafter she said that she was confused, and that wasn't the truth?***
>                             *      *      *      *
> A:  ***That is correct.***
> Q:  Okay. So other than that statement, did any other person state that Donte Howard possessed, or struck Kim Edmonson with a pole?
> A:  Not to the best of my recollection.
> Q:  ***Well, you reviewed your documents before today, did you not, sir?***
> A:  ***Yes.***
> Q:  ***Did you seen anything in those records where another person stated that Donte Howard struck Kim Edmonson with a pole?***
> A:  ***No, I did not.***

(Exhibit C, Garcia Dep at 14:10-20); (See also Exhibit A, CCR at pg. 16: "she only said that because she was scared." Aside from Tabatha's quickly recanted, 3:09 a.m. statement about Donte, Defendants knew that he was not responsible for Edmonson's death:

> Q:  ***Did either White, Washington or Cage state that Howard struck Edmondson in the back of the head?***
> A:  ***No.***

(Exhibit L, Balodimas Dep at 60:4-7; emphasis added); (Exhibit K, ASA Leuin Dep at 106:7-10); (Exhibit E, Cage Trial Testimony at 40:7-9: ***Q: "At any point did you see [Donte] with any objects in his hands?"*** A: "***Oh, no, no***."; emphasis added).

28.     Plaintiff Washington repeated twice that Plaintiff Howard struck Mr. Edmondson in the head with the pole, and on two occasions she said Plaintiff Howard hit Mr. Edmondson with the pole twice. (Ex. 12, 321:15-24; Ex. 15, 3:17:17-3:17:33, 3:19:28-3:20:13, 3:22:28-3:22:51).

**Response:**

Admitted in part, denied in part. Defs' Ex. 12, 321:15-24 does not support Paragraph 28:

Q:     Did Donte Howard hit Kim Edmonson with a pole?
A:     No.
Q:     Did Donte Howard ever hold a pole on May 30, 2018?
A:     Not to my recognition. I'm not for sure. I don't remember.
Q:     You mean not to your recollection?
A:     Yeah, to my memory, I don't believe he did.

(*Id.*; See also Exhibit M, 10/12/21 Tabatha Dep at 321:15-24).

Paragraph 28 also omits several key statements from the cited video, including Garcia telling Tabatha: "We don't believe you're strong enough to do the damage that he got sustained. (Defs' Ex. 15, 3:17:17-3:17:21)  The remainder of that video says nothing about Donte hitting Edmonson with a pole.

Admitted that in Defendants' other cited videos Tabatha tells Balodimas and Garcia that Donte hit Edmonson with the pole twice, but it is denied that it was accurate, corroborated, or that Defendants had any reason to believe it after she recanted it.

Tabatha confirmed that the only reason she implicated Donte was because she was scared and felt the detectives were trying to put words in her mouth.  (Exhibit M, 10/12/2021 Tabatha Dep at 307:9-308:2).  Tabatha quickly rescinded that story:

Q:     Did anybody ever tell you that Donte struck Kim Edmondson with a pole?
A:     Yes.
Q:     Who?
A:     Tabatha.
Q:     ***And, isn't it true that shortly thereafter she said that she was confused, and that wasn't the truth?***
                    \*     \*     \*     \*
A:     ***That is correct.***
Q:     Okay.  So other than that statement, did any other person state that Donte Howard possessed, or struck Kim Edmonson with a pole?
A:     Not to the best of my recollection.
Q:     ***Well, you reviewed your documents before today, did you not, sir?***
A:     ***Yes.***
Q:     ***Did you seen anything in those records where another person stated that Donte Howard struck Kim Edmonson with a pole?***
A:     ***No, I did not.***

(Exhibit C, Garcia Dep at 14:10-20); (See also Exhibit A, CCR at pg. 16: "she only said that because she was scared."  Aside from Tabatha's quickly recanted, 3:09 a.m. statement about Donte, Defendants knew that he was not responsible for Edmonson's death:

- 18 -

> Q: ***Did either White, Washington or Cage state that Howard struck Edmondson in the back of the head?***
>
> A: ***No.***

(Exhibit L, Balodimas Dep at 60:4-7; emphasis added); (Exhibit K, ASA Leuin Dep at 106:7-10).

29.     When Plaintiff Howard struck Mr. Edmondson with the pole, Plaintiff Washington said she and Ms. Cage brought her children inside, leaving Mr. White, Plaintiff Howard, and Mr. Edmondson on the street fighting. (Ex. 15, 3:19:50-3:20:13, 3:24:50-3:25:25, 5:29:41-5:29, 5:31:19- 5:31:23). As Detectives Garcia and Balodimas left, Plaintiff Washington apologized for lying. (Ex. 15, 3:28:05-3:28:12).

**Response:**

The first sentence is denied; it is not supported by Tabatha's statements to Garcia and Balodimas in Ex. 15, 3:19:50-3:13 or 3:24:50-3:25:25. There is no interview contained in Defs' Ex. 15 5:31:19-5:31:23 and it is unclear what "5:29:41-5:29" refers to. The audio is too difficult to make out in Defs' Ex, 3:28:05-3:28:12 and therefore the second sentence is denied.

30.     Later, when Plaintiff Washington asked for an update on the case, Plaintiff Washington said she swung and struck Mr. Edmondson twice on his body, striking him on his lip and across his chest. (Ex. 15, 17:14:55-17:15:00).

**Response:**

Admitted.

### E.     Ms. Cage's Interview with Police

31.     Detectives Alonzo and Balodimas interviewed Ms. Cage at Plaintiff Washington's apartment in the morning of May 31, 2018. (Ex. 7, 82:24-83:15; Ex. 8, 14:14-15:3; Ex. 9, 25:5-11). Ms. Cage told the detectives that Mr. White first punched Mr. Edmondson during an argument between the two. (Ex. 17, pg. 18; Ex. 8, 14:24-15:3; Ex. 9, 27:17-28:5)

**Response:**

The first sentence is admitted. The second sentence is denied. Defendants' version of that interview is memorialized in Defendants' Clear Closed Report, which does not state that White "first punched" Edmondson, and is not further corroborated:

> Cage stated that "Black" (Kim Edmondson) and Carlton White had an altercation about a week ago where White received an abrasion to his nose. She stated that on Wednesday, Edmondson and White stated [sic] arguing in in front of 5316 W. Washington. She stated that Edmondson was calling her a "bitch." She stated that while White and Edmonson were arguing, White punched Edmonson.

(Exhibit A, CCR at pg. 18). In neither of Cage's subsequent statements did she state that White punched Edmondson, let alone first:

> Q:    And that was –the person you know as Black (Edmonson) had you said sliced or cut the person you know as Derrick (White) in the face?
> A:     Yes.
> Q:    What happened after when they were arguing there?
> A:     They had a little altercation. They were both fighting each other.
> Q:    Did this las long?
> A:     No, it didn't

(Exhibit S, Cage GJ at 5:20-6:5). She testified similarly at the criminal trial:

> Q:    When you say he got to quarrelling, are you talking about the person you're referring to as Black and the person that you're referring to as Derrick who is also Carlton?
> A:     Yes.
> Q:    And at this point are they having words or what is going on?
> A:     Words and a little physical, not a lot.
> Q:    How would you describe the physical?
> A:     ***Pushing back and forth***.
> Q:    At this point is there anyone else involved?
> A:     No, no, no one else was involved at this time.
> Q:    ***At this point was anybody injured?***
> A:     ***No.***

(Exhibit E, Cage Trial Testimony at 30:3-16).

32.    While Mr. White and Mr. Edmondson were arguing, Plaintiff Washington approached them with a pole and struck Mr. Edmondson several times with the pole. (Ex. 17, pg.

- 20 -

18; Ex. 8, 14:25- 3, 48:3-16). Plaintiff Howard then fought Mr. Edmondson in the street and

Plaintiff Howard landed some punches on Mr. Edmondson. (Ex. 17, pg. 18; Ex. 8, 14:25-3).

Mr. Edmondson left, bleeding from the mouth and walking toward Laramie. *Id*.

**Response:**

Admitted that in Defs' Ex. 17, pg. 18, which is Defendants' Clear Closed Report, Defendants reported that Cynthia Cage allegedly made a statement that is generally consistent with the first sentence in Paragraph 32, otherwise denied. It is unclear what Defs' "Ex 8, 14:25-3" refers to, and Ex 8, 43:3-16 is Alonzo's deposition testimony, in which he merely reads from the same passage in the Report. Cynthia Cage's subsequent interviews establish that Tabatha hit Edmonson after the incident between him and White was over. (Exhibit S, Cage GJ at 5:24-7:4); (Exhibit E, Cage Trial Testimony at 32:2-11).

Admitted that in Defs' Ex. 17, pg. 18, which is the Clear Closed Report, Defendants reported Cynthia Cage allegedly made a statement that is generally consistent with the second sentence in paragraph 32, otherwise denied. It is unclear what Defs' "Ex 8, 14:25-3" is. Cage described the altercation between Donte and Edmonson by saying it "wasn't a fight really at all. It was something like little cat swipes basically." (Exhibit E, Cage Trial Testimony at 39:5-7). The Third Sentence is admitted.

### F.    Mr. White's Second Interview with Police

33. Detective Balodimas and non-defendant detective interviewed Mr. White again. (Ex. 16, 4:57:45-4:57:50). Mr. White said the other male in the fight was the man in the

apartment. (Ex. 16, 4:59:50-5:00:29). Mr. White told the detectives three times that Plaintiff

Howard and Mr. Edmondson did not land a punch on each other. (Ex. 16, 5:00:45-5:00:51).

**Response:**

Admitted.

34. Mr. White repeated to the detectives that he hit Mr. Edmondson once and then Mr. Edmondson left. (Ex. 16, 5:06:38-5:07:02). When Mr. Edmondson came back, Mr. White said "D" started fighting with Mr. Edmondson, but they were only throwing punches, and slipping in the street. (Ex. 16, 5:07:07-5:07:24).

**Response:**

Admitted.

35.     After "D's" fight, Mr. Edmondson left. (Ex. 16, 5:07:07-5:07:24). Mr. White said nothing about Plaintiff Washington's altercation. (Ex. 16, 5:06:38-5:07:33). Mr. White repeated a similar story again, not including Plaintiff Washington's altercation. (Ex. 16, 5:11:35-5:12:06).

**Response:**

Admitted.

36.     The detectives asked Mr. White how many times Plaintiff Washington struck Mr. Edmondson and he said "probably three" times. (Ex. 16, 5:12:04-5:12:11). Mr. White said Plaintiff Washington hit Mr. Edmondson with a gray stick, not a wooden stick. (Ex. 16, 5:12:36-5:13:34). Mr. White said Plaintiff Washington was the last person to strike Mr. Edmondson. (Ex. 16, 5:13:51-5:14:09).

**Response:**

Admitted that White told the detective that she hit Edmondson "probably three" times, otherwise denied.  Cynthia Cage, though, was unequivocal that Tabatha only made contact twice. (Exhibit S, Cage GJ at 7:3-8); (Exhibit E, Cage Trial Testimony at 35:10-11: "Just twice.  It was like boop, boop.  That was it.").  The injuries that were observed by Beard, Hill and Nelson were also consistent with Tabatha only striking Edmonson twice.  (See also Exhibit WW, Tabatha Interview Video at 17:14:55-17:15:00).

Admitted that White said that it was a gray stick and was certain.  In the portion of the video that Defendants omit, Garcia specifically asks White if it was "a stick or a pipe," and White immediately says: "No, it was a stick, it wasn't no pipe."  (Defs Ex. 16 5:12:28-36).  After White says that that it was gray, Garcia again asks: "like a pipe?"  (*Id.* at 5:13:00-5:30:02).  The third sentence is denied.  In the cited video White says "that was the last hit," but does not say that Tabatha "was the last person to strike" Edmonson.

37.     Mr. White explained the incident again, saying first he punched Mr. Edmondson

- 22 -

when Mr. Edmondson approached him with an attitude. (Ex. 16, 5:18:42-5:18:51, 5:24:51-5:24:56). Mr. White challenged Mr. Edmondson to come back up to him but Mr. Edmondson walked off. (Ex. 16, 5:18:51-5:19:16, 5:25:00-5:25:21).

**Response:**

The first sentence is denied, as it is not an accurate description of the video, and is contradicted by White's statements that Edmonson swung on him first. (Exhibit F, White Video Interview at 131:55-132:20).

