UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TABATHA WASHINGTON and DONTE
HOWARD,

              Plaintiffs,

              v.

CITY OF CHICAGO, et al.,

              Defendants.

No. 20 CV 442

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Tabatha Washington, Donte Howard, and Washington's cousin Carlton White each engaged in physical altercations with Kim Edmondson outside Washington's apartment in Chicago. When the skirmishes ended, Edmondson left the area, walked about half a mile north, and told three friends he'd been jumped by two men and one or two women. Edmondson then walked behind a nearby dumpster, collapsed, and with blood pooling around the back of his head, died. The medical examiner would later conclude that Edmondson died from blunt force trauma to the back of the head.

Later that evening, Washington and White were taken into custody and questioned by defendant detectives Vincent Alonzo, Adrian Garcia, and Demosthenes Balodimas. A prosecutor from the Cook County State's Attorney's Office also interviewed Washington and White. A few days later, the State's Attorney's Office approved first-degree murder charges against both Washington and Howard (and rejected charges against White). Within a month, a judge had determined there was probable cause to detain Washington and Howard, and a grand jury indicted both of

them on counts of first-degree murder and mob action. Months later, after a one-day bench trial, a Cook County judge found Washington and Howard not guilty on all counts.

Howard and Washington filed this suit against Alonzo, Garcia, Balodimas, and the City of Chicago, bringing claims for unlawful pre-trial detention under the Fourth Amendment and 42 U.S.C. § 1983, and for malicious prosecution under Illinois law. Defendants move for summary judgment under Federal Rule of Civil Procedure 56. Because probable cause supported plaintiffs' arrests and detention, and plaintiffs have failed to produce any evidence from which a reasonable juror could conclude that the detectives improperly influenced the prosecutor's independent decision to bring proceedings against plaintiffs, the motion is granted.

## I. Legal Standards

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I construe all facts and reasonable inferences in plaintiffs' favor. *Robertson v. Department of Health Services*, 949 F.3d 371, 377–78 (7th Cir. 2020). The defendants are entitled to summary judgment, however, if plaintiffs have not made "a sufficient showing on an essential element" of their case for which they have the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (nonmovant's version of events must be "backed up by a measure of plausible evidence" in the record).

## II.     Background

This case ultimately comes down to whether probable cause existed to arrest, detain, and prosecute Howard and Washington. It centers on whether—based on the information defendants possessed at the time—a reasonable officer could conclude that such information supplied probable cause to believe that each plaintiff had committed a crime. *See United States v. Reedy*, 989 F.3d 548, 554 (7th Cir. 2021). Many facts offered by the parties are not material to the probable-cause inquiry. For example, facts concerning the ultimate truth of what happened, the underlying veracity of what the detectives were told, subsequent evidence and testimony offered at plaintiffs' criminal trial, and the findings of fact by the judge in the criminal case. What's more, many of the purported disputes in the parties Rule 56.1 statements are readily resolved by reference to the underlying source material. When necessary, I consider and cite such materials below. *See* Fed. R. Civ. P. 56(c)(3).

In short, despite a litany of purported disputes in the parties' Local Rule 56.1 statements of fact, the material facts regarding probable cause—what the officers knew at the time of arrest and detention—are largely undisputed.

### A.     Edmondson's Final Moments

On May 30, 2018, at about 9 p.m., Kim Edmondson walked up to three of his friends—Anthony Beard, Khadijah Hill, and Larry Nelson—near the intersection of West Lake Street and North Laramie Avenue. [125] ¶ 3; [119] ¶ 8.[1] Shirtless and

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiffs' response to defendants' amended Local Rule 56.1 statement,

bleeding from his lip and chest, Edmondson told them that he'd been jumped by two men and one or two women with a pole; he then walked behind a dumpster to urinate. [125] ¶ 3; [105-19]; [105-20]; [105-21]. Soon thereafter, someone told Beard, Hill, and Nelson that their friend had collapsed, and they walked over and saw Edmondson behind the dumpster lying on his back, not breathing, with blood pooling around his head. [125] ¶ 4. They called 911 and flagged down nearby police officers, but first responders were unable to resuscitate Edmondson. *Id.* He was pronounced dead at the scene. *Id.*

Chicago Police Department detectives Vincent Alonzo, Adrian Garcia, and Demosthenes Balodimas arrived at the parking lot to investigate the death. [125] ¶ 5. Beard reported that Edmondson approached him bleeding and said that he was attacked by a couple of males and a couple of females near where he lived. [125] ¶ 6; [105-8] at 15:20–16:22. Nelson also reported that Edmondson was bleeding and said he'd been beaten up by his neighbors. [125] ¶ 6. Nelson indicated that he knew where Edmondson had lived and voluntarily brought officers to 5316 West Washington Boulevard, about half a mile away from the parking lot. [125] ¶ 7; [105-9] at 12:23–13:18. Garcia, Balodimas, and other officers arrived at the address and canvassed the building to see if anyone knew about an altercation with Edmondson. [125] ¶ 7; [105-11].

---

[125], and defendants' response to plaintiffs' statement of additional material facts, [119], where both the asserted fact and the opposing party's response are set forth in one document.

### B.    Washington's Apartment

An officer stood at the back door of plaintiff Tabatha Washington's ground-level apartment when Washington, her cousin Carlton White, and plaintiff Donte Howard opened the door. [125] ¶ 8; [105-11] at 1:00–40. Howard initially told the officer that he could not enter without a warrant. [105-11] at 1:35–46. The officer asked if everything was alright in the apartment and Washington said yes; White then stated that "there was an altercation earlier, with some guy that had been evicted from this building." [105-11] at 1:51–57. Washington added: "He was trying to fight me." *Id*. at 1:58–2:00.