The second sentence is admitted in part, denied in part. In the cited video White specifically tells the detectives that he "wasn't going to approach him because the last time I approached him on some drunk shit I got cut in the face, so I'm not on that." White then says that "I'm not playing offense, I'm playing defense" to avoid a similar event, and Edmondson walked off.

38. When Mr. Edmondson came back, he wanted to fight "D," who Mr. Edmondson called "big homie." (Ex. 16, 5:19:16-5:19:29, 5:25:21-5:25:31). The two started fighting, not landing any punches. (Ex. 16, 5:19:29-5:19:40, 5:25:31-5:25:49). "D" was coming at Mr. Edmondson and Mr. Edmondson was backing up. (Ex. 16, 5:19:40-5:19:53).

**Response:**

The first sentence is admitted, but incomplete. In the cited video, White specifically tells the detectives that when he returned, Edmondson began yelling at Donte that he was "a bitch." The second sentence is admitted.

Admitted that the third sentence is roughly accurate to what White tells the detectives, otherwise denied. White specifically states that Edmondson was the aggressor, looking for a fight, and no one else claimed that Donte pursued Edmondson. (See, for example, Exhibit S, Cage GJ at 9:1-15); (Exhibit N, Donte Dep at 109:20-110:20). Defendants conspicuously omit White's statements to the detectives that Donte "didn't even want to fight." (Defs' Ex. 16, 5:22:04-5:22:08)

39. That was when Plaintiff Washington ran up with a little pole, swung three times, hitting Mr. Edmondson in the chest, then in the arm, and last in the lip. (Ex. 16, 5:19:53-5:20:10, 5:21:45- 5:22:01, 5:25:49-5:26:19). Mr. Edmondson walked away after Plaintiff

- 23 -

Washington struck him and never returned. (Ex. 16, 5:20:10-5:20:24, 5:26:19-5:26:23).

**Response:**

Admitted that the first and sentence sentences are roughly accurate as to what White told the detectives, otherwise incomplete and denied. In the cited video clips, White tells the detectives that Edmondson "pushed" Tabatha, and told her "I ain't playing, I'm going to fuck you up." White's chronology of the altercation is not corroborated by any other source, and there is no support for the notion that Tabatha "ran up" with the pole. (See, for example, Exhibit S, Cage GJ at pgs. 6-10); (Exhibit Q, 9/28/21 Tabatha Dep at 120:9-16, 121:24-122:8); (See also Exhibit N, Donte Dep at 69:8-16).

40. Mr. White told the detectives that he did not tell them "D" was the other guy in the apartment because he didn't know "D," Plaintiff Washington knew him, and he was not going to "snitch" on someone he did not know. (Ex. 16, 5:09:11-5:09:23, 5:22:56-5:23:34). He also said he did not know Mr. Edmondson was "fucked up." (Ex. 16, 5:09:23-5:09:35).

**Response:**

The first sentence is admitted. The second sentence is admitted insofar as White is claiming that he had no knowledge of Edmondson being "fucked up" as in hurt, because in the preceding portion of the video, that Defendants omit, White repeatedly tells Defendants that they were not responsible for any injury to his head. (Def's Ex. 16, 5:06:25-5:06:30: "I don't know who the fuck hit him upside the head, it wasn't us. It wasn't us.")

41. According to Mr. White, "D" had animosity with Mr. Edmondson because of the earlier incident where Mr. Edmondson tried to enter Plaintiff Washington's apartment when she was alone. (Ex. 16, 5:23:39-5:24:18). Mr. White later told the detectives that "D" was the boyfriend of one of Plaintiff Washington's friends. (Ex. 16, 14:57:20-14:57:42).

**Response:**

Admitted that White tells the detectives a story roughly consistent with the first sentence, otherwise denied. There is no support for the alleged story of Edmondson trying to get into Tabatha's apartment previously, or Donte having any involvement or animosity towards Edmondson. Donte confirmed that there was no disagreement with Edmondson prior to May 30, 2018. (Exhibit N, Donte Dep at 38:2-39:19). The second sentence is admitted.

42.     Detective Garcia told Mr. White that Plaintiff Washington said she went inside with her kids while Mr. White, "D," and Mr. Edmondson stayed outside fighting. (Ex. 16, 5:29:29-5:29:41). Mr. White said Plaintiff Washington was lying and Plaintiff Washington and Ms. Cage were outside the entire time and the children remained inside the house. (Ex. 16, 5:29:41-5:29:45, 5:31:19-5:31:31).

**Response:**

The first sentence is denied as inaccurate and incomplete. In the cited video, Garcia tells White that "they" saw White hit Edmondson one time and then they went inside while he, "D" and "old boy" stayed outside fighting. Denied that the chronology of events is accurate, or that Tabatha told Garcia that story, and denied that Garcia said that Tabatha specifically told him the story.

The second sentence is denied. In relation to the false story from the first sentence, Garcia asks White "so your cousin is lying" and he responds: "She got to be lying." (About a story she never told the Defendants, that was presented to White as fact).

### G.     Nelson, Hill, and Beard's Interview with State's Attorney's Office

43.     On May 31, 2018, Assistant State's Attorney Patrick Waller (hereinafter, "ASA Waller") arrived at Area North and spoke with detectives, Larry Nelson, Anthony Beard, and Khadijah Hill, who voluntarily came to the station. (Ex. 18, 22:2-25:23, 26:16-27:8). All three witnesses spoke to ASA Waller both off video and on video recording. (Ex. 18, 28:25-29:3).

**Response:**

Admitted.

44.     Nelson said Mr. Edmondson, who he called "Mo," approached him near Lake and Laramie and said he had been attacked by men and women with poles or pipes. (Ex. 19, 0:03:58- 0:04:47, 0:07:14-0:07:26, 0:09:12-0:09:20). Larry asked who attacked him and Mr. Edmondson said the people who lived downstairs from him. (Ex. 19, 0:07:27-0:07:30).

**Response:**

Admitted.

45.     Larry indicated Mr. Edmondson was bleeding in the cheek area of the right side of his face and on his chest. (Ex. 18, 66:7-14; Ex. 19, 0:08:18-0:08:43). After spoke to some others  and walked away, Nelson learned Mr. Edmondson collapsed and saw Mr. Edmondson lying on the ground behind a dumpster. (Ex. 19, 0:09:44-0:10:06; 0:10:07-0:10:14, 0:10:27-0:10:47). Nelson confirmed he spoke to police and told them what he reported to ASA Waller. (Ex. 19, 0:11:00-0:11:23).

**Response:**

Admitted.

46.     ASA Waller interviewed Khadijah Hill, Anthony Beard's girlfriend. (Ex. 20, 0:10:38- 0:10:50) Hill recounted that Mr. Edmondson, who she called "Mo-man," walked up to her and Beard near Lake and Laramie. (Ex. 20, 0:04:24-0:04:39). Mr. Edmondson said he had been jumped by two women and two men and they used a pole. (Ex. 20, 0:04:24-0:04:39, 0:08:35-0:08:46).

**Response:**

Admitted.

47.     Mr. Edmondson was not wearing a shirt and Hill saw he had a gash on his lip and cut to his chest. (Ex. 20, 0:08:10-0:08:32). Hill only looked at Mr. Edmondson from the front of his body and did not examine him head to toe. (Ex. 4, 23:19-24:5, 25:9-26:8, 30:20-31:5; Ex. 20, 0:08:56- 0:09:03). After Mr. Edmondson told them about the altercation, he walked toward the dumpsters and never came back. (Ex. 20, 0:09:17-0:09:22).

**Response:**

Admitted as to the first sentence and third sentences, otherwise denied. In Hill's interview with Alonzo and ASA Waller, Waller asks "***So when he walks up***, you're only looking at the front of him, right?...You didn't, like, examine him head to toe?" (Defs' Ex. 20, Hill Interview Video at 0:08:55-0:09:03; emphasis added). Hill testified that she spoke with Edmondson "a good ten minutes" before he left to go to the bathroom. (Exhibit E, Hill Trial Testimony at pg. 139:19-24). Hill also testified that she watched Edmondson as he walked away, and noticed no blood:

> Q: ***So you said that you saw Mo-man walk away. And when he walked away, his back was toward you?***
> A: Yep.
> Q: ***You could see the back of his head?***
> A: ***Yep***
> Q: ***And you did not see any blood on the back of his head?***
> A: ***No.***

(*Id.* at 138:15-22; emphasis added); (See also Exhibit K, ASA Leuin Dep at 84:9-14). At her deposition, Hill repeated her testimony that she observed no wound to Edmondson's head. (Exhibit T, Hill Dep at 62:10-63:8). Hill confirmed that the ***only*** injuries Edmondson had were to his lip and chest. (*Id.* at 73:12-74:4; emphasis added). Hill was consistent about Edmonson being fine prior to his fall by the dumpster:

> Q: ***Okay. And so you said he walked into the parking lot. Other than bleeding form his lip, he appeared totally fine?***
> A: ***Yeah. The way he was walking, Yeah.***
> Q: Yeah. He walked in. He wasn't bleeding from the back of his head?
> A: ***No, I never seen nothing on the back of his head.***

(Exhibit E, Hill Trial Transcript at 119:12-17; emphasis added).

48. ASA Waller interviewed Anthony Beard, who said he was at Lake and Laramie and Mr. Edmondson, who he also called "Mo-man," approached, after speaking with Mr. Nelson, and had a cut on his mouth and a cut on his chest. (Ex. 21, 0:03:49-0:03:59, 0:07:38-0:08:03; 08:14-08:30). Beard never looked at the back of Mr. Edmondson's head. (Ex. 21, 0:08:35-0:08:50, 22:2-23:3).

**Response:**

The first sentence is admitted. The second sentence is denied, and it is unclear what Defs' Ex. 21 "22:2-23:3" refers to. In the cited video, Beard says nothing about whether or not he saw the back of Edmondson's head. In the video, ASA Waller specifically asks: "Okay, so when ***Larry***

walks up you notice these injuries, you guys are looking face to face, right?  Would it be fair to say you didn't give him, like, a head to toe…"  Beard responds: "I only saw his face (gesturing) and the wound to his chest (gesturing)."

Every statement Beard has ever made though says specifically that Edmondson's head was **not** bleeding prior to his fall:

Q:      And so after he told you this did you notice any injuries on [Edmondson]?
A:      Yes, *his lip, he had a gash that was bleeding and he had a gash in his chest, this wasn't bleeding, but that is all I seen.*
Q:      So after he told you what happened where did he go?
A:      First I offered to take him to the hospital but he said he didn't want to go and then he went to the back behind the dumpster where people normally use the bathroom back there and somebody came out and told him he fell out.
Q:      And did you go back there and check on him?
A:      Yes.
Q:      What happened when you got back there [behind the dumpster]?
A:      He wasn't breathing.
Q:      *Did you notice any injuries when you saw him?*
A:      *He was bleeding from the back of his head.*
Q:      And so *did you notice that from before*?
A:      *No.*

(Exhibit U, Beard GJ at 4:13-6); (Exhibit V, CPD Body Camera at 0:01:39-0:01:52: "His head wasn't bleeding."); (Exhibit A, CCR at pg. 14); (Exhibit B, Alonzo Dep at 16:8-17:20, 28:19-29:8); (Exhibit E, Trial Transcript at 119:18-19: "No, I never seen nothing on the back of his head."); (Exhibit W, Beard Dep at 59:9-22, 64:16-65:3).

49.      Mr. Edmondson said he got jumped on at Lorel and Plaintiff Washington by a couple guys and one female, who hit him with a pole or pipe. (Ex. 21, 0:08:15-0:08:35; 0:09:06-0:09:12, 0:09:20-0:09:40). Shortly after Mr. Edmondson left, someone alerted him that Mr. Edmondson had fallen, Beard went behind the dumpster and saw Mr. Edmondson was not breathing, his eyes were open, and blood was coming out of the back of his head. (Ex. 21, 0:09:52-0:10:19).

**Response:**

Admitted, except that Beard didn't say anything about "Lorel and Plaintiff Washington." [Dkt. #109 at 11].

- 28 -

### H. Mr. White's Interview with the State's Attorney's Office

50.     ASA Waller interviewed Mr. White. (Ex. 22, pg. 16 at 10:42 p.m.; Ex. 23). Mr. White said he, Ms. Cage, Plaintiff Washington, and "D" were outside. (Ex. 22, pg. 17 at 10:47 p.m.). According to Mr. White, Plaintiff Washington knew "D" through her friend Kiki. (Ex. 22, pg. 17 at 10:44 p.m.).