Washington then met Garcia and other officers at the front door and allowed them to enter her apartment. [125] ¶ 8. She and White spoke with officers in the living room while Howard and another friend, Cynthia Cage, sat on the couch nearby. *Id*.; [105-11] at 3:21–4:07. White explained that there was an altercation with a guy who had been evicted from the building who "kept coming around trying to fight," and White was defending himself. [105-11] at 3:21–51. Washington added "he tried to hit me," so she hit him to defend herself. [105-11] at 3:54–59. Garcia told the group that they needed to come to the police station to straighten everything out. [125] ¶ 9; [105-11] at 4:09–11. Washington stated that Cage was not involved in the altercation and that Howard had just gotten there. [125] ¶ 9; [105-11] at 4:18–50. Howard told detectives that his name was Jeremiah Johnson and said that he'd just arrived at the apartment. [125] ¶ 10. Detectives handcuffed Washington and White, placed them in separate squad cars, and took them to the police station for further investigation. *Id*.;

[105-11] at 8:40–12:59. As White walked with officers to the car, he pointed out a jacket hanging on the fence and told officers Edmondson had hung it up so he could fight. [105-11] at 8:36–48.

### C.    Defendants' Custodial Interviews with Washington and White

Once at the station and just after midnight on May 31, Garcia and Alonzo began interrogating Washington in an interview room. She told detectives that White and Edmondson "got into it," and that she was trying to stop the fight. [125] ¶ 11; [105-15] at 33:18–47. She also said another man fought with Edmondson but denied knowing his name. [125] ¶ 12; [105-15] at 34:52–35:24. Washington said that Edmondson tried to hit her, so she picked up a pole and tried to hit him. [125] ¶ 11; [105-15] at 34:05–31, 38:21–31. But Washington insisted that "nobody hit [Edmondson] with nothing." [125] ¶ 11; [105-15] at 40:01–31. And she denied having any negative history with Edmondson. [125] ¶ 12.

Just after 1:20 a.m., Garcia and Alonzo went to interview White in a different room. [105-16] at 1:18:15–41:15. White told detectives Edmondson had attacked him a week earlier and left a cut on his face. [125] ¶ 13; [105-16] at 1:19:55–20:05. White said the altercation earlier that evening started when Edmondson—clearly high on cocaine or other substances—approached him and Cage and repeatedly called Cage a bitch; when White tried to calm him down, Edmondson swung at him. [125] ¶ 13; [105-16] at 1:21:28–22:04, 1:23:50–24:20. White ducked the punch and hit Edmondson once. *Id*. White then said Washington came out with a "little stick from a tree," hit Edmondson in the chest and told him, "stop playing with my cousin." [125]

6

¶ 14; [105-16] at 1:22:03–23:12. According to White, Edmondson then said, "I'll be back," and walked away, and White thought it was over with. [125] ¶ 14; [105-16] at 1:22:03–23:17. White told detectives it was only him, Washington, and Cage outside during the altercation with Edmondson. [125] ¶ 15.

Garcia told White that Washington had told detectives that a third man was involved in the fight. [125] ¶ 16; [105-16] at 1:25:48–26:09. White said that the other person, D, was tussling in the street with Edmondson, but they weren't really fighting—they were just exchanging "air blows" and "nobody [was] getting hit, period." [125] ¶ 16; [105-16] at 1:27:52–28:09. White said that while D and Edmondson were quarreling in the street, a white truck pulled up, Edmondson fell on the hood, and the driver demanded that Edmondson get off the hood; Edmondson then got up, said "I'll be right back," and walked away toward Laramie. [105-16] at 1:28:07–29:13. At that point, White, Washington, Cage, and D went to the liquor store, got a drink, and came right back to the apartment. *Id*. at 1:28:34–29:03.

White then explained the incident again, but slightly differently. [125] ¶ 17; [105-16] at 1:31:32–34:07. White said that Edmondson approached him aggressively and tried to punch him; White ducked the punch and hit Edmondson one time. [105-16] at 1:31:32–54. Washington then came outside with a little stick from a tree; she yelled at Edmondson to get off her cousin, and when Edmondson approached Washington, she hit him in the chest. [125] ¶ 17; [105-16] at 1:32:02–30. After that, D and Edmondson exchanged air punches "for another 10 minutes just dancing" in the middle of the street, while White and Washington watched and laughed. [125]

¶ 17; [105-16] at 1:32:31–33:41. Edmondson then backed into the truck, told them he'd be right back, and walked away with a scrape on his chest and a cut on his mouth from falling on the truck. [125] ¶ 18. White told Garcia and Alonzo that the only reason he was at Washington's house was because she didn't feel safe and feared for her life because Edmondson had come to her house, banged on her front and back doors, and said he was the boogeyman. [125] ¶ 19; [105-16] at 1:35:20–55. When Alonzo and Garcia asked for more information about D, White said that Washington knew D. [125] ¶ 19.

At about 2:40 a.m., Alonzo returned Washington's interview room, woke her up, and asked where officers could find D. *Id.* ¶ 20; [105-15] at 2:41:27–39. Washington said she did not know where D was, and said she was trying to figure out who he was talking about because "both their names start with D" (Washington called White "D" sometimes too). [105-15] at 2:41:33–45. Alonzo then asked, "well, D is your cousin, right?" to which Washington responded: "D is Donte"—as in, Donte Howard. [125] ¶ 20; [105-15] at 2:42:46–51. She told Alonzo that she didn't know Donte's last name or where he lived, but she described Howard's physical features and told Alonzo that Donte was going to school and had recently been released from prison. [125] ¶ 20; [105-15] at 2:41:53–43:46. Alonzo left and Garcia came in a couple minutes later to ask Washington about the second man in her apartment; she confirmed that it was Howard and that he was the other man fighting with Edmondson. [125] ¶ 21.