**Response:**

Admitted that sentences 1 and 2 in Defendants' Paragraph 50 are contained in the cited Ex. 22 (CCSAO "Video Statement Log"), though it is an incomplete recitation and the document itself is labeled: "**NOT VERBATIM.**"  Defendants do not attach any ERI video of White's interview with ASA Waller, and he has admitted that he has never seen such a video and is not sure it even exists.  (Exhibit X, ASA Waller Dep at 98:25-99:9).

51.     When it started to rain, the group went inside, and Mr. Edmondson tried to force his way into Plaintiff Washington's apartment. (Ex. 22, pg. 18-19 at 10:52 p.m., 10:55 p.m.) Plaintiff Washington grabbed a pole from her children's feeding tubes, showed it to him, and Mr. Edmondson backed out of the apartment building. (Ex. 22, pg. 19 at 10:56 p.m.)

**Response:**

Admitted that sentences 1 and 2 in Defendants' Paragraph 51 are roughly contained in the cited Ex. 22, though is an incomplete recitation of the document itself, and otherwise denied.  There is no other evidence supporting the alleged story of Edmondson trying to "force his way into Plaintiff Washington's apartment."

52.     Mr. Edmondson started to yell, got in Mr. White's face, and Mr. White struck him. (Ex. 22, pg. 19-20 at 10:58 p.m.) Then "D" approached Mr. White, and they started fighting. (Ex. 22, pg. 20 at 11:00 p.m.) Plaintiff Washington went into the house again and came out with a second gray aluminum stick, ran up to Mr. White and struck him in the chest, arm, and lip. (Ex. 18, 44:17-45:6; Ex. 22, pg. 20 at 11:01-11:02 p.m., 11:05 p.m., pg. 21 at 11:04-11:05, 11:07

p.m., pg. 22 at 11:13 p.m.). Mr. White said he saw Plaintiff Washington swing multiple times, but she only connected four times. (Ex. 18, 43:13-20, 45:8-17; Ex. 22, pg. 21 at 11:05 p.m., pg. 22 at 11:11 p.m.).

**Response:**

Admitted that much of paragraph 52 is captured in Defs' Ex. 22, which is a CCSAO Video Statement Log, labeled "**NON VERBATIM**," and allegedly describes erratic, inconsistent stories from White that are not contained anywhere else, such as Tabatha connecting "four times." Further, White's alleged testimony was ***not*** that Tabatha "came out with a second gray aluminum stick," i.e., with that there were two sticks outside, but that she previously had a separate stick inside the apartment that White had taken from her. (Defs' Ex. 22, pg. 20 at 10:55 p.m.; 10:56 p.m. "so I took it from him (sic) and put it down."; 11:01: "Are we talking about the same stick from Earlier?" "No, I took that one.")

Many of White's alleged statements are not corroborated by the above cited deposition testimony of ASA Waller, in which he merely states:

Q: Your memory is that she used it during the altercation—that she used the stick during the altercation several times, according to Carlton White.

\*     \*     \*     \*

A: The stick or the metal pole. It was, again, whatever this implement was described not only by Carlton White a lot of different ways but by multiple people. It was describ3d a lot of different ways. So I will agree that I recall Carlton White indicating that Tabatha used whatever this implement was it was described multiple different ways more than one time, multiple times.

\*     \*     \*     \*

Q: Do you have a recollection of what Carlton White told you Tabatha did in the altercation?

A: Just generally that Tabatha had some of –it was described a couple of different ways –some sort of metal implement and she used that during the altercation on Kim Edmondson several times.

\*     \*     \*     \*

Q: Okay. I guess –so putting the description of this implement aside, do you have a memory that Carlton White told you he saw Tabatha Washington swing the stick several times at Kim Edmondson?

\*     \*     \*     \*

A: Yes.

(Defs' Ex. 18 at 44:17-45:6, 43:13-20 and 45:8-17).

## I.     Plaintiff Washington's Interview with the State's Attorney's Office

53.     ASA Waller interviewed Plaintiff Washington. (Ex. 15, 23:37:50-23:38:15).

Plaintiff Washington asked that the detectives be present for her interview. (Ex. 15, 17:19:39-

17:20:06).

**<u>Response:</u>**

The first sentence is admitted.  The second sentence is denied.  In the cited video, Tabatha
specifically asks Alonzo if she'll "have the chance to talk to him (The State's Attorney)" when
they arrive, and if "y'all will be in there with me."

54.     ASA Waller interviewed Plaintiff Washington and she said on May 30, 2018,

Mr. Edmondson was outside while she and her children were selling snow cones. (Ex. 15,

23:43:34- 23:44:07). Edmonson jumped in her face, and she hit him with a small pole across

his lip and chest and missed him the third time when he jumped back. (Ex. 12, 325:12-

326:18; Ex. 15, 23:45:02- 23:45:31). At that point, Plaintiff Washington said Mr. Edmondson

started the altercation with the males for a few minutes. (Ex. 15, 23:45:31-23:45:45).

**<u>Response:</u>**

The first sentence is denied.  In the cited video, Tabatha informs ASA Waller that she was
selling snow cones with her kids, Cage, Donte and White, but there is no discussion of Edmondson.

ASA Waller and Tabatha later discuss Edmondson: ASA Waller asks about the incidents
yesterday evening," Like, what is this all about?"  Tabatha tells ASA Waller that Edmondson was
"high and drunk, and I kept asking him to move from my stand and stop cursing and stuff in front
of my kids.  So he started cursing me out."  (Defs' Ex. 15, at 23:44:52-23:45:03).

The second sentence is admitted, though incomplete.  In the cited video, Tabatha
specifically informs ASA Waller that she was defending herself.  The third sentence is admitted.

55.     Discussing the story again, Plaintiff Washington said everyone was drinking

outside but not one was drunk. (Ex. 15, 23:48:02-23:48:13). Mr. Edmondson approached Plaintiff

Washington and the first altercation occurred with her. (Ex. 15, 23:47:58-23:48:03, 23:48:42-

- 31 -

23:48:47). She found a pole on the ground, which she described as a light metal pole with a ragged end. (Ex. 15, 23:48:16-23:48:42).

**Response:**

Admitted.

56.  She swung the pole at Mr. Edmondson and struck him on the left side of his lip. (Ex. 15, 23:48:42-23:48:48; Ex. 18, 48:4-17). Plaintiff Washington said Mr. Edmondson jumped again and she swung again, hitting him on his chest. (Ex. 15, 23:48:48-23:48:54; Ex. 18, 48:4-17). The third time Plaintiff Washington swung the pole, she missed Mr. Edmondson because he jumped back. (Ex. 15, 23:48:54-23:48:57; Ex. 18, 48:4-17). Plaintiff Washington claimed that was the end of the entire altercation and the group went to the liquor store. (Ex. 15, 23:48:57-23:49:18).

**Response:**

Admitted.

57.  ASA Waller asked her directly about the men's interactions. (Ex. 15, 23:49:18-23:49:19). Plaintiff Washington said they only threw a few punches and then Mr. Edmondson left. (Ex. 15, 23:49:19-23:49:35).

**Response:**

The first sentence is denied and mischaracterizes the cited video. In the video, ASA Waller specifically asks Tabatha about Donte: "What about the men, what about Donte, and you said that he got into it with the….(inaudible)." The second sentence is admitted as far as Tabatha recounting Donte's altercation with Edmondson.

58.  Plaintiff Washington told ASA Waller the story again and she said Mr. White struck Mr. Edmondson first, while she was arguing with Mr. Edmondson, and then Plaintiff Howard and Mr. Edmondson started an altercation. (Ex. 15, 23:51:24-23:52:23). When ASA

Waller tried to clarify, Plaintiff Washington said first Mr. White punched Mr. Edmondson once, then she got the stick and swung it at Mr. Edmondson three times, striking him twice, and then Plaintiff Howard started fighting Mr. Edmondson. (Ex. 15, 23:53:14-23:55:30).

**Response:**

Denied that the first sentence accurately reflects what Tabatha told ASA Waller. In the cited video, Tabatha says that "it all happened so fast," and she thinks White hit Edmondson while "me and him was arguing," and that he only hit him once. The cited portion of the video makes no mention of Donte. Tabatha then goes on to tell Waller that she continued to ask Edmondson to leave, as was calling them "bitches and hoes."

Denied that the second sentence accurately reflects what Tabatha told ASA Waller. In the cited video, she tells him that after White's altercation with Edmondson, she repeatedly asked Edmondson to leave, because he was acting high, and he responded "bitch, shut up." She also told ASA Waller that Edmondson jumped at her, and her reflexes were to swing and "caught him." She also informs ASA Waller that Edmondson "was always facing me," and after striking him twice "that was it between him and me." Though she didn't know what Donte was doing this event, she tells ASA Waller that later, "somehow he (Donte) and Edmondson started fighting in the street."

59. When ASA Waller asked Plaintiff Washington about Mr. White's statement that she went inside and brought out a pole, Plaintiff Washington said it was not true and the pole came from the ground outside. (Ex. 15, 23:53:14-23:55:30).

**Response:**

Admitted.

60. ASA Waller asked Plaintiff Washington about her earlier statement that Plaintiff Howard struck Mr. Edmondson with the pole and Plaintiff Washington said she did not mean to say Plaintiff Howard used the pole to strike Mr. Edmondson. (Ex. 15, 0:00:21-

0:01:53 \ 24:00:21-24:01:53)[2].

**Response:**

Admitted, though Defendants' Paragraph 60 does not accurately reflect what Washington told ASA Waller. In the cited video, she is asked by ASA Waller: "How come before when you were talking with the detectives that you told them that Donte...," and Tabatha responds: "I'm not going to lie to you, I was talking fast, I was scared, I was nervous. I didn't mean to say he hit him. He was hitting him with his fists. That's why I said I don't see how his head got bust." Garcia confirmed that Tabatha quickly disavowed stating that Donte hit Edmondson with a pole, and that she was confused and it wasn't the truth. (Exhibit C, Garcia Dep at 14:10-20).

### J.    Mr. Edmondson's Autopsy Results

61.    On May 31, 2018, at 7:45 a.m., Dr. Kirstin Howell performed Mr. Edmondson's autopsy. (Ex. 24, 50:4-7). Dr. Howell concluded Mr. Edmondson died of blunt force trauma to the head and the internal and external injuries supported a finding that he was the victim of an assault and homicide. (Ex. 24, 106:15-18, 110:14-111:6, 126:17-127:14).

**Response:**

Admitted to the first sentence. The second sentence is admitted in part, and denied in part. Dr. Howell concluded that Edmonson died from blunt force trauma to the head, but the cited testimony makes no reference to "external injuries," let alone that "the internal and external injuries supported a finding that he was the victim of an assault and homicide." However, the implication that such conclusions were based on the autopsy is denied; they were based on false information that she received from her investigator. In the above cited testimony, Dr. Howell admitted:

Q:    And you made that decision because you ruled it a homicide?
A:    Yes.
Q:    ***And why did you rule it a homicide?***
A:    ***Because there was a history of an assault***, we had injuries consistent with assault. And death at the hands of another is ruled as a homicide? (sic)
Q:    ***So the history of the assault that came from Investigator Santoro; is that right?***
A:    ***Yes.***

---

[2] If using a media player that displays the total recorded time as "25:11:05", then use the second time stamp listed. If using a media player that displays the total recorded time as "1:11:04", then use the first time stamp listed.

| | | |
|---|---|---|
| Q: | And then injuries consistent with assault, that came from your own examination? | |
| A: | Yes. | |
| Q: | So what made you determine that there was death at the hands of another? | |
| A: | ***That there was a story of an assault*** and that the injuries were consistent with that. | |

(Defs' Ex. 24, 110:14-111:6; emphasis added). When Dr. Howell performed her postmortem examination of Edmondson, she was also informed by the false story that her medical examiner got from the detectives about an alleged eyewitness (Nelson) actually seeing Edmondson being beaten by multiple people wielding multiple pipes:

| | |
|---|---|
| Q: | So we'll review this. So you'll see at the bottom of Page 3, "***According to Larry Nelson, witness related that he observed Edmondson getting beat by three male blacks and two female blacks with pipes in their ands all beating on [Edmondson], correct?*** |
| A: | Yes. |
| Q: | And that as part of the narrative that you considered, correct? |
| A: | Yes. |
| Q: | ***So your determination was based, was it not, on multiple people beating Edmondson with multiple pipes, yes?*** |
| A: | That was the story that we got, ***yes***. |

(Exhibit Y, Dr. Howell Dep at 179:18-180:6); (Exhibit Z, Medical Examiner Investigator's Report at pg. 3); (Exhibit AA, Santoro Notes at pg. 2: "3M/1 + 2F/1 =Lives w/OFFENDERS – ALL 5 OFF HAD PIPES & BEATING VICTIM UP"); (Exhibit BB, Santoro Dep at 34:2-6:)

Dr. Howell explained how her investigator gathered the information for his report, as well as her reliance on it:

| | |
|---|---|
| Q: | That report that you reviewed, well, the case report that the medical examiner investigator prepares that you said you reviewed before the autopsy, that includes a narrative, correct? |
| A: | Correct. |
| Q: | And that narrative comes from the medical investigator speaking with Chicago police officers on the scene? |
| A: | Yes. |
| Q: | And possibly any witnesses that may have been there as well? |
| A: | Yes. |
| Q: | ***So the narrative is essentially the police officer's version of their educated guess of what happened to this victim; right?*** |
| A: | ***Yes, and whatever other information our investigatory may have gotten from other people at the scene.*** |

*      *      *      *

| | |
|---|---|
| Q: | So at the time of your autopsy, you knew everything that the polices said happened to Mr. Edmondson; right? |

- 35 -

A:      I –whatever our investigator had.