Garcia returned 20 minutes later with Balodimas and informed Washington, for the first time, that Edmondson had died. [125] ¶ 22; [105-15] at 3:05:31–06:10.

Garcia accused Washington of not being truthful because she told detectives that she didn't know the other person who fought with Edmondson when she in fact knew that Howard was that person. [105-15] at 3:06:40–07:25. Washington insisted that she had been truthful, but the detectives were having none of it. [105-15] at 3:07:25–51. Balodimas scolded Washington and said that, when he was standing outside her apartment, he heard her say, "Fuck that bitch he got what he deserved," and "he ain't gonna get my gun," and Balodimas said he heard White say, "You gotta protect, you gotta fight." [105-15] at 3:08:35–09:03. Washington said she never said or heard any of that, told Balodimas she didn't have any gun, and insisted that police could search her house and they wouldn't find a gun. [105-15] at 3:09:03–21; [119] ¶ 16. But Washington later told Garcia and Balodimas that just before officers entered the apartment, other people were talking about the fight while she was getting her kids ready for bed. [105-15] at 3:17:53–18:46.

Garcia told Washington that she better start talking, so she described the altercation again. [105-15] at 3:09:51–56. Washington told detectives the fight started with White and Edmondson and she stepped in to break it up. [125] ¶ 22. Edmondson tried to hit Washington, and Washington picked up a stick or a pole and hit him in the chest with it. [125] ¶ 23; [105-15] at 3:11:30–50, 3:15:18–23. She said no one beat up Edmondson—it "wasn't that kind of fight" and they were just slipping and sliding because it was raining. [105-15] at 3:10:41–54. After she tried to break up the fight, Howard and Edmondson got into a tussle, Edmondson backed up into a car, and "that was it" and Edmondson walked off. [105-15] at 3:10:57–11:20.

9

Balodimas told Washington: "Let me tell you something. The damage that was done to his head, you couldn't have done that." *Id.* at 3:11:36–44. Washington agreed, and intimated that she only hit Edmondson in the chest. *Id.* at 3:11:45–56. Garcia and Balodimas then pressed Washington to tell them who hit Edmondson with the pole in the head, and she said Howard did. [125] ¶ 24. Garcia told Washington to start over again and tell them what happened; she said that White and Edmondson started arguing about something stupid and then started tussling. *Id.* ¶ 25. Washington said that when she tried to break it up, Edmondson tried to hit her, so she picked up a light stick and hit Edmondson across his chest. [125] ¶ 26; [105-15] at 3:14:50–15:20.

When pressed further about who hit Edmondson in the head and how many times, Washington told detectives that Howard hit Edmondson over the head with a pole one time. [125] ¶ 27; [105-15] at 3:15:40–52, 3:16:20–29. Garcia assured Washington: "We don't think you're strong enough to do the damage that [Edmondson] sustained, okay? So it's between your cousin and Donte, and who did what, and that's what we need to know." [105-15] at 3:17:16–28. Washington again said that it was Howard. [125] ¶ 27; [105-15] at 3:17:28–37. Washington later told detectives three times that she saw Howard hit Edmondson with a pole twice. [125] ¶ 28; [105-15] at 3:19:35–59, 3:22:48–58, 3:25:20–25. Washington said she wasn't sure if Howard hit Edmondson more times, because she brought her kids inside after Howard hit Edmondson with the pole twice. [125] ¶ 29; [105-15] at 3:20:01–13, 3:22:48–23:09, 3:25:20–25. Washington apologized for lying and insisted that she did not know that Howard hit Edmondson that hard. [125] ¶ 29; [105-15] at 3:28:09–31.

10

At about 5 a.m., Garcia and another detective woke up White for another interview. [125] ¶ 33; [105-16] at 4:57:46–55. White said the other man in the fight was the man in Washington's apartment (Howard) and told detectives three times that neither Howard nor Edmondson landed a punch on each other. [125] ¶ 33. White repeated that he hit Edmondson once and then Edmondson left, before coming back and starting to fight with Howard in the street. *Id.* ¶ 34. White said Edmondson left after the fight with Howard. *Id.* ¶ 35. Detectives then asked White how many times Washington struck Edmondson, and he said "probably three" times—in the chest, arm, and lip—with a gray, non-wooden stick; according to White, "that was the last hit" on Edmondson. *Id.* ¶ 36; [105-16] at 5:13:51–14:10. White was adamant that no one ever hit Edmondson on the top of the head and that Edmondson had no head injury when he walked off. [119] ¶ 21; [105-16] at 5:15:18–17:31, 5:21:21–33, 5:27:27–28:31.

White also provided more details about the lead-up to the altercation. [125] ¶¶ 37–39; [105-16] at 5:17:41–25:50. White said he had just been dropped off and Cage, Washington, and Howard were all outside selling snow cones. [105-16] at 5:17:41–53. When White arrived, Edmondson "was already outside … on some angry shit;" White impersonated Edmonson's demeanor for the detectives by rocking back and forth, huffing and puffing angrily. *Id.* at 5:17:53–59. White said he tried to go talk to Edmondson to see if he was good, and Edmondson told him "I'm out of my mind," so White gave him some of his drink and a cigarette. *Id.* at 5:18:01–19. But White could tell that Edmondson was already high and aggravated, walking back and

forth, talking to himself, looking angry, and tying up his shoes tight. *Id.* at 5:18:26–36. Edmondson then approached the group and said something to Howard; after White told Edmondson not to start anything, Edmondson turned to White and White punched him and told him to calm down. *Id.* at 5:18:37–50. White said that he wasn't going to approach Edmondson because the last time he got his face scratched, so he was playing defense, not offense. *Id.* at 5:18:55–19:13.