Q:      ***Well, the narrative included the statement that the weapon used was a pipe; right?***

A:      ***Yes.***

Q:      ***So that's what you were going on when you performed this autopsy?***

A:      ***That is, yes.***

(Exhibit E, Trial Transcript at 84:16-85:7, 87:13-22).

      62.     The autopsy revealed the following injuries to the top, back, right side of Mr. Edmondson's head:

- A cruciform or cross or T-shaped laceration on the top, back, right side of his head with a skin tear that was X or T-shaped. (Ex. 24, 73:13-20).
- The laceration to the top, back of his head was 1 ¼ by ¾ inch. (Ex. 24, 73:21-23).
- Internally, Mr. Edmondson had a hole in his skull that was 1 by 15/16 inch, and fragments of bone within the brain. (Ex. 24, 74:6-22).

**Response:**

    Admitted.

      63.     The autopsy revealed external injuries consistent with an assault shortly before his death. (Ex. 24, 110:14-111:6). The injuries included a laceration to Mr. Edmondson's upper left lip, a laceration to his lower left lip, multiple purple contusions on his lower left lip, a recent abrasion behind his left ear, a laceration to the center of his chest, a contusion to his posterior left forearm, which would be consistent with him being struck with a 1-inch or smaller object on his forearm, approximately nine contusions on Mr. Edmondson's left upper arm, multiple contusions on his right upper arm, and at least three contusions on Mr. Edmondson's right forearm (Ex. 24, 84:19-25, 85:11- 24, 86:4-9, 92:20-2, 95:14-19, 97:17, 99:4-100:3, 100:7-10, 101:6-25, 103-7-17).

**Response:**

    Admitted that Dr. Howell testified that the autopsy revealed "injuries consistent with an

assault," but otherwise denied.  The cited testimony says nothing about "external injuries":

> Q:     And you made that decision because you ruled it a homicide?
> A:     Yes.
> Q:     ***And why did you rule it a homicide?***
> A:     ***Because there was a history of an assault***, we had injuries consistent with assault.
>        And death at the hands of another is ruled as a homicide? (sic)
> Q:     ***So the history of the assault that came from Investigator Santoro; is that right?***
> A:     ***Yes.***
> Q:     And then injuries consistent with assault, that came from your own examination?
> A:     Yes.
> Q:     So what made you determine that there was death at the hands of another?
> A:     ***That there was a story of an assault*** and that the injuries were consistent with that.

(Defs' Ex. 24, 110:14-111:6; emphasis added).

Admitted that Dr. Howell observed various abrasions, contusions, etc. to Edmondson's body, otherwise denied.  Dr. Howell did not specifically say that all of these injuries – which she could not date – were the basis for her opinion about an assault.  (Exhibit Y, Dr. Howell Dep at 141:1-2).  Further, some of the many representations in the second sentence are false: Dr. Howell did ***not*** opine that an abrasion behind Edmondson's ear was "recent":

> Q:     Which means that you – ***does that mean that you believe that abrasion on the back***
>        ***side of his left ear was a recent abrasion?***
> A:     ***That just means I documented it at the time of the autopsy.***

(Exhibit Y, Dr. Howell Dep at 144:22-145; emphasis added).  Additionally, Dr. Howell did ***not*** state that "a contusion to [Edmondson's] posterior left forearm…***would be consistent with him being struck with a 1-inch or smaller object on his forearm."***  Her testimony was:

> Q:     Did you –was there an injury to Kim Edmondson's posterior left forearm?
> A:     Yes.
> Q:     What was that injury?
> A:     There was a linear 1-inch contusion with central pallor.

(*Id.* at 95:14-19).

64.     Dr. Howell opined Mr. Edmondson had to be struck at least twice on his head to cause the injuries to his lips and behind his ear and potentially his chest, at least three times on his left arm, and at least twice on his right arm to cause the injuries noted on his upper extremities. (Ex. 24, 92:9-19, 99:4-100:3, 104:4-13).

**Response:**

Admitted that at her deposition, Dr. Howell provided roughly the information contained in Defendants' Paragraph 64, denied as to the implication that any of this information was conveyed to Defendants or was presented at trial. (Exhibit E, Dr. Howell Trial Testimony at pgs. 58-109).

65.     Dr. Howell advised Detective Alonzo of the results of her autopsy. (Ex. 8, 36:4-17; Ex. 17, pg. 19; Ex. 25. Dr. Howell concluded the object to cause that upper back head wound had to be a round object, approximately 1 inch in diameter. (Ex. 24, 74:23-74:3).

**Response:**

The first sentence is admitted. Admitted that at her deposition, Dr. Howell testified consistent with the second sentence. However, denied that her opinion in 2018 involved "a round object, approximately 1 inch in diameter" or that it was conveyed to any Defendant. This "conclusion" is not found in Dr. Howell's postmortem report, nor did she give such testimony at trial about the diameter of any such object. (Exhibit CC, Dr. Howell Report); (Exhibit E, Trial Testimony at 94:3-6) ). There is also no evidence that she told this to Alonzo, as it does not appear in either the CCR or the GPR of his conversation with her. (Exhibit A, CCR at pg. 19); (Exhibit DD, Howell GPR)

**K.     ASA Waller's Designation as "Continued Investigation" and Detectives' Additional Investigative Steps**

66.     When ASA Waller completed his interviews, he spoke to the detectives again about their investigation. (Ex. 18, 51:20-25). This included the information Dr. Howell provided the detectives. (Ex. 18, 139:17-140:12).

**Response:**

Denied. Defendants' Paragraph 66 is unsupported in the cited record. ASA Waller's testimony was that "after talking to Tabatha Washington," the "next step that he took" was that he "***would have*** talked to the detectives," (Defs' Ex. 18, 51:20-25) though no evidence exists that he actually did. The second sentence is likewise unsupported. ASA's cited testimony begins by discussing a document that he's not even sure if he was the author of; on the previous page he's asked:

Q:     And down on page 68 did you fill out the results of the autopsy in this summary?
A:     I did not fill that out.
Q:     It's above the paragraph that has Defendant Washington made post-Miranda

statements admitting to striking victim in the chest.  Did you have –

A:  It's possible I filled that out, but I'm not – I don't recall offhand

(Defs' Ex. 18 at 138:19-140:2).  He is then asked about Dr. Howell's autopsy report.  Even though Edmondson's autopsy allegedly took place at 7:45 a.m. on May 31, the report itself is dated August 13, 2018, and thus could not have been reviewed by ASA Waller at that time.

   67.  ASA Waller designated the investigation as "continuing" because he felt it was important the detectives attempt to search Plaintiff Washington's apartment for any metal poles or implements that would be consistent with Mr. Edmondson's injuries, attempt to interview Cynthia Ms. Cage, and to allow the CCSAO time to do a full review of any recorded statement. (Ex. 18, 53:6- 18). ASA Waller advised Deputy Supervisor Assistant State's Attorney Laura Ayala-Gonzalez (hereinafter, "ASA Gonzalez") of all information he learned during his investigation. (Ex. 18, 56:23-57:10).

**Response:**

  Admitted that ASA Waller gave testimony consistent with the first sentence, denied that anyone at the CCSAO actually did "a full review of any recorded statement" in this case.  ASA Gonzalez testified specifically that she did not review any materials, let alone recorded statements:

  Q:  Did you ever review the videotaped recording of [ASA Waller's] interviews of those three individuals?

  A:  Not that I recall.

*  *  *  *

  Q:  ***Were you provided any materials to review prior to giving a felony approval for either of [Plaintiffs'] charges?***

  A:  ***No.***

(Exhibit EE, ASA Gonzalez Dep at 26:8-11, 65:10-13; emphasis added).  ASA Waller admitted that, prior to his depositions, he had never reviewed the videos of his interviews with Tabatha or White  (Exhibit X, ASA Waller Dep at 98:10-24), and there is no evidence that he reviewed the interviews with Beard, Hill or Nelson prior to felony approval being given.

  Admitted that ASA Waller testified that he told ASA Gonzales "everything that [he] learned during the investigation.  (*Id.*, at 57:6-10).  If true, this would have included the false Balodimas story, which now included ***multiple*** detectives:  "And they were standing outside and could hear conversations coming from inside one of the apartments that sounded to be individuals

discussing the altercation that they detectives were investigating." (*Id.* at 23:25-24:4)

68.     Plaintiff Washington executed a consent to search her apartment to locate the pole she admitted to using on Mr. Edmondson. (Ex. 15, 0:54:53-0:55:43; Ex. 26). Detective Alonzo went to her apartment and discovered four silver metal poles that appeared to be approximately one inch in diameter. (Ex. 8, 22:11-14; 25:2-11). Evidence technicians collected those poles and submitted them to the Illinois State Police crime laboratory for processing. (Ex. 8, 26:3-10).

 **Response:**

The first sentence is admitted.  Admitted that Alonzo (as well as Balodimas) went to Tabatha's apartment and recovered "four silver table leg poles," and that Alonzo "basically approximated their size by my sight," and that they were "approximately an inch in diameter poles."  Alonzo also made no "affirmative step to ascertain the [pole's] dimensions." (Exhibit B, Alonzo Dep at 27:1-10).  The third sentence is admitted.

69.     One pole later tested positive for Mr. Edmondson's DNA. (Ex. 8, 23:14-19; Ex. 37, ¶2).

 **Response:**

Admitted.

**L.     State's Attorney's Office Decision on Murder Charges**

70.     The Cook County State's Attorney's Office (hereinafter, "CCSAO") decides whether an arrestee may be charged with murder after reviewing evidence and conducting its own investigation if needed. (Ex. 18, 16:11-14, 16-19; Ex. 28, 15-21, 48:23-49:12). In this case, ASA Gonzalez decided whether Plaintiff Washington and Plaintiff Howard could be charged with murder. (Ex. 28, 16:6-22)  ASA Waller and potentially another State's Attorney continued to advise ASA Gonzalez about the information learned. (Ex. 28, 17:13-18:4, 26:16-19, 32:23-20).

**Response:**

The first sentence is denied; it is unsupported in the cited testimony and contradicted by what actually happened in this case. ASA Gonzalez reviewed no documents or materials prior to giving felony approval, including what was gathered by ASA Waller, and only learned about his investigation from speaking with him. (Exhibit EE, ASA Gonzalez Dep at 26:8-11, 64:25-65:13)

Alonzo personally spoke with ASA Gonzalez on June 1, 2018, about felony review (Exhibit B, Alonzo Dep at 37:19-38:8); (Exhibit FF, ASA Gonzalez GPR), then prepared the Felony Minutes 101 Form that was used at the June 2 detention hearing the following morning; at that hearing, the CCSAO ASA Taylor Dall specifically recited the Defendants' manufactured evidence, claiming that:

> The Defendant Washington struck the victim with a pole multiple times causing injuries to his face, **head** and chest.
>
>       *     *     *     *
>
> Detectives overheard a loud conversation coming from Defendant Washington's apartment. The detectives observed the Defendant Washington, the co-offender and a third individual through the apartment window. ***Detectives overheard a female and male voice indicating that the victim got what he deserved***."

(Exhibit HH, June 2, 2018 Hearing Transcript at 3:15-17, 4:15-22; emphasis added); (Exhibit GG, Felony Minutes Form 101).

The second sentence is admitted. The third sentence is denied; it is unsupported in the cited testimony, and it is unclear what Defs' Ex. 28 "32:23-20" refers to. Further, ASA Gonzalez provided no testimony that any ASA "continued to advise [her] about the information learned."