Edmondson did walk away, but then approached again, called Howard a bitch, and wanted to fight him. [125] ¶ 38; [105-16] at 5:19:17–23. According to White, Howard had animosity toward Edmondson because Edmondson had tried to enter Washington's apartment when she was alone, calling himself the boogeyman. [125] ¶ 41; [105-16] at 5:23:45–24:19. Howard and Edmondson started fighting, neither landing any punches. [125] ¶ 38. White said that's when Washington ran up and hit Edmondson with a little stick in the chest, arm, and lip, and after that, Edmondson walked away and said he'd be right back but never returned. [125] ¶ 39; [105-15] at 5:26:01–21. Garcia informed White that Washington told detectives that she went inside with her children after White hit Edmondson; White said if Washington said that, it was a lie because the kids were already inside and Washington and Cage were outside the whole time. [125] ¶ 42; [105-16] at 5:29:30–59, 5:31:19–30.

White told detectives that he did not tell them Howard was the other person in the apartment because he didn't know him—Washington did—and he was not going to snitch on someone he did not know. [125] ¶ 40. White later told detectives that Howard was Washington's friend's boyfriend. *Id.* ¶ 41.

After Washington had been detained in the interview room for over 17 hours, she asked for an update on the case. [125] ¶ 30. She told Alonzo that she hit Edmondson in the lip and across his chest, and when he kept coming at her, Howard started fighting Edmondson. [125] ¶ 30; [105-15] at 17:14:55–15:09. She was adamant that she never hit him in the head and told Alonzo that he could ask Cage because she was right there next to Washington. [105-15] at 17:20:28–43.

### D.   Other Witness Interviews

On the morning of May 31, Alonzo and Balodimas returned to Washington's apartment to speak with Cage. [125] ¶ 31. Cage told the detectives that White and Edmondson started arguing in front of the building, that Edmondson was calling her a bitch, and that White punched Edmondson while the two were arguing. [125] ¶ 31; [105-17] at 19. Cage said that during the altercation between White and Edmondson, Washington approached with a pole in her hand and hit Edmondson with it several times. [125] ¶ 32; [105-17] at 19. Then, Cage continued, Howard began to fight with Edmondson in the middle of the street, landing some punches until Edmondson lightly fell back into a passing car and walked away towards Laramie. *Id*. She said Edmondson was bleeding from the mouth but appeared fine when he left. *Id*.; [119] ¶ 18.

Later that evening, Cook County Assistant State's Attorney Patrick Waller interviewed Beard, Hill, and Nelson at the station. [125] ¶ 43. Nelson said Edmondson walked up to him near Lake and Laramie, shirtless and bleeding from chest and right cheek area, and said that the men and women who lived downstairs

13

from him had attacked him with poles and pipes. [125] ¶¶ 44–45. According to Nelson, Edmondson then spoke to the others, walked away, and collapsed on the ground behind a dumpster. [125] ¶ 45. Beard told a similar story: Edmondson walked up to him, with cuts on his chest and lip, said that a couple of guys and a woman jumped him with a pole or a pipe; he then walked off and collapsed behind the dumpster. [125] ¶¶ 48–49; [105-21] at 3:50–4:15, 7:54–8:05, 9:21–59. Hill told Waller that Edmondson approached her and Beard with gashes on his lip and chest and told her that he had been jumped by two men and two women with a pole; Edmondson then walked behind the dumpster to go to the bathroom, and collapsed. [125] ¶¶ 46–47; [105-20] at 4:25–40, 5:13–25, 8:20–57.

Hill also said that she only looked at him from the front and did not see any leaking or dripping blood down his back. [119] ¶¶ 11–12; [105-20] at 6:36–44. Hill assumed Edmondson had fallen and hit his head when she saw him behind the dumpster after his collapse. [119] ¶ 12; [105-20] at 6:30–36. None of the three friends told detectives that they saw Edmondson bleeding from the top or back of his head.

### E. Assistant State's Attorney Interviews of White and Washington

A few hours later, just before 11 p.m. on May 31, Waller interviewed White. [125] ¶ 50. White told Waller that he was outside with Cage, Washington, and Howard. *Id*. When it started to rain, they all went inside, but Edmondson tried to force his way into Washington's apartment; that's when Washington grabbed a pole

from her child's feeding tube and showed it to Edmondson. *Id.* ¶¶ 50–51.[2] Edmondson backed away but started to yell and get into White's face, before White struck him. *Id.* ¶¶ 51–52. Howard then approached and started fighting with Edmondson in the street. [125] ¶ 52; [105-22] at 21. Washington went into the house and came out with a little gray aluminum stick, and hit Edmondson multiple times in the chest, arm, and lip. [125] ¶ 52; [105-22] at 21–22.

About half an hour after concluding his interview with White, Waller interviewed Washington. [125] ¶ 53. Washington told Waller that she was outside selling snow cones with Cage, White, Howard, and they were all drinking, but no one was drunk. *Id.* ¶¶ 54–55; [105-15] at 23:43:55–44:10, 23:48:02–12. According to Washington, after Edmondson approached and got in her face, she found a light metal pole with a ragged end on the ground and swung it at him three times. [125] ¶¶ 54–55. Washington said she struck Edmondson on the left side of his lip first and then on his chest after he jumped at her again, but the third swing missed because Edmondson jumped back. [125] ¶¶ 54–56. That was the end of the altercation, Washington said, and she went to the liquor store with Cage, White, and Howard. [125] ¶ 56.