71.    On June 1, 2018, ASA Gonzalez approved the decision to charge Plaintiff Washington with murder. (Ex. 17, p. 19; Ex. 28, 16:6-22).

**Response:**

Admitted.

72.    Plaintiff Howard was taken into custody on June 4, 2018, and declined to speak with the detectives. (Ex. 39, 29:25-29:41; 30:09-30:14). ASA Gonzalez approved the murder charge against him on June 6, 2018. (Ex. 17, p. 20; Ex. 28, 16:6-22).

**Response:**

Admitted that Donte was taken into custody on June 4, 2018, otherwise denied. In the above cited video, Donte began to speak freely with Balodimas and Alonzo, including freely to previously using the alias "Jeremiah." Donte made a request to speak to an attorney, which was denied:

Q:    And you said, no, I don't want to talk?
A:    No, I did not say that. I said I want an attorney to speak to, so I can be directed. I just wanted an attorney present. They never had me with an attorney or let me call my attorney, appointed me with an attorney or let me call my attorney…. I just informed them that I wanted to speak to my attorney first, and they never allowed me to speak to my attorney or appointed me an attorney.

(Exhibit N, Donte Dep at pgs. 156:14-157:7; see also 199:12-16, 203:23-204). Admitted as to the second sentence.

**M.    Judge Lyke Determined There Was Probable Cause To Arrest Plaintiffs.**

73.    On June 2, 2018, Judge Lyke found probable cause to detain Plaintiff Washington. (Ex. 29, p. 1; *see Brisco v. Stinar*, 2020 WL 7027719, at *4 (Nov. 30, 2020 N.D. Ill.) *citing Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (finding the court may take judicial notice of a certified statement of conviction/disposition from the Circuit Court of Cook County)). On June 7, 2018, Judge Lyke found probable cause to detain Plaintiff Howard. (Ex. 30, p. 1).

**Response:**

Plaintiffs object to Paragraph 73 in its entirety, as it improperly seeks to advance legal arguments and cites to two non-bates stamped documents that were never produced in this litigation and used for the very first time in support of Summary Judgment.

Answering further, admitted that such a finding was made; however, the collection of "evidence" presented to Judge Lyke in order to make a probable cause determination was compromised by the tainted, manufactured information supplied by the Defendants, namely that Tabatha had beaten Edmondson "on and about the head with a metal object several times" and that she and Donte were overhead making false, incriminating statements. (Exhibit HH, June 2, 2018 Hearing Transcript at 3:15-17, 4:15-22); (Exhibit JJ, June 7, 2018 Hearing Transcript at 3:15-17, 4:13-19).

**N.    Grand Jury Proceedings**

74.     The CCSAO presented the charges of murder and mob action against Plaintiffs before a grand jury. (Ex. 36, p. 1-2). Nelson, Beard, and Hill testified consistently with the information they provided the detectives and ASA Waller. (Ex. 5; Ex. 31; Ex. 32).

**Response:**

Agreed as to the first sentence.  Admitted that Nelson, Beard and Hill told the grand jury that their testimony was consistent with the information they provided to the detectives and ASA Waller, otherwise denied.  For instance, the initial interviews that Beard and Nelson gave to Alonzo and Garcia, respectively, made no mention of Edmondson getting hit with a weapon, but now Nelson claims that Edmondson mentioned "a pipe."  (Exhibit B, Alonzo Dep at 16:10-17:1); (Exhibit C, Garcia Dep at 36:22-37:7, 39:20-40:1).

Certain exculpatory testimony was not presented to the grand jury either, such as Hill telling ASA Waller that she just assumed Edmondson fell and hit his head:

Q:     Do you remember Khadijah Hill telling you that she just assumed that Kim Edmondson fell and hit head?
A:     She –she stated something about assuming that he fell and hit his head.
Q:     Because she had never seen any blood dripping or she put it leaking from the back of his head; correct?
                           *        *        *        *
A:     She used those words, yes.

(Exhibit X, Waller Dep at 122:22-123:8).  Hill confirmed those statements to the police at her deposition:

Q:     Right.  And so my question, ma'am, is just but when you did speak to the cops and when you said you thought that he had fell and hit his head, you didn't mention anything about concrete.  What you told them was you never noticed anything dripping or leaking from his head, right?
A:     I never, right, no.
Q:     And that's what you told the cops, correct?
A:     That's what I assume, that he hit his head to the dumpster or something that's right there?
Q:     Why – why did you think he may have hit his head on the dumpster?
A:     Because it wasn't nothing.  He wasn't bleeding.  His head wasn't bleeding or whatever.  Only two cuts over there and I saw was the one that is in his chest and on his lip.

(Exhibit T, Hill Dep at 80:2-19); (Exhibit KK, Hill Interview Video at 0:06:30-0:06:45)

- 43 -

75.     Ms. Cage also testified before the grand jury and confirmed her testimony was consistent with information she provided Detective Alonzo. (Ex. 33, 9-15). She said after Mr. White stopped fighting Mr. Edmondson, Plaintiff Washington retrieved a pole from her apartment and went after Mr. Edmondson. (Ex. 33, 4:16-17, 5:3-7, 5:24-6:10, 6:18-22) Plaintiff Washington struck Mr. Edmondson with the pole and then Plaintiff Howard got into an altercation with Mr. Edmondson in the street. (Ex. 33, 7:3-4, 7:19-21, 8:12-24).

**Response:**

Admitted that Cage testified before the grand jury and stated that her testimony was consistent with the information she provided Alonzo, otherwise denied.  Cage's interview with Alonzo contained additional – exculpatory – information that was not presented to the grand jury, including the fact Edmondson was calling her a "bitch," and that after his altercation with Donte, Edmondson "was bleeding from the mouth, but appeared to be fine when he left."  (Exhibit A, CCR at pg. 18).

Admitted that Cage gave the testimony in second sentence but denied as to the veracity that "Washington retrieved a pole from her apartment and went after Mr. Edmondson."  Donte and Tabatha testified that the pole that she struck Edmondson with came from off the ground, as she was using it to stabilize the snow cone table. (Exhibit N, Donte Dep at 69:8-16, 70:1-5); (Exhibit Q, 9/28/21 Tabatha Dep at 121:24-8, 124:10-12, 149:5-10).  Tabatha testified that she only picked up the pole after Edmondson threatened her, claiming that he would beat her "bitch ass," then aggressively pursued her (*Id.* at 160:13--23, 161:6-19; 164:1-12).  Donte similarly testified:

Q:     When Kim came back, was he saying anything?
A:     He was calling –he was doing –calling Tabatha bitches and hoes.
Q:     So he continued calling Tabatha bitches and hoes.
A:     Yes.
Q:     What happened next?
A:     That's when Tabatha, I believe, that she picked up something, and she was trying to wave him off because he was –he was constantly approaching her and, you know, she was trying to –she was trying to get him, you know, to go on about his business.

(Exhibit N, Donte Dep at 60:6-19).  ASA Waller acknowledged that Tabatha told him that Edmondson "lunged or jumped" at her, and ASA Waller doesn't recall telling anyone that he didn't believe Tabatha.  (Exhibit X, ASA Waller Dep at 89:1-17, 94:8-15).  The same story was relayed to Defendant Alonzo:

Q:    Well, she also says that he lunged at her, did she not?
A:    Yes.
Q:    She said that he was acting erratically calling them bitches and hoes. Do you recall her testifying to that?

                        *        *        *        *

A:     I do recall that, yes.

(Exhibit B, Alonzo Dep at 48:23-495).

Admitted that Cage stated that Donte got into an altercation with Edmondson after Tabatha's altercation with Edmondson, that Defendants' third sentence is accurate and complete. Cage's testimony was that after Tabatha hit Edmondson twice, he walked away, then returned to confront Donte, who was "trying to hide himself." (Exhibit S, Cage GJ at 7:19-8:16)

76.    Ms. Cage said Plaintiff Howard struck Mr. Edmondson a couple of times, then

Mr. Edmondson hit a truck and left. (Ex. 33, 9:1-15). Ms. Cage also confirmed she told Alonzo

the same information she testified to before the grand jury. (Ex. 33, 9:21-10:7).

**Response:**

Admitted that Cage said that Donte "hit" Edmondson "a couple of times," and that the Edmondson hit a truck and walked off, otherwise denied that Defendants' paragraph 76 accurately captures Cage's cited testimony, in which she states:

Q:    And did the person you know as DT (Howard) hit the person you know as Black?
A:    Yes.
Q:    And was it more than one time?
A:    A couple times.
Q:    A couple times?
A:    ***They were hitting each other.***
Q:    Then what happened next?
A:    He punched him and he hit the car. The car was a Buick, a white Buick truck. He hit the car. The car had stopped. He punched him and he went back on the car.
Q:    And then what happened?
A:    And then that was it. He walked off. Everybody walked off.

(Ex. 33, 9:1-15; emphasis added). Admitted that Cage testified before the grand jury and stated that her testimony was consistent with the information she provided Alonzo, otherwise denied. Cage's interview with Alonzo contained additional – exculpatory – information that was not presented to the grand jury, including the fact Edmondson was calling her a "bitch," and that after his altercation with Donte, Edmondson "was bleeding from the mouth, but appeared to be fine when he left." (Exhibit A, CCR at pg. 18).

- 45 -

77.     Detective Alonzo also testified before the grand jury. He testified to the information he learned during the investigation into Mr. Edmondson's murder. (Ex. 8, 45:17-23, 47:17-48:7, 50:10- 19; Ex. 34). The grand jury indicted Plaintiffs for murder and felony mob action on June 28, 2018. (Ex. 29, p. 3; Ex. 30, p. 3; Ex. 36, p. 3-9).

**Response:**

Admitted that Alonzo testified before the grand jury.  Admitted that Alonzo claims that his "investigation reveal[ed]" certain information, otherwise denied.  Alonzo's grand jury testimony was contradicted by the record and what he learned during his investigation, and his false testimony is demonstrated several ways.  Alonzo testified that his investigation revealed that "Donte Howard was located outside 5316 West Washington consuming alcohol," but couldn't identify a single document supporting that claim.  (Exhibit B, Alonzo Dep at 46:24-47:13).

Alonzo testified that his investigation revealed that Tabatha "began to chase Edmondson and then began to strike Kim Edmonson with a metal pole about the head and body."  (Exhibit LL, Alonzo GJ at 4:12-16); (Exhibit B, Alonzo Dep at 50:8-17).  Prior to his deposition, Alonzo reviewed the interview videos of eyewitnesses Tabatha, Donte and White - as well as his reports - but couldn't recall the alleged source for the claim that Tabatha "chased" Edmondson:

Q:     ***Who told you that she chased Kim Edmondson?***
A:     ***I don't recall***
Q:     As you sit here today, can you think of a single course for that statement?
A:     As I sit here today, ***I don't recall which of the witnesses that said that she chased him.***

(Exhibit B, Alonzo Dep at 50:18-23; emphasis added) (*Id.* at 12:3-5, 12:13-14:1)  The only other eyewitness was Cynthia Cage, and Alonzo denied that she was the source for this alleged "chase" statement:

Q:     ***Well, okay, how many interviews did you take that weren't recorded?***
A;     One
Q:     And who was that?
A:     Cynthia Cage
Q:     ***And so is it your testimony that you think Cynthia Cage might have told you that she witnessed Tabatha Washington chasing Kim Edmonson?***
                    *          *          *          *
A:     ***No.***

(*Id.* at 52:2-11; emphasis added) In response to an interrogatory, Alonzo originally claimed that

- 46 -

the source for the "chase" testimony was that it was: "Based on plaintiff Washington's admissions statements from Carlton White, Cynthia Cage, Larry Nelson, Anthony Beard, and Khadijah Hill. (*Id.* at 55:14-19) (Exhibit MM, Alonzo Interrogatory Answers at pgs. 1-2). Alonzo conceded though that Nelson, Beard and Hill were ***not*** witnesses, and could not "recall anywhere anyone using the word "chase." (Exhibit B, Alonzo Dep at 55:20-56:7, 57:6-8).