Waller asked Washington about Howard's involvement; Washington said he and Edmondson only threw a few punches and then Edmondson left. [125] ¶ 57. Washington described the sequence of events as: first, White punched Edmondson

---

[2] Plaintiffs admit these facts but note that they come from a video statement log and not the video itself. But plaintiffs do not deny or controvert the facts cited therein.

once; then—after Edmondson continued to act disrespectful and jumped at Washington—she got the stick from the ground and swung it at him three times; finally, Howard and Edmondson fought in the street. [125] ¶ 58; [105-15] at 23:53:23–55:30. Waller asked Washington about White's statement to detectives that she went inside and brought out a pole; she said that was not true and the pole came from the ground outside. [125] ¶ 59. When asked about whether she, Cage, Howard, and White were discussing the altercation in the apartment later that night, Washington told Waller that she couldn't remember specifics but said everybody was talking loud about what had happened. [105-15] at 23:56:44–57:30.

When Waller confronted Washington about her earlier statement to detectives about Howard striking Edmondson in the head with the pole, Washington responded that she was talking fast and was scared and nervous. [125] ¶ 60. Washington said that she did not mean to say Howard hit him with the pole. *Id.* Howard "was hitting him with his fists," Washington said, "that's why I said I don't see how his head got bust[ed]." *Id.*; [105-15] at 24:00:41–01:03. Washington repeatedly insisted that she never hit Edmondson in the head. [105-15] at 24:01:03–4:50.

### F. Edmondson's Autopsy

Dr. Kristin Howell performed Edmondson's autopsy at 7:45 a.m. on May 31. [125] ¶ 61. She concluded that the cause of death was blunt force trauma to the head. *Id.*; [119] ¶ 17. The autopsy revealed a cross-shaped 1.25-inch by .75-inch laceration on the top, back, right side of Edmondson's head, a hole in his skull that was about 1-inch by 1-inch, and fragments of bone within the brain. [125] ¶ 62; [114-30] at 3–4.

Other injuries included lacerations and contusions to Edmondson's left lip, an abrasion to his left ear, a laceration to the center of his chest, and multiple contusions on both arms. [125] ¶ 63.

Howell also concluded that Edmondson's death was a homicide. [114-30] at 8. She based her conclusion on the medical examiner investigator's report of assault and her own examination of Edmondson's injuries, which were consistent with an assault. [125] ¶¶ 61, 63; [119] ¶ 17; [105-24] at 110:14–111:6. The investigator's report falsely stated that Nelson witnessed Edmondson getting beat by three Black men and two Black women with pipes in their hands. [119] ¶¶ 14, 17; [114-27].[3] Howell clarified, however, that regardless of the investigator's narrative, she performed an independent autopsy and reached her own conclusion as to the cause and manner of death. [105-24] at 37:1–38:3, 40:4–8. Howell stated that her findings were consistent with an assault and injury with a pipe. [105-24] at 38:4–7. Howell spoke with Alonzo about the results of her autopsy. [125] ¶ 65; [119] ¶ 35.

### G. Charges and State-Court Proceedings

Waller designated the investigation as continuing and advised another ASA, Laura Ayala-Gonzalez, of all the information he had learned during his investigation. [125] ¶ 67.[4] Washington provided consent to search her apartment to locate the pole

---

[3] The investigator, Lawrence Santoro, said he listened to Nelson speak with an unidentified detective and mistakenly and incorrectly wrote in his report that Nelson witnessed the altercation. [114-29] at 30:2–33:19, 42:22–43:05, 52:22–53:24.

[4] Plaintiffs say that Ayala-Gonzalez testified that she was not given any materials to review before approving felony charges, and Waller admitted that he did not review the videos of the interviews he conducted with Nelson, Hill, Beard, or Washington. But plaintiffs have offered

she used on Edmondson. *Id.* ¶ 68. At the apartment, Alonzo and Balodimas recovered four silver metal poles that appeared to be approximately one inch in diameter; evidence technicians collected the poles and submitted them to the Illinois State Police crime lab for processing. *Id.* One of the poles tested positive for Edmondson's DNA. *Id.* ¶ 69.

On June 1, Ayala-Gonzalez approved the decision to charge Washington with first-degree murder. *Id.* ¶¶ 70–71. The felony minutes form—created and signed by Alonzo for use in a probable-cause detention hearing and approved by Ayala-Gonzalez—stated: "The facts briefly stated are as follows: The defendant, Washington, was arrested after investigation determined that the victim Kim Edmondson was struck on and about the head with a metal object several times by Washington. The victim Edmondson subsequently expired due to the injuries received." [114-34] at 2; [119] ¶ 29. Alonzo spoke with Ayala-Gonzalez when she approved the charges for Washington and rejected charges for White. [119] ¶ 35. The next day, a Cook County judge found probable cause to detain Washington. [125] ¶ 73. Howard was taken into custody on June 4, Ayala-Gonzalez approved the murder charge against him on June 6, and a Cook County judge found probable cause to detain him on June 7. *Id.* ¶¶ 72–73.

Later that month, the State's Attorney's Office presented the charges of first-degree murder and felony mob action against plaintiffs to a grand jury. *Id.* ¶ 74.

---

no evidence to dispute the asserted fact: that Waller spoke with Ayala-Gonzalez and informed her of everything he'd learned about the investigation up to that point. [125] ¶¶ 67, 70.

Nelson, Beard, and Hill testified consistent with the information they had provided the detectives and Waller. *Id.*; [105-5]; [105-31]; [105-32]. Cage also testified before the grand jury and stated that her testimony was consistent with the information she had previously provided to Alonzo. [125] ¶¶ 75–76; [105-33]. Specifically, she testified that after White stopped fighting with Edmondson, Washington retrieved a little pole from her apartment, went after Edmondson with it, and hit him twice. [125] ¶ 75; [105-33] at 7:1–8:21. Then, Cage said, Howard got into an altercation with Edmondson in the street; the two were hitting each other and Howard hit Edmondson a couple of times before Edmondson hit a truck and walked off. [125] ¶¶ 75–76. Alonzo also testified before the grand jury about the investigation into Edmondson's death. *Id.* ¶ 77. No other defendant testified in the grand jury proceedings. *Id.* ¶ 78. On June 28, the grand jury indicted Washington and Howard on both counts. *Id.* ¶ 77.