Alonzo's fiction about Tabatha striking Edmondson "about ***the head*** and body" is also belied by the record and Alonzo's own admissions; in response to an Interrogatory, Alonzo claimed that "Washington and White both stated that Washington hit Edmondson in the head with a pole and Edmondson sustained injuries to the head, including in the back of the head." (Exhibit MM, Alonzo Interrogatory Answers at pg. 3). At his deposition, though, Alonzo conceded that when he said the "the head," he was referring to the lip:

> Q:   So when you say that you're aware that Washington and white both stated that she hit him in the head, are you referring to the lip?
>
> A:   As part of the head, yes.
>
> *      *      *      *
>
> Q:   Oh, okay.  So when you say that Washington hit –Washington and White both stated that Washington hit Edmondson in the head with the pole, is that specifically referring to the lip?
>
> *      *      *      *
>
> A:   Yes.
>
> *      *      *      *
>
> Q:   Now, when you say that he was struck on the and about the head, are you talking about the lip or you referring to, like the top of his head?
>
> A:   Both.
>
> Q:   But did anyone tell you that she hit him on the top of the head?
>
> A:   Did anyone tell me she hit him on top of the head?  No.
>
> *      *      *      *
>
> Q:   In the video that you reviewed, Carlton white say that Tabatha Washington struck him in the head.  Correct?
>
> *      *      *      *
>
> A:   Yes
>
> *      *      *      *
>
> Q:   Now, what de he say, that she struck him in the lip or on the top of the head?
>
> A:   He said that –my recollection is that he said that she struck him a few times with the metal pole, and then he had a cut to his lip, and he observed a cut to his lip.
>
> Q:   Okay.  But – and sir, I'm asking you something a little different here.  Did Carlton White tell you that Tabatha Washington hit Kim Edmondson on the top of the head, yes or no.?
>
> A:   No.

(Exhibit B, Alonzo Dep at 59:9-12, 61:1- 4, 61:6, 40:20-41:2, 34:16-9).  Alonzo provided similar testimony regarding other aspects of the investigation, including his interview with Nelson:

Q:    Did you hear [Larry Nelson] remark on any wounds to Kim Edmondson's head?
A:    Yes.
Q:    You did hear him make a statement about a wound to Kim Edmond's head?
A:    Yes.
Q:    that not in this report, though, is it?
A:    It is.
Q:    Okay. Can you please show me where, sir?
A:    "Observed the victim" who he knows as "Moe," "bleeding from the mouth."
Q:    Okay.  That's a little different than a head wound to the top of the head, though. Correct?
A:    Bleeding from the mouth is different than a wound at the top of the head, yes.

           *       *       *       *

Q:    So, just so the record is clear, Larry Nelson's memorialized interview here says nothing about observing a head wound to the top of the head, back of the head, to Kim Edmondson.   Correct?

           *       *       *       *

A:    To that location, no.

           *       *       *       *

Q:    [Nelson] does describe a head wound for Mr. Edmondson.  He described a lip bleeding, I believe.
A:    Is that the only head wound?
Q:    That's the only head wound that he observed.

(Exhibit B, Alonzo Dep at 29:9-30:7, 30:10-15,31:9-15)

78.    Other than Detective Alonzo's grand jury testimony, Defendant Officers did not have any other involvement in the grand jury proceedings, and they did not testify at Plaintiffs' criminal trial. (Ex. 35, 19:12-18).

**Response:**

Admitted.

79.    At the criminal trial, Dr. Howell opined the size of the poles collected were consistent with Mr. Edmondson's fatal upper head and skull wound. (Ex. 27, 18:3-11, 90:22-91:3). Dr. Howell denied the possibility that Mr. Edmondson received the skull fracture from the dumpster handle. (Ex. 27, 38:7-39:10). Further, Dr. Howell believed Mr. Edmondson could have

- 48 -

walked the one-half mile distance from the altercation to where he died with the fatal head wound. (Ex. 24, 153:4-20; Ex. 27, 40:16-20).

**Response:**

Denied as to the first sentence.[3] Denied as to the veracity of Dr. Howell's testimony and denied that the cited testimony is complete as to her opinion. Dr. Howell did not "***opine that the size of the poles collected were consistent*** with Mr. Edmondson's fatal upper head and skull wound;" her cited testimony was:

> Q:  Okay. Are any of those four poles consistent with your opinion that those ***could have*** been used to cause the injury that caused the death of Kim Edmondson?
>
> A:  ***It's possible*** that any of them were used.

(Defs' Ex. 27, 90:22-91:3; emphasis added). Dr. Howell, though, informed ASA Leuin on August 5, 2019, that it was "***possible but unlikely***" that Edmondson's injury was caused by one of the poles. (Exhibit K, ASA Leuin Dep at 78:12-79:13; emphasis added). Further, Dr. Howell's postmortem examination of Edmondson was also informed by the false story that her medical examiner got from the detectives about an alleged eyewitness actually seeing Edmondson being beaten by multiple people wielding multiple pipes:

> Q:  So we'll review this. So you'll see at the bottom of Page 3, "***According to Larry Nelson, witness related that he observed Edmondson getting beat by three male blacks and two female blacks with pipes in their ands all beating on [Edmondson], correct?***
>
> A:  Yes.
>
> Q:  And that as part of the narrative that you considered, correct?
>
> A:  Yes.
>
> Q:  ***So you determination was based, was it not, on multiple people beating Edmondson with multiple pipes, yes?***
>
> A:  That was the story that we got, ***yes***.

(Exhibit Y, Dr. Howell Dep at 179:18-180:6); (Exhibit Z, Medical Examiner Investigator's Report at pg. 3).

As far as the poles themselves, Dr. Howell never even inspected them, nor did she even know the exact measurements of them. (Exhibit Y, Dr. Howell Dep at 180:7-18); (Exhibit E, Dr. Howell Trial Testimony at 91:23-92:4: "I don't know what the exact measurements of all of these

---

[3] It is unclear what "Ex. 27, 18:3-11" refers to, as Dr. Howell's testimony begins on page 58 of Defs' Ex. 27. If "18:3-11" refers to the ECF page number (page 73), then that testimony does not relate to the first sentence.

are."); (See also Exhibit B, Alonzo Dep at: 26:6-9: "When [the poles] are collected by the evidence technician the evidence technician themselves inventory those poles and then they are sent through some process to the state lab, where they are tested.")

Denied as to the second sentence. [4] Dr. Howell's testimony was not that she "denied the possibility that Mr. Edmondson received the skull fracture from the dumpster handle." Dr. Howell's testimony was that it was "unlikely" that Edmondson's injury came from falling onto a dumpster handle, but agreed that the dumpster handle **could** have caused an injury in a different way. (Exhibit E, Dr. Howell Trial Transcript at 94:7-17, 95:11-21). Admitted that Dr. Howell opined that he could have walked the "one half mile" distance with the fatal head wound, otherwise the fourth sentence is denied.[5] Dr. Howell's testimony, coupled with the fact that there was no blood on Edmondson's half mile trail, suggest he could not have sustained that injury at 5316 W. Washington:

| | |
|---|---|
| Q: | And what about the type of bleeding involved in that injury? |
| A: | Usually head wound bleed significantly |
| | *     *     *     * |
| Q: | Are people able to walk and job a half mile with an injury like that to his head where he died instantly on the scene? |
| A: | They could because he could have been dying on the entire route to the scene. |
| Q: | Okay. Well, as you indicated, there is a lot of blood loss; right? |
| A: | Yes. |
| Q: | And so if he was walking down the street for a half mile, there certainly would have been a trail of blood along behind him; right? |
| A: | I would expect him to have been bleeding along the route. |

(Exhibit E, Dr. Howell Trial Testimony at 75:16-18, 96:16-97:4); (Exhibit K, ASA Leuin Dep 135:15-24).

## II. PLAINTIFFS' LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF SUMMARY JUDGMENT
### The Altercation Between Plaintiffs and Kim Edmondson

---

[4] It is again unclear what "Ex. 27, 38:7-39:10" refers to, as Dr. Howell's testimony begins on page 58 of Defs' Ex. 27. If "38:7-39:10" refers to the ECF page number (Transcript pgs. 93-94), then that testimony does not relate to the second sentence.

[5] It is again unclear what "Ex. 27, 40:16-20" refers to. If "40:16-20" refers to the ECF page number (Transcript pg. 95), then that testimony does not relate to the fourth sentence

1.     On May 30, 2018, Kim Edmondson was a convicted felon and a "chronic drug user" who was high on PCP, cocaine and alcohol.  (Exhibit NN, Edmondson Rap Sheet); (Exhibit B, Alonzo Dep at 62:5-19); (Exhibit OO, Edmondson Toxicology); (Exhibit E, Dr. Howell Trial Testimony at 99:16-21); (Exhibit Y, Dr. Howell Dep at 128:4-6, 151:12-152:13: "They were active substances in his body.")

2.     In May, 2018, Tabatha Washington was a single mother with special needs children, had no criminal history, and had been employed as a Certified Nursing Assistant since 2003.  (Exhibit  R, 9/20/21 Dep at 13:-13-14); (Exhibit Q, 9/28/21 Tabatha Dep at 131:11-15); (Exhibit M, 10/12/21 Tabatha Dep at 302:1-5, 375:3-14); (Exhibit B, Alonzo Dep at 67:11-14: "no criminal history"); (Exhibit C, Garcia Dep at 21:14-21: no arrests prior to May 30, 2018).

3.     On the night of May 30, 2018, Donte (Tabatha's friend), Tabatha, Tabatha's children, her cousin Carlton White, and Cynthia Cage were outside her apartment at 5316 W. Washington Blvd. selling snow cones when Edmondson approached them acting erratically, aggressively, and calling the women "bitches and hoes."  (Exhibit S, Cage GJ at 4:13-19); (Exhibit N, Donte Dep at 49:5-22).

4.     Three short, discrete altercations occurred because of Edmondson's behavior: first, Edmondson and White briefly scuffled.  Next, Edmondson lunged at Tabatha, who swung a pole at him to fend him off. Finally, Donte and Edmondson sparred (Exhibit E at 39:7:"like little cat swipes basically")  until the latter walked away, heading eastbound before turning north on Laramie. (Exhibit F, White Interview at 5:15:02-5:15:07: "[Edmondson] left, he came back twice, he came back, he kept coming back.") (Exhibit E, Trial Transcript at 198:13-199:22); (Exhibit B, Alonzo Dep at 48:23-49:5, 76::4-7); (Exhibit S, Cage GJ at pgs. 6-10); (Exhibit M,

10/12/21 Tabatha Dep at 258:1—10, 259:14-18, 294:20-294:3); (Exhibit Q, 9/28/21 Tabatha

Dep at:154:16-9-18: "He walked off and came back", 171:13-15: "***He, once again, came back***

***being vague.  Donte telling him, come on, man, that's a girl  And he told Donte, I'll knock***

***your bitch ass out***.")

5.       Defendants were explicitly, and repeatedly, told that it was Edmondson who was

acting violently and erratically, and was calling Tabatha and Cage "bitches and hoes."  (Exhibit

B, Alonzo Dep at 48:23-49:5); (Exhibit C, Garcia Dep at 99:12-100:5); (Exhibit WW, Tabatha

Interview Video at 0:36:01-0:36:47: "He tried to hit me…He smokes rocks…He was high….I'm

trying to stop him."; 0:41:53: "He (Edmonson) was aggressive").

6.       Defendants were aware of the physical disparity in stature between Tabatha and

Edmondson:

> Q:     How would you describe her physical build?
> A:     Thin.
> Q:     Was she tall?
> A:     I would say may maybe 5'2" to 5'5" if I recall correctly.
> Q:     Muscular?
> A:     Not much muscular, no.
> Q:     Okay.  Heavy?
> A:     Not heavy, no.
> Q:     Okay.  Do you remember Kim Edmondson's build?
>                         *       *       *       *
> Q:     He was tall, I would say about 6 feet; between 200 and -- between 180 and 210
>        let's say.

(Exhibit C, Garcia Dep at 20:14-24, 21:4-6)

7.       At the criminal trial, Judge Kenworthy found that: (1) Edmondson "was

belligerent," and "aggressive"; (2) the "only common factor on Washington Street was

[Edmondson's] continued aggression towards multiple parties"; and (3) "Ms. Washington is

very petite in stature.  She used a pole to try to persuade [Edmondson] to leave.  ***Any injuries***

*inflicted by that pole were minimal."* (Exhibit E, Trial Transcript at 198:22, 199:16, 203:1-3, 203:10-13; emphasis added).