In November 2019, after a one-day bench trial, a Cook County judge found Washington and Howard not guilty of all charges. [119] ¶ 40. Washington and Howard filed this suit in January 2020, bringing claims against Alonzo, Balodimas, and Garcia for false arrest and unlawful detention under the Fourth Amendment and 42 U.S.C. § 1983 (Count I), and for malicious prosecution under Illinois law (Count II). [1]; [125] ¶¶ 1–2.[5] Plaintiffs also brought claims against the City of Chicago for indemnification and under the doctrine of respondeat superior (Counts IV & V). *Id.* Defendants now move for summary judgment.

---

[5] Defendants note that plaintiffs agreed to drop their intentional infliction of emotional distress claim (Count III), which plaintiffs do not contest. [110] at 8 n.1. Accordingly, defendants are entitled to summary judgment on this claim.

### III.  Analysis

Section 1983 authorizes suits against police officers who violate constitutional rights while acting under color of state law. *See* 42 U.S.C. § 1983. The constitutional right at issue here is the Fourth Amendment's ban on unreasonable seizures. *See* U.S. Const. amend. IV. A plaintiff may recover damages for Fourth Amendment violations based on arrests that lack probable cause at the outset, and for ensuing pretrial detention without probable cause. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 918–19 (2017); *Mitchell v. Doherty*, 37 F.4th 1277, 1283–86 (7th Cir. 2022). To prevail on a malicious-prosecution claim under Illinois law, plaintiffs must show that: "(1) [they were] subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff[s'] favor; and (5) there was an injury." *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018) (citation omitted).

Wrongful pretrial detention and malicious prosecution are distinct claims, but the existence of probable cause is a complete defense to both. *See Farnik v. City of Chicago*, 1 F.4th 535, 545 (7th Cir. 2021) (citation omitted); *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015); *see also Norris v. Serrato*, 761 Fed. App'x 612, 615 (7th Cir. 2019) ("[P]robable cause is an absolute defense to claims under section 1983 against police officers for an allegedly unreasonable seizure, whether a false arrest or a wrongful pretrial detention."). Here, defendants contend that they are entitled to summary judgment because the undisputed material facts demonstrate that they possessed probable cause to arrest and detain plaintiffs.

20

Probable cause "is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)). The standard is an objective one; a seizure "is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *District of Columbia v. Wesby*, 138 S. Ct. 577, 584 n.2 (2018); *see also Sroga v. Weiglen*, 649 F.3d 604, 608 (7th Cir. 2011) ("The existence of probable cause to arrest a suspect for any offense, even one that was not identified by the officers on the scene or in the charging documents, will defeat a Fourth Amendment false-arrest claim."). Accordingly, an officer's subjective beliefs and motivations are immaterial to whether probable cause exists. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014).

An officer's belief need not be "correct or even more likely true than false, so long as it is reasonable." *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022) (citation omitted). As such, an acquittal does not, without more, undermine the constitutionality of the seizure that preceded it. *See Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest."). Instead, an officer has probable cause to seize a person "when, given the totality of the circumstances, a reasonable officer would believe that the suspect had committed a

crime." *Cibulka v. City of Madison*, 992 F.3d 633, 638 (7th Cir. 2021) (citation and quotation marks omitted).

Further, when a court has already determined that probable cause exists to arrest or detain a person, that finding "is normally entitled to a presumption of validity." *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019). The presumption may be rebutted, however, if an officer "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officer's determination that probable cause existed for the arrest." *Id.* (citation omitted). Similarly, a grand jury's indictment is prima facie evidence of probable cause. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019); *Bontkowski v. United States*, 28 F.3d 36, 37 (7th Cir. 1994) (citing *Freides v. Sani–Mode Mfg. Co.*, 33 Ill.2d 291, 296 (1964)). But the presumption "may be rebutted by evidence that law enforcement obtained the indictment through improper or fraudulent means." *Coleman*, 925 F.3d at 351 (citations omitted).

Here, plaintiffs argue that defendants created a false and misleading narrative that hijacked the investigation and caused their unlawful detention. That narrative consists of two things: (1) Alonzo writing in the felony minutes form that Washington struck Edmondson "on and about the head" and (2) Balodimas's claim that he heard, from outside Washington's apartment, a man and a woman inside the apartment discussing an altercation and a victim getting "what he deserved." Plaintiffs say Alonzo's characterization was false because he knew that Washington struck

Edmondson on the lip or mouth area, but no witness told him (or any defendant) that Washington hit Edmondson on the top or back of his head. And plaintiffs say Balodimas made up the conversation between the man and woman in the apartment.

According to plaintiffs, moreover, Alonzo's deceptive spin drove the entire investigation and prosecution. Plaintiffs assert that defendants' "collection of 'evidence,' which was then presented to subsequent decision makers—ASAs, Judges, etc.—was so materially flawed and rife with false, incriminating facts that nobody downstream of the Defendant Officers could *ever* make a fair appraisal of the cases against [Washington] and [Howard]." [113] at 23. As proof, plaintiffs argue that the prosecutors "parroted" false statements from Alonzo and Balodimas to the judge at their probable-cause hearings. But probable cause did not exist, plaintiffs say, because the hearing and the grand jury proceedings were irreversibly tainted by defendants' manipulation of the facts. [113] at 20.