### Edmondson Thereafter Walked a Half Mile; No Head Wound or Blood is Seen

8.     After leaving 5316 W. Washington Blvd, Edmondson walked a half mile to a commercial strip on Lake and Laramie where he encountered, and spoke with three friends: Anthony Beard, Khadijah Hill, Larry Nelson (Exhibit A, CCR at pgs. 14, 18); much of Edmondson's walk is captured on surveillance video, and at no point does Edmondson appear to be in any distress, nor does he appear to be bleeding. (Exhibit E, Trial Transcript at 202:11-15: "the Court watched pod video of Mr. Edmondson traveling from Washington to Laramie. At no time did the Court observe blood coming from the back of [Edmondson] or of him holding his shirt to the back of his head."); (Exhibit B, Alonzo Dep at 85:8-9: "There's no obvious distress that I can see in this particular video [referencing pod video]"; 91:25-92:1: Alonzo: "it looks like a normal walk, a wide-stanced walk [referencing B & B video]"); (See also Exhibit PP, 123 N. Laramie Pod Video at 8:54:12.313-8:54:36.187); (Exhibit QQ, 158 N. Laramie Pod Video at 8:57:11:343-8:57:51:723); (Exhibit G, B & B Beauty Supply Security Video).

9.     The Medical Examiner acknowledged that she would have expected Edmondson to have been bleeding along the half mile walk, but no blood was ever found on his trail. (Exhibit E, Dr. Howell Trial Testimony at 96:24-97:4); (Exhibit B, Alonzo Dep at 86:17-87:12); (Exhibit K, ASA Leuin Dep at 135:15-24).

### Beard, Hill and Nelson Never Saw a Wound at The Back of Edmondson's Head

10.     Anthony Beard stated that, prior to Edmondson's death, he observed no bleeding from the back of Edmondson's head, which was consistent with: (1) what he told the first

responders on the scene; (2) what he then told Alonzo (also on scene); (3) what he told Garcia; (4) his testimony at trial; and (5) his deposition testimony:

> Q.   And so after he told you this did you notice any injuries on [Edmondson]?
> A.   **Yes, *his lip, he had a gash that was bleeding and he had a gash in his chest, this wasn't bleeding, but that is all I seen.***
> Q.   So after he told you what happened where did he go?
> A.   First I offered to take him to the hospital but he said he didn't want to go and then he went to the back behind the dumpster where people normally use the bathroom back there and somebody came out and told him he fell out.
> Q.   And did you go back there and check on him?
> A.   Yes.
> Q.   What happened when you got back there [behind the dumpster]?
> A.   He wasn't breathing.
> Q.   ***Did you notice any injuries when you saw him?***
> A.   ***He was bleeding from the back of his head.***
> Q.   And so ***did you notice that from before***?
> A.   ***No.***

(Exhibit U, Beard GJ at 4:13-6); (Exhibit V, CPD Body Cam at 0:01:39-0:01:52: "His head wasn't bleeding."); (Exhibit A, CCR at pg. 14); (Exhibit B, Alonzo Dep at 16:8-17:20, 28:19-29:8); (Exhibit E, Trial Transcript at 119:18-19: "No, I never seen nothing on the back of his head."); (Exhibit W, Beard Dep at 59:9-22, 64:16-65:3).

11.    Khadijah Hill talked to Edmondson "a good ten minutes," and she told Alonzo that the only wounds she observed on Edmondson were two scratches (the lip and chest); this statement was consistent with: (1) her testimony for the grand jury; (2) her testimony at trial; and (3) her deposition testimony.  (Exhibit E, Hill Trial Testimony at 130:19-24, 131:1-15, 136:18-137:6, 138:15-22); (Exhibit A, CCR at 18); (Exhibit SS, Hill GJ at 5:6-18); (Exhibit T, Hill Dep at 80:14-19).

12.    Hill also told Alonzo that she assumed that Edmondson had later fallen and hit his head because when she looked at him nothing "dripping or leaking" from his head.

- 54 -

Q:    But –but what you – you didn't mention anything about that to the cops.  In fact, what you said was there wasn't anything dripping or leaking, correct?

A:    No.

Q:    No, what I said was incorrect?

A:    ***No.  There wasn't anything dripping or leaking.***

Q:    Right.

A:    ***Gash on his lip or what you call it.  It wasn't even that bed neither.***  It wasn't, you get what I'm saying?  It's just you want to sit there and take care of yourself, so if you got a gash in your chest, yes, I told him to go to the hospital.

Q:    ***Right.  And so my question, ma'am, is just but when you did speak to the cops and when you said you thought that he had fell and hit his head, you didn't mention anything about concrete.  What you told them was you never noticed anything dripping or leaking form his head, right?***

A:    ***I never, right, no.***

Q:    ***And that's and that's what you told the cops, correct?***

A:    ***That what I assume, that he hit his head to the dumpster or something that's right there.***

Q:    ***Why –why did you think he may have hit his head on the dumpster?***

A:    ***Because it wasn't nothing – he wasn't bleeding.  His head wasn't bleeding or whatever.  Only two cuts over there that I saw was the one that is in his chest and on his lip.***

(Exhibit T, Hill Dep at 79:12-80:19; emphasis added); (Exhibit KK, Hill Interview Video at 0:06:30-0:06:45).

13.    Larry Nelson told Garcia that the only injuries he observed to Edmonson were that he was bleeding "from the side of his face and his chest."  (Exhibit C, Garcia Dep at 34:22-35:5); (Exhibit D, Nelson GPR); (Exhibit TT, Nelson Interview Video at 8:22-8:29).

14.    The Cook County Medical Examiner Investigator, Lawrence Santoro, spoke with Garcia and Alonzo that night.  (Exhibit BB, Santoro Dep at 30:9-31:6, 62:1-3, 62:10-63:15); (Exhibit D, Nelson GPR).  Santoro's Case Report included a false narrative – which he believed came "from the detectives [Garcia and Alonzo]" – in which Larry Nelson actually observed Edmondson "getting beat up by three male blacks and two female blacks with pipes in their hands all beating on EDMONDON [sic]."  (Exhibit Z, Santoro Report at pg. 3); (Exhibit AA,

- 55 -

Santoro Notes); (Exhibit BB, Santoro Dep at 34:2-6).

**Balodimas and Garcia Go to 5316 W. Washington Blvd.**

15.     Sometime after arriving at 5316 W. Washington Blvd., Balodimas allegedly "heard Plaintiffs discussing their earlier attack on Edmondson"– through closed windows in a basement apartment – and make several bizarre, incriminating statements, such as: (1) "Fuck that bitch.  He got what he deserved"; (2) "When you protect, you have to fight"; and (3) "He ain't gonna get my gun."[6]  (Exhibit A, CCR at 14); (Exhibit M, 10/12/21 Tabatha Dep at 412:3-7).

16.     As previously addressed in Plaintiffs' response to Defendants' Statement of Fact No. 7, Balodimas fabricated these alleged statements, as it would have been impossible to hear any such conversation; he was nowhere near the window by the back room where Plaintiffs were sitting (Exhibit L, Balodimas Dep at 31:24-32:22, 33:14-34:7, 34:13-23; Exhibit B, Alonzo Dep at 95:8-16; Exhibit C, Garcia Dep at 47:7-12); the windows were shut (Exhibit M, 10/12/21 Tabatha Dep at 412:3-21); the time frame of these alleged statements are captured on video (and are not heard) (Exhibit P, CPD Officer Allen Body Camera at 0:00:57-0:03:51); and Plaintiffs deny such statements were ever made.  (Exhibit M, 10/12/21 Tabatha Dep at 281:5-17); (Exhibit N, Donte Dep at 160:2-13).

**The Autopsy**

---

[6] Defendants originally denied related allegations, such as the fact that Plaintiffs were in the back of the apartment, not the front, and that no gun was found when the apartment was searched.  (Exhibit UU, Defendants' Answer at pg. 8).  Each of those denials were then contradicted in discovery. (Exhibit L, Balodimas Dep at 34:13-2); (Exhibit C, Garcia Dep at 54:9-11).

17.     The Medical Examiner, Dr. Kirstin Howell, opined that the cause of Edmondson's death was blunt force trauma to the back of the head (Exhibit Y, Dr. Howell Dep at 106:15-18); her opinion heavily relied on the inaccurate Case Report that her investigator provided, with a story that he received from the detectives:

> Q:     So we'll review this.  So you'll see at the bottom of Page 3, "*According to Larry Nelson, witness related that he observed Edmondson getting beat by three male blacks and two female blacks with pipes in their hands all beating on [Edmondson], correct?*
> A:     Yes.
> Q:     And that was part of the narrative that you considered, correct?
> A:     Yes.
> Q:     *So you determination was based, was it not, on multiple people beating Edmondson with multiple pipes, yes?*
> A:     That was the story that we got, *yes*.

(Exhibit Y, Dr. Howell Dep at 179:18-180:6, 1:10:14-111:6); (Exhibit Z, Medical Examiner Investigator's Report at pg. 3); (Exhibit AA, Santoro Notes at pg. 2: "3M/1 + 2F/1 =Lives w/OFFENDERS – ALL 5 OFF HAD PIPES & BEATING VICTIM UP"); (Exhibit BB, Santoro Dep at 34:2-6; (Exhibit E, Trial Transcript at 200:10-19; emphasis added: Judge Kenworthy found Dr. Howell "*seemed to give great weight to the narrative given to her by the medical examiner's investigator and didn't' feel the need to explore any other options regarding the cause of death*," such as a dumpster next to where the complaining witness died.").

### Cynthia Cage and Carlton White Tell Defendants That Nobody Hit Edmondson in the Head

18.     Balodimas and Alonzo interviewed Cynthia Cage who informed them that Edmondson appeared to be fine when he left 5316 W. Washington.  (Exhibit A, CCR at pg. 18)

19.     Cage appeared before a grand jury and at Plaintiffs' criminal trial; she testified that: (1) Edmondson's altercations with White, Tabatha and Donte were three separate incidents;

(2) Tabatha hit Edmondson only twice with a little light pole, once on the chest and once on the lip and (3) that Edmondson and Donte's altercation "wasn't a fight really at all."  (See, for example, Exhibit S, Cage GJ at pgs. 6-10; 7:3-8); (Exhibit E, Cage Trial Testimony at 39:2-7, 48:16-24).

20.      Cage also testified that at no point did Donte ever have a weapon, which was consistent with what she told Balodimas and Alonzo, and later confirmed by a 911 caller. (Exhibit E, Cage Trial Testimony at 40:7-9); (Exhibit A, CCR at pg. 18); (Exhibit VV, ASA Kucaba Dep at 26:24-27:12)

21.      Defendants interviewed White several times; he told them multiple times that nobody hit Edmondson in the head:

> Q:      Does that refresh your recollection that [White] told you several times that nobody hit Kim Edmonson over the head?
> A:      That's correct, sir.

(Exhibit C, Garcia Dep at 89:24-90:3); (Exhibit K, ASA Leuin Dep at 98:15-21); (See also Exhibit F, White Video Interview at 5:15:17-5:15:35)

22.      Defendants omitted exculpatory statements like White's from their investigation reports:

> Q:      ***Does this recap mention anything about Carlton White saying that nobody hit Kim Edmondson in the head?***
> A:      ***It does not say that.***
> Q:      Okay.
> A:      In this statement it doesn't say that no one hit him in the head.
> Q:      ***Right.  So that statement that he made repeatedly is not in the report, correct?***
> A:      ***That's Correct.***

(Exhibit C, Garcia Dep at 90:14-91:1; emphasis added); (Ex. A, CCR at pg. 17).

**The Interrogations of Tabatha Washington**

23.     Tabatha was sobbing when she was placed in an investigation room shortly before midnight on May 30, 2018, and was visibly freezing for the next 34 hours that she remained there. (Exhibit WW, Tabatha Interview Video at 0:01:17, 0:05:35; 0:42:35-0:44:50); (Exhibit UU, Defendants' Answer at pg. 10)

24.     Garcia and Balodimas awoke Tabatha at 3:03 a.m. on the morning of May 31 and over the next twenty-two minutes they yelled and blew cigarette smoke at her while she sat shaking and crying. (Exhibit WW, Tabatha Interview at 3:05:30- 3:27:42; 3:12:32-3:12:38: Balodimas: "If you'd had said he (Donte) was there fighting, his black ass would have been brought in here."); (Exhibit M, 10/12/21 Tabatha Dep at 411:3-6): (Exhibit L, Alonzo Dep at 103:16-17: Q: "What did you just say to her?  A: "I think I said, fucking fat bitch"; 104: 5-6: Q: "Why are you yelling at her?" A: "Because she's been lying.")