The problem for plaintiffs is that they must show not only that defendants provided false information to prosecutors or judicial officers, but also that their "seizure[s] would lack probable cause without that false evidence." *Ramos v. City of Chicago*, 716 F.3d 1013, 1019 (7th Cir. 2013). Here, after excising both Alonzo's and Balodimas's allegedly false statements, the undisputed facts still demonstrate that defendants had probable cause to detain plaintiffs. No reasonable jury could conclude otherwise.

Start with the offenses of mob action and first-degree murder—the charges brought by prosecutors and on which the grand jury indicted plaintiffs. Illinois's mob-

action statute makes it a felony for a person to engage in "the knowing or reckless use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law." 720 ILCS 5/25-1(a)(1); *People v. Davison*, 236 Ill.2d 232, 242 (2010). In other words, the statute prohibits a person from acting as "part of a group engaged in physical aggression reasonably capable of inspiring fear of injury or harm." *In re B.C.*, 176 Ill.2d 536, 549 (1997) (citing *People v. Simpkins*, 48 Ill.2d 106, 109 (1971)). Illinois's felony-murder rule subjects an offender to a first-degree murder charge if another person is killed during or in furtherance of the offender's commission of a forcible felony. *See* 720 ILCS 5/9-1(a)(3). Felony mob action can serve as a predicate offense underlying a felony-murder charge. *Davison*, 236 Ill. 2d at 243–44; *People v. Davis*, 213 Ill.2d 459, 474–75 (2004). Illinois courts have upheld felony-murder convictions predicated on a defendant's participation in fatal group attacks on a victim, moreover, even when there was no clear evidence that the defendant caused the fatal injuries. *See Davison*, 236 Ill.2d at 243 (citing *Davis*, 213 Ill.2d at 475 and *People v. Viser*, 62 Ill.2d 568 (1975)).

The undisputed facts demonstrate that, at the time of plaintiffs' arrests and detention, defendants possessed probable cause to believe that plaintiffs had acted as part of a group that engaged in violence against Edmondson. The defendant detectives spoke with six witnesses who all corroborated that Edmondson was in a violent quarrel with multiple people just before his death. Edmondson's three friends each reported that Edmondson told them he'd been jumped by two men and one or two women just before he arrived at Lake and Laramie. Officers knew that

Edmondson died of blunt force trauma to the head. Defendants also knew that Washington and Howard had violent altercations with Edmondson shortly before his death because Washington told them as much. Washington, as well as White and Cage, told defendants that Washington hit Edmondson with a metal pole multiple times, including in the face. Washington and Cage reported that Howard fought with Edmondson in the street, and Washington said that Howard hit Edmondson in the back of the head twice with the pole (although she later recanted this part when speaking with Waller). It was reasonable, given these facts, for defendants to believe that plaintiffs had engaged in criminal conduct.

Plaintiffs contend that defendants lacked probable cause to arrest on the mob action charge because there was no evidence that they acted in concert with one another. For support, plaintiffs rely on *People v. Kent*, 2016 IL App (2d) 140340, where an Illinois appellate court vacated a defendant's conviction based on lack of "evidence of a common purpose to disturb the public peace." *Id*. ¶ 25. But while a conviction under the mob-action statute requires evidence of a common purpose, at the probable-cause stage, police officers are not required "to act as a judge or jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute." *Stokes v. Bd. Of Educ. Of the City of Chicago*, 599 F.3d 617, 622–23 (7th Cir. 2010). The facts known to defendants reasonably suggested that plaintiffs (and White) were part of a group engaged in physical violence against Edmondson. That was enough to support the arrest and detention of plaintiffs while prosecutors weighed specific charges. And as defendants point out, the State's Attorney amended

plaintiffs' criminal complaints at their detention hearings to seek felony-murder charges. [124] at 10 n.2; [114-35] at 9:20–10:19; [114-37] at 3:16–20. Plaintiffs' have supplied no evidence to suggest that any defendant was responsible for the decision to charge plaintiffs with mob action and felony murder, even as probable cause existed to detain plaintiffs on both charges.

In addition—as defendants point out and plaintiffs do not contest—the facts known to defendants supplied probable cause to arrest Washington and Howard for other crimes under the Illinois code. Based on interviews with Washington and the other witnesses, the officers had probable cause to believe Washington and Howard had committed battery (720 ILCS 5/12–3), aggravated battery (720 ILCS 5/12-3.05), and disorderly conduct (720 ILCS 5/26–1), to name a few. And after Washington told detectives that Howard hit Edmondson in the head with a pole, officers had probable cause to arrest him too. Further, after defendants learned Howard's true identity from Washington and White, they possessed probable cause to believe Howard had committed obstruction by providing a false name. *See* 720 ILCS 5/31–4(a)("A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he or she knowingly … furnishes false information."); *People v. Remias*, 169 Ill.App.3d 309, 310–12 (3rd Dist. 1988) (upholding defendant's conviction under obstruction statute for providing false name to police officer during traffic stop).

Plaintiffs also argue that defendants knew of other evidence that weighed against a probable-cause finding. In particular, plaintiffs emphasize that no witness

ever told defendants that either plaintiff hit Edmondson in the back of the head or reported seeing an injury to the back of his head. Witnesses also told defendants that Edmondson was the aggressor in the altercation and that he seemed fine when he left. Further, street surveillance videos showed Edmondson walking normally along Laramie after the altercation and did not clearly show him bleeding from the back of his head; there was no trail of blood along Edmondson's path between Washington's apartment and Lake and Laramie; and Washington was much smaller than Edmondson. *See* [113] at 22, 26.