25.     Defendants were told that Tabatha was diabetic, and during her 34 hours of confinement in the interview room, she was visibly ill, vomiting at least four separate times. (Exhibit WW, Tabatha Interview Video at 15:09:00-15:11:20, 15:30:54-15:32:12, 17:24:45-17:25:36, 20:00:24-20:01:25).  As Tabatha's blood sugar dropped to dangerously low levels, the only food she was provided was food that she could not eat: a meal from McDonald's and potato chips. (Exhibit L, Balodimas Dep at 82:8-18); (Exhibit UU, Defendants' Answer at pg. 10); (Exhibit WW, Tabatha Interview Video at 9:58:29: given a bottle of water and potato chips for "breakfast."; 14:52:07).

26.     In Tabatha's first interview with Garcia and Alonzo she admitted to hitting Edmondson with a pole after he swung at her (Exhibit WW, Tabatha Interview at 0:34:045-0:34:20) and subsequently told Defendants repeatedly that she had struck Edmondson only

twice, once in the mouth, and once in the chest, and was adamant that Donte used only his fists during his subsequent scuffle with Edmondson in the street. (*Id.* at 3:11:16-3:11:50 (indicating fists)).

### The "Murder Weapon"

27.     Defendants described the "murder weapon" as a "pipe" (Exhibit A, CCR at pg. 2).  Dr. Howell said that a cross shape laceration, like the one on Edmondson's head was different than a semicircle laceration, like the one on his lip, and that the same object could cause both in this case, because: "***it is consistent with the story that I had that he was struck with a pipe***."  (Exhibit Y, Dr. Howell Dep at 189:24-190:8; emphasis added).

28.     Dr. Howell opined that in the "unlikely" event that one of the poles collected from Tabatha's apartment was the instrument that caused Edmondson's death, it would have had to have been driven perpendicularly into the back of his head.  (Exhibit E, Dr. Howell Trial Testimony at 91:4-11); (Exhibit Y, Dr. Howell Dep at 182:21-183:1) (Exhibit K, ASA Leuin Dep at 78:12-79-13)

### The Charges Resulted from False "Facts" Conveyed By Defendants to the CCSAO

29.     Alonzo knew that Edmondson died from blunt force trauma to the top or back of the head (Exhibit B, Alonzo Dep at 33:5-22) and prepared a "Felony Minutes Form 101" that falsely claimed that that the investigation "determined that the victim KIM EDMONDSON was struck on and about the head with a metal object several times by WASHINGTON.  The victim EDMONDSON subsequently expired true to the injuries received"; that form was created for "use in hearing for probable cause to detain," and "went to court with Washington."  (Exhibit GG, Felony Minutes Form 101); (Exhibit B, Alonzo Dep at 39:12-40:8).

30.     Nobody told Alonzo that Tabatha hit Edmonson on the top or back of his head;

instead he was told that she hit his lip:

Q:     So when you say that you're aware that Washington and white both stated that she hit him in the head, *are you referring to the lip?*
A:     *As part of the head, yes.*
                            *       *       *       *
Q:     *Oh, okay.  So when you say that Washington hit –Washington and White both stated that Washington hit Edmondson in the head with the pole, is that specifically referring to the lip?*
                            *       *       *       *
A:     *Yes.*
                            *       *       *       *
Q:     Now, when you say that he was struck on the and about the head, are you talking about the lip or you referring to, like the top of his head?
A:     Both.
Q:     *But did anyone tell you that she hit him on the top of the head?*
A:     *Did anyone tell me she hit him on top of the head?  No.*
                            *       *       *       *
Q:     In the video that you reviewed, Carlton white says that Tabatha Washington struck him in the head.  Correct?
                            *       *       *       *
A:     Yes
                            *       *       *       *
Q:     Now, what de he say, that she struck him in the lip or on the top of the head?
A:     He said that –my recollection is that he said that she struck him a few times with the metal pole, *and then he had a cut to his lip, and he observed a cut to his lip.*
Q:     Okay.  But – and sir, I'm asking you something a little different here*.  Did Carlton White tell you that Tabatha Washington hit Kim Edmondson on the top of the head, yes or no.?*
A:     *No.*

(Alonzo Dep at 59:9-12, 61:1-6, 40:20-41:2, 34:16-35:9; emphasis added).

31.     Each of the three defendants engaged in this sort of word game; Balodimas

likewise morphed Tabatha striking Edmondson in the "the mouth area" into "the head":

Q:     *Did either Washington or White state that she struck [Edmondson] in the back of the head?*
                            *       *       *       *
A:     *I don't recall that.  I –I just remember her saying she struck him in the head.*
Q:     *Did she say she struck him in the head or she struck him in the lip?*

- 61 -

> A: **Mouth area.  I don't recall if it was the lip exactly.  I know it was in the mouth area.**
>
> Q: Did Either Tabatha Washington or Carlton White sate that she hit him in the back of the head?
>
>                        \*       \*       \*       \*
>
> A: Not that I recall.
>
> Q: Well, you reviewed documents prior to your deposition today; did you not?
>
> A: And in your review of those documents, **can you identify a single one that suggests that they gave that testimony that she shit him in the back of the head?**
>
> A: **No.**

(Exhibit L, Balodimas Dep at 58:1-59:2; emphasis added).

32.     Garcia reviewed Tabatha's interview before his deposition, then continued the

head vs. lip word game:

> Q: Did anyone tell you that Tabatha Washington struck Kim Edmondson in the head with the pole?
>
> A: I believe Tabatha herself said she struck the victim in the head.
>
> Q: In the back of the head?
>
> A; In the head?
>
> Q: Sir, in the back of the head?
>
>                        \*       \*       \*       \*
>
> A: **Specifically to the back of the head, no.**
>
>                        \*       \*       \*       \*
>
> Q: **But again, not a single person said she hit him in the back of the head, correct?**
>
>                        \*       \*       \*       \*
>
> A: **Correct.**
>
>                        \*       \*       \*       \*
>
> Q: **And, just so we're clear, you reviewed this video prior to this deposition, and is it your belief that in that video that you reviewed, that she told you that she struck him on the head?**
>
> A: **She at some point during my interview with her admitted to striking him in the head area.**
>
> Q: **Did she say that she struck him on the lip or the head?**
>
> A: **The lip which is part of the head.**

(Exhibit C, Garcia Dep at 25:9-21, 27:1-6, 27:10-20; emphasis added).

33.     Alonzo claimed that the witnesses that were with Edmondson just prior to his

death testified that they observed "head" wounds, but again grudgingly admitted that "head"

meant "lip":

Q:    Did you hear [Larry Nelson] remark on any wounds to Kim Edmondson's head?
A:    Yes.
Q:    You did hear him make a statement about a wound to Kim Edmondson's head?
A:    Yes.
Q:    That's not in this report though, is it?
A:    It is.
Q:    Okay.  Can you please show me where, sir?
A:    "Observed the victim" who he knows as "Moe," "bleeding from the mouth?"
Q:    Okay.  That's a little different than a head wound to the top of the head, though.  Correct?
A:    Bleeding from the mouth is different than a wound at the top of the head, yes.
                          *          *          *          *
Q:    Oh, okay.  And you watched Larry Nelson's interview thin the last couple of days.  Correct?
A:    Yes.
Q:    And you would agree with me, sir, that at no point does he in the interview mention seeing a head wound to Mr. Edmondson, either I the top or the back.  Correct?
                          *          *          *          *
A:    He does describe a head wound for Mr. Edmondson.  He described a lip bleeding, I believe.
Q:    Is that the only head wound?
A:    That's the only head would that he observed.

(Exhibit B, Alonzo Dep at 29:18-30:7, 30:24-31:5, 31:9-15 emphasis added); (Exhibit A, CCR at

pg. 14) .

      34.    Alonzo likewise conceded that Khadijah Hill's alleged statements about a head

wound actually referred to Edmondson's lip.  (Exhibit B, Alonzo Dep at 31:16-32:14: "I believe

she mentioned the head wound to his lip.").

      35.    Alonzo spoke with the Medical Examiner Dr. Howell about Edmondson's

autopsy and his death being classified as a homicide (Exhibit, CCR at p. 19);(Exhibit B, Alonzo

Dep at pg. 36:4-17); (Exhibit DD, Dr. Howell GPR); he also spoke with ASA Gonzalez when

she approved charges for Tabatha and rejected charges for White, based on the fact that their

altercations with Edmondson were separate events.  (Exhibit B, Alonzo Dep at 37:11-38:15);

(Exhibit FF, ASA Gonzalez GPR).

36.     According to the "Clear Closed" report prepared by all three Defendants (and two other detectives), the three Defendants contacted Felony Review on June 1, 2018, and, based on the information provided, ASA Gonzalez approved a First-Degree Murder charge against Plaintiff Washington.  (Exhibit A, CCR at p. 19).  That same report indicates that on June 6, 2018, Defendant Alonzo contacted Felony Review, and, based on the information conveyed, ASA Gonzalez approved a First-Degree Murder charge against Plaintiff Howard.  (*Id.* at p. 20).

37.     Alonzo's false story about Tabatha striking Edmondson "on and about the head" (which Defendants also orally conveyed to the CCSAO and the Medical Examiner's Investigator) and Balodimas' false story about overhearing the Plaintiffs discussing their alterations with Edmondson were then repeated nearly verbatim by the CCSAO, including by three separate ASAs at Tabatha's June 2 and 4, 2018, bond hearings, as well as Donte's hearing on June 7, 2018 (In each hearing the CCSAO parroted Defendants' narratives: "The Defendant Washington struck the victim with a pole multiple times causing injuries to his face, ***head*** and chest"…."***Detectives overheard a female and male voice indicating that the victim got what he deserved***").  (Exhibit HH, June 2, 2018 Hearing Transcript at 3:15-17, 4:15-22); (Exhibit II, June 4, 2018 Hearing Transcript at 7:1-4, 8:1-7); (Exhibit JJ, June 7, 2018 Hearing Transcript, at 3:15-17, 4:13-19; emphasis added).

38.     Alonzo repeated Defendants' false narrative about Tabatha striking Edmondson "about the head and body" to the grand jury on July 12, 2018, and claimed that she was "identified by witnesses as the person" that struck Edmondson, even though nobody *ever* stated that she struck him in the back of the head:

- 64 -

> Q: ***But again, not a single person said that she hit him in the back of the head, correct?***
> A: ***Correct.***

(Exhibit C, Garcia Dep at 27:1-6; emphasis added); (Exhibit B, Alonzo GJ at 4:17-20, 5:16-19).

**Defendants Gave the Surveillance Videos or Disclosed their Content to the CCSAO**

39.     As addressed above (SAF ¶7), videos show a non-bloody Edmondson walking "normally" over a half mile after leaving Plaintiffs.  There is no evidence that these videos were ever turned over to CCSAO for felony review/charging consideration.  Alonzo recovered and received the B&B Security Video on May 31, 2018 and the pod videos on June 6, 2018, but ASA Waller had no "specific recollection" of ever receiving the video (Exhibit X, ASA Waller Dep at 100:13-101:8); (Exhibit RR, Defendant City's Amended Answer to Interrogatory No. 1 at pg. 2); (see also Exhibit EE, ASA Gonzalez Dep at: 65:10-13: Q: "***Were you provided any materials to review prior to giving a felony approval for either of these charges***?" A: ***"No."***).  Though those videos graphically refute the notion that Edmondson had a "severe head wound" after leaving Plaintiffs, the Defendants mention nothing about them in their reports.  See, e.g., Exhibit A.

**The Trial**

40.     On November 19, 2019, after a one-day bench trial, Judge Diane Kenworthy found Tabatha and Donte not guilty of all charges; her ruling from the bench included the following findings:

> There is no evidence that Derrick, Donte and Tabatha acted in concert.  The only common factor on Washington Street was [Edmondson's] continued aggression toward multiple parties.
>
> *            *            *            *

- 65 -

The complaining witness then moved on to Dante Howard, who engaged in a minor scuffle with him. No weapons were involved in that altercation, which is corroborated by the 911 call.

At no time did anyone see either defendant strike the complaining witness on the back of the head with anything. At no time did any witness, either on Washington or on Lake and Laramie, observe blood or injuries to the back of the complaining witness's head.

(Exhibit E, Trial Transcript at 202-03).

Dated: February 25, 2022

Respectfully submitted,

/s/ Paul K. Vickrey
Paul K. Vickrey
Patrick F. Solon
Dylan M. Brown
**Vitale, Vickrey, Niro, Solon & Gasey LLP**
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
Phone: (312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
dbrown@vvnlaw.com

Mark D. Roth
**Roth Fioretti LLC**
311 S. Wacker Drive, Suite 2470
Chicago, Illinois 60606
Phone: (312) 922-6262
mark@rothfioretti.com
***Attorneys for Plaintiffs***