But "police often encounter competing and inconsistent stories," and so long as officers have probable cause to believe any crime has been committed, "[t]he Constitution permits them to initiate the criminal process and leave the sifting of competing claims and inferences to detectives, prosecutors, judges, and juries in the criminal prosecution." *Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006). When faced with conflicting and incomplete evidence, officers are not required to "use the rules for summary judgment and draw inferences in favor of the suspects." *Coleman*, 925 F.3d at 351 (quoting *Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir. 2013)). Even when presented with information that may be inaccurate, officers are entitled to act "and let the courts determine whether to credit a suspect's claim of innocence." *Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006).

Here, defendants had statements from three witnesses at the scene of Edmondson's death and three witnesses—including Washington herself—to the earlier altercation with Edmondson. All of those stories corroborated, in one way or

27

another, the fact that Edmondson had been in a violent altercation shortly before his death. No reasonable jury could conclude that such evidence—when paired with Washington's admission that she struck Edmondson with a metal pole multiple times—did not give rise to probable cause to believe Washington had committed a crime. Defendants were not required to accept as true Washington's claims of innocence nor her subsequent recantation regarding Howard hitting Edmondson in the head with a pole. *See Hurem v. Tavares*, 793 F.3d 742, 746 (7th Cir. 2015); *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999) ("Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established."). In short, Washington's "ability to explain away seemingly damning facts [did] not negate the existence of probable cause, even though it might [have] provide[d] a good defense should the case go to trial." *Sroga*, 649 F.3d at 608 (citation omitted).[6]

Moreover, plaintiffs have failed to provide evidence to rebut the probable-cause determinations of the judge at their detention hearings and of the grand jury. A judge found probable cause to detain Washington on June 2 and Howard on June 7. [114-35], [114-37]. In both hearings, an Assistant State's Attorney summarized the evidence against plaintiffs; none of the defendants spoke at the hearings. Plaintiffs have failed to show that any defendant made any statement to a judge—let alone a

---

[6] Howard advances no argument regarding how any allegedly false statements from Alonzo or Balodimas caused his detention. In fact, the prosecutor told judge at the detention hearing that Howard struck Edmondson only with his fists. [114-37] at 4:17–18. Neither that judge nor the grand jury were ever told that Howard used a weapon, or that Howard made the statements Balodimas allegedly heard from inside Washington's apartment.

28

false one—that was necessary to the judge's determination that probable cause existed to detain plaintiffs. *See Lewis*, 914 F.3d at 477.

There is also no evidence that defendants "obtained the indictment through improper or fraudulent means." *Coleman*, 925 F.3d at 351 (citation omitted). In Illinois, the State's Attorney prosecutes crimes, not the police. *See Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017) (quoting *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)). To rebut the presumptive probable cause of an indictment, plaintiffs must show some post-arrest action that "influenced the prosecutor's decision to indict." *Colbert*, 851 F.3d at 655 (quoting *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 902 (7th Cir. 2001)). There is no evidence that any defendant duped the State's Attorney into seeking pretrial detention or pursuing grand-jury indictments.

In fact, the record demonstrates the opposite. From the earliest stages of the investigation—before signing off on any charging decision—the State's Attorney's Office conducted its own investigation. Assistant State's Attorney Waller interviewed Washington, White, Nelson, Beard, and Hill, and the State's Attorney's Office knew from those interviews that no one claimed that Washington hit Edmondson on the top or back of his head or reported seeing Edmondson bleeding from the top or back of his head before his collapse. The prosecutor had access to the medical examiner and all the relevant witnesses and underlying source material. Waller also knew that Washington had gone back on her story about Howard hitting Edmondson in the head with a pole (because Washington told Waller this). And Waller informed Assistant

29

State's Attorney Ayala-Gonzalez of all the information he had learned from the investigation before she approved charges against Washington and Howard. Plaintiffs' assertions that defendants withheld evidence, or somehow compromised the State's Attorney's independent charging decision, find no support in the record. The only reasonable conclusion to be drawn from the undisputed evidence is that the State's Attorney maintained control over plaintiffs' prosecution.

To the extent that plaintiffs attempt to use Alonzo's grand jury testimony against him, he is absolutely immune from liability based on his grand jury testimony.[7] *See Rehberg v. Paulk*, 566 U.S. 356, 369 (2012) (grand jury witness "has absolute immunity from any § 1983 claim based on the witness' testimony" and "rule may not be circumvented by … using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution"). In addition, his testimony was not false. When asked whether his investigation revealed that Washington had struck Edmondson "with a metal pole about the head and body," Alonzo replied "yes." [105-34] at 5:12–16. Alonzo provided an accurate answer to an imprecise question about the general vicinity of where Washington struck Edmondson. And in any event, his testimony before the grand jury did not supplant the State's Attorney's role in initiating plaintiffs' prosecution. *See Rehberg*, 566 U.S. at 371 ("It would thus be anomalous to permit a police officer who testifies before a grand jury to be sued for maliciously procuring an unjust prosecution when

---

[7] Plaintiffs say that Alonzo was the only witness to testify before the grand jury, but Cage, Nelson, Beard, and Hill all testified before the same grand jury (No. 248) as Alonzo (just on different days). *See* [105-5], [105-31], [105-32], [105-33], [105-34].

it is the prosecutor, who is shielded by absolute immunity, who is actually responsible for the decision to prosecute.").[8]

On a final note, defendants argue that they are at least entitled to qualified immunity. Because no reasonable juror could find that defendants lacked actual probable cause to arrest and detain Washington and Howard, I need not reach defendants' qualified immunity arguments. Suffice it to say, any officer who possessed actual probable cause also had arguable probable cause.

## V.    Conclusion

Defendants' motion for summary judgment, [107], is granted. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  July 22, 2022

---

[8] Balodimas did not testify before the grand jury and no witness testified about any purported conversation within Washington's apartment. The issue did not come up before the grand jury and could not have influenced its decision to return an indictment against plaintiffs